UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____x
D. JOSEPH KURTZ, Individually and on
Behalf of All Others Similarly Situated,                          **MEMORANDUM & ORDER**
                                                                 **CERTIFYING CLASS ACTIONS**

                                                                 **14-CV-1142**

                                    Plaintiff,

              -against-

KIMBERLY-CLARK CORPORATION &
COSTCO WHOLESALE CORPORATION,

                                    Defendants.
_____x
ANTHONY BELFIORE, Individually and on
Behalf of All Others Similarly Situated,

                                    Plaintiff,              **14-CV-4090**

              -against-

THE PROCTER & GAMBLE COMPANY,

                                    Defendant.
_____x
DESMOND R. ARMSTRONG, Individually and on
Behalf of All Others Similarly Situated,

                                    Plaintiff,              **15-CV-2909**

              -against-

COSTCO WHOLESALE CORPORATION &
NICE-PAK PRODUCTS, INC.,

                                    Defendants.
_____x

_____x
GLADYS HONIGMAN, Individually and on
Behalf of All Others Similarly Situated,

                    Plaintiff,                **15-CV-2910**

       -against-

KIMBERLY-CLARK CORPORATION,

                    Defendant.
_____x
STEVEN and ELLEN PALMER, Individually and on
Behalf of All Others Similarly Situated,

                    Plaintiffs,             **15-CV-2928**

       -against-

CVS HEALTH &
NICE-PAK PRODUCTS, INC.,

                    Defendants.
_____x
EUGENE and VICTORIA RICHARD, Individually and on
Behalf of All Others Similarly Situated,

                    Plaintiff,                **15-CV-4579**

       -against-

WAL-MART STORES, INC. & ROCKLINE INDUSTRIES,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**APPEARANCES**

**Anthony Belfiore:**                  **Lester L. Levy**
                                        **Michele Fried Raphael**
                                        **Roy Herrera**
                                        **Sean Michael Zaroogian**
                                        **Matthew Insley-Pruitt**
                                        **Robert Scott Plosky**
                                        Wolf Popper LLP
                                        845 Third Avenue

|  | 12th Floor<br>New York, NY 10022 |
|---|---|
| **D. Joseph Kurtz:** | **Samuel H. Rudman**<br>**Mark S. Reich**<br>Robbins Geller Rudman & Dowd LLP<br>58 South Service Road<br>Suite 200<br>Melville, NY 11747 |

**Mark J. Dearman**
**Stuart A. Davidson**
Robbins Geller Rudman & Dowd LLP
120 East Palmetto Park Road
Suite 500
Boca Raton, FL 33432

**Desmond R. Armstrong:**     **Mark S. Reich**
Robbins Geller Rudman & Dowd, LLP
58 South Service Road
Suite 200
Melville, NY 11747

**Gladys Honigman:**     **Mark S. Reich**
Robbins Geller Rudman & Dowd, LLP
58 South Service Road
Suite 200
Melville, NY 11747

**Steven and Ellen Palmer:**     **Samuel H. Rudman**
**Mark S. Reich**
Robbins Geller Rudman & Dowd LLP
58 South Service Road
Suite 200
Melville, NY 11747

**The Procter and Gamble Company:**     **Emily Henn**
Covington & Burling LLP
333 Twin Dolphin Drive
Suite 700
Redwood Shores, CA 94065

**Claire Catalano Dean**
Covington & Burling LLP
850 Tenth Street NW
Washington, DC 20001

**Cortlin Lannin**
**Sonya Winner**
Covington & Burling LLP
One Front Street
San Francisco, CA 94111

**Kimberly-Clark Corporation**:

**Eamon Paul Joyce**
Sidley Austin LLP
787 Seventh Ave
New York, NY 10019

**Daniel A. Spira**
**Kara L. McCall**
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603

**Costco Wholesale Corporation:**

**James M. Bergin**
**Adam James Hunt**
**Kayvan Betteridge Sadeghi**
Morrison & Foerster
250 West 55th Street
New York, NY 10019

**Eamon Paul Joyce**
Sidley Austin LLP
787 Seventh Ave
New York, NY 10019

**Nice-Pak Products, Inc.:**

**James M. Bergin**
Morrison & Foerster
250 West 55th Street
New York, NY 10019

**CVS Pharmacy, Inc.:**

**James M. Bergin**
Morrison & Foerster
250 West 55th Street
New York, NY 10019

JACK B. WEINSTEIN, Senior United States District Judge:

## Table of Contents

I.   Introduction ................................................................................................................ 3

   A.   General Theory ...................................................................................................... 4

   B.   Original Cases ....................................................................................................... 6

II.   Procedural Background ............................................................................................ 12

   A.   Overview of Cases ............................................................................................... 12

   B.   Motion to Dismiss for Lack of Standing Denied in *Belfiore* Action ........................... 14

   C.   Motions for Class Certification in the *Belfiore* and *Kurtz* Actions .............................. 15

   D.   Preliminary Rulings on Class Certification in *Belfiore* Action.................................... 16

      1.   Injunctive Class ........................................................................................... 18

      2.   Damages Class ............................................................................................. 19

   E.   Stay and FTC Referral ......................................................................................... 24

   F.   Motion to Reconsider Denied in *Belfiore* Action.................................................... 25

   G.   Final FTC Consent Order with Nice-Pak ............................................................. 26

   H.   Motion to Lift Stay Denied in *Kurtz* Action ......................................................... 27

   I.   Continued Urging of Settlement Discussions ...................................................... 28

   J.   Aggregate Agency Adjudication .......................................................................... 29

   K.   Conclusion of FTC Investigation of Kimberly-Clark........................................... 29

   L.   *Belfiore* Update Letter and Request for Conference .............................................. 30

   M.   Request for Briefing on Lifting of Stay ............................................................... 32

   N.   Continued Encouragement to Aggregate and Settle ........................................... 32

   O.   Instant Motion Practice........................................................................................ 33

III.   Deciding Class Certification Prior to Deciding Summary Judgment ...................... 34

IV.   Facts ........................................................................................................................ 36

   A.   Plaintiff Belfiore ................................................................................................. 36

   B.   Plaintiff Kurtz ..................................................................................................... 37

   C.   Procter & Gamble's Charmin Freshmates............................................................ 39

   D.   Kimberly-Clark's Flushable Wipes...................................................................... 42

    E.   Costco's Kirkland Signature Moist Flushable Wipes ................................................ 48

V.   Definitions of "Flushability" ................................................................................ 55

    A.   According to the FTC ................................................................................ 55

    B.   According to the Plaintiffs ................................................................................ 55

    C.   According to Plaintiffs' Experts ................................................................................ 56

    D.   According to Plaintiffs' Counsel ................................................................................ 57

    E.   According to Defendants' Experts ................................................................................ 57

    F.   According to Defendants' Counsel ................................................................................ 58

    G.   According to Defendants' Labeling Practices ................................................................................ 60

    H.   According to Dictionaries ................................................................................ 61

    I.   Lack of Consumer Surveys ................................................................................ 61

VI.   Expert Reports ................................................................................ 62

    A.   Plaintiffs' Expert: Colin B. Weir ................................................................................ 62

    B.   Procter & Gamble's Expert: Carol A. Scott, Ph.D. ................................................................................ 64

    C.   Costco's Expert: Denise N. Martin, Ph.D. ................................................................................ 65

    D.   Kimberly-Clark's Expert: Keith R. Ugone, Ph.D. ................................................................................ 66

VII.   New York Law ................................................................................ 66

    A.   New York General Business Law §§ 349 and 350 ................................................................................ 67

    B.   Common Law Claims ................................................................................ 69

        1.   Negligent Misrepresentation ................................................................................ 69

        2.   Breach of Express Warranty ................................................................................ 70

        3.   Unjust Enrichment ................................................................................ 70

VIII.   Class Certification in *Kurtz* and *Belfiore* ................................................................................ 70

    A.   Rule 23(a)(1): Numerosity ................................................................................ 74

    B.   Rule 23(a)(2): Commonality ................................................................................ 76

    C.   Rule 23(a)(3): Typicality ................................................................................ 82

        1.   Typicality in *Belfiore* ................................................................................ 84

        2.   Typicality in *Kurtz* ................................................................................ 85

    D.   Rule 23(a)(4): Adequacy of Representation ................................................................................ 89

        1.   Adequacy in *Belfiore* ................................................................................ 90

        2.   Adequacy in *Kurtz* ................................................................................ 91

E.    Implied Requirement of Ascertainability ........................................................ 94

F.    Rule 23(b) Factors .............................................................................................. 98

    1.    Rule 23(b)(2) Injunctive Relief ................................................................. 98

    2.    Rule 23(b)(3) Damages ............................................................................. 114

IX.    Appointment of Class Counsel ............................................................................. 129

X.    Conclusion ............................................................................................................. 129

## I.    Introduction

In a number of class actions, consumers sue vendors and manufacturers of "flushable toilet wipes."  Purchasers contend that the products are not flushable—they clog household plumbing.

From the beginning of this litigation it was clear that some form of consolidation of consumer complaint (as well as those of municipalities, if possible) was desirable.  *See* Letter to Judges Phyllis Hamilton, Donald C. Nugent, and Leonard D. Wexler, 14-CV-1142, Sept. 11, 2014, ECF No. 39; Letter to Judge Robert L. Hinkle, 14-CV-1142, Feb. 18, 2015, ECF No. 77.  Thus far, a constellation of class actions has appeared: suits by consumers' lawyers have proliferated; dug in defenses by producers and sellers have slowed disposition; and failure by the courts and an administrative agency to apply mass tort solutions have left an unresolved, fractured litigation.

In the most recent round of briefing, the parties have directed attention to what they consider the most critical point in the litigation: the motions for class certification made in cases brought by New York purchasers D. Joseph Kurtz (14-CV-1142) and Anthony Belfiore (14-CV-4090).    In the present memorandum and order, the court grants, in part, the motions for class certification in these two cases.  The other actions have been stayed, transferred or dismissed, and in *Kurtz*, slimmed down to include only New York purchasers and law.  *See Palmer v. CVS-Health & Nice-Pak Prod, Inc.*, 2017 WL 656767 (E.D.N.Y. Feb. 17, 2017) (transferring action to the District of Maryland); *Armstrong v. Costco Wholesale Corp. & Nice-Pak Prod., Inc.*, 2017 WL

656768 (E.D.N.Y. Feb. 17, 2017) (transferring action to the District of Oregon); *Kurtz v. Kimberly-Clark Corp.*, 2017 WL 751231 (E.D.N.Y. Feb. 27, 2017) (severing and transferring New Jersey-based claims, denying certification of a nationwide class, and staying *Honigman & Kurtz v. Kimberly–Clark*, 15-CV-2910); *Richard & Richard v. Wal–Mart Stores, Inc. & Rockline Indus.*, Order Dismissing Case with Prejudice, 15-CV-4579, Jan. 19, 2017, ECF No. 95 (dismissing New Hampshire case with prejudice on consent). *Kurtz* and *Belfiore* are now New York consumer class actions.

### A.    General Theory

Six separate but related consumer class actions were before the court. They were brought by consumers who purchased moist toilet wipes sold by retailer defendants, produced by manufacturer defendants, and marked "flushable." Alleged in all the cases are defects in labeling. Consumers seek money damages and injunctive relief against manufacturers and retailers of these moist wipes, which are labeled and advertised as "flushable" but alleged not to be "flushable." *See Kurtz v. Kimberly-Clark Corp., Costco Wholesale Corp.*, No. 14-CV-1142 ("*Kurtz* action") (relying on New Jersey and New York law); *Armstrong & Kurtz v. Costco Wholesale Corp. & Nice-Pak Prods., Inc.*, 15-CV-2909 ("*Armstrong* action") (relying on Oregon law); *Palmer & Palmer v. CVS Health & Nice-Pak Prods., Inc.*, 15-CV-2928 ("*Palmer* action") (relying on Maryland law); *Honigman v. Kimberly-Clark*, 15-CV-2910 ("*Honigman* action") (relying on New York law); *Belfiore v. Procter & Gamble Co.*, 14-CV-4090 ("*Belfiore* action") (relying on New York law); *Richard & Richard v. Wal-Mart Stores, Inc. & Rockline Industries*, 15-CV-4579 ("*Richard* action") (relying on New Hampshire law).

In dealing with the kind of multiple-plaintiff versus multiple-defendant national consumer problems presented in the instant federal litigation, there are a number of ways to proceed. The

goal is to achieve a single decision by a single court or administrative agency—preferably through a global settlement—that fairly decides all pending disputes, forestalls future similar disputes, and protects both consumers and suppliers.  The American civil adjudicative system provides a number of flexible tools to achieve such a resolution.  The memorandum issued by the court on November 18, 2016 explains these tools in detail.  *See Kurtz v. Kimberly-Clark Corp.*, 2016 WL 6820405 (E.D.N.Y. Nov. 18, 2016).  The parties, contrary to the court's urging, have chosen to proceed independently and to litigate a dispute which could have been readily settled to the benefit of all parties and the public by relatively minor changes in labeling.

This court was faced with six individual class actions, while keeping its eye on related cases in other venues.  *See, e.g.*, *City of Perry, Iowa v. Procter & Gamble Co.*, 188 F. Supp. 3d 276 (S.D.N.Y. 2016) (a municipal waste disposal case); *Meta v. Target Corp.*, 2016 WL 5076089 (N.D. Ohio Sept. 20, 2016) (consumer case); *Belfiore v. Procter & Gamble Co.*, 311 F.R.D. 29, 43-45 (E.D.N.Y. 2015), *reconsideration denied*, 140 F. Supp. 3d 241 (E.D.N.Y. 2015) (listing pending "flushable" wipes litigations brought by consumers and municipalities in other jurisdictions); Scheduling Order, 14-CV-4090, Oct. 13, 2016, ECF No. 209 at 3 (requiring the parties to "notify the court of any similar cases they are aware of involving flushable wipes' efficacy and dangers pending in any court or administrative agency, whether consumer or municipality oriented, in the United States or abroad").

Individual class case adjudication state by state is not satisfactory.  Nevertheless, the plaintiffs have chosen this route—unchallenged by defendants—and the court is compelled to follow the parties' choice.  It is certifying New York class actions in *Kurtz* and *Belfiore* and has transferred, stayed, or dismissed the other actions.

B.    Original Cases

Consumers in all six cases claimed they paid a premium for what are known as "flushable wipes"—moist towelettes intended for use in place of, or in addition to, toilet paper—that are not flushable and clog household toilet facilities.  While in some cases consumers seek damages for impairment by clogging of household human waste systems (leading into municipal sewers or private cesspools), the central injury claimed is payment of an unjustified premium for a product that was misrepresented as "flushable."  *See, e.g.*, *Belfiore* 311 F.R.D. at 64 ("The injury is the payment of an inflated price, not the clog.  What happened after [the individual plaintiff's] purchase, as a result of his sewage disposal system or the condition of his pipes, is irrelevant to the class's premium price theory.").  Damages for impairment of cesspools or household sewage systems or municipal systems by clogging or otherwise is not covered by the class certifications since they are either not before the court or are too variable and individual to be covered in a class action.

These are putative class actions by consumers and householders only.  It might have been contended that consumers have standing not only to pursue their own claims, but also to advance municipal claims as taxpayers because clogging at sewage plants ultimately puts in danger the system to which their household disposal systems are connected.  Arguably, this would provide householders with an interest in the whole municipal operating system for disposing of toilet waste.  But such municipal-based claims have not been advanced by plaintiffs.  The instant consumer cases are distinguished from cases claiming clogging of municipal sewage systems and their machinery. *See e.g.*, *City of Perry*, 188 F. Supp. 3d.

The "flushable" industry has sales in the billion dollar range. It includes many manufacturers and retailers, different designs, and a variety of brands.  It depends on convincing

consumers that they will get the added comfort from "moist" wipes without fear that, because the fabric is stronger and less likely than toilet paper to break up quickly when flushed, the toilet will clog.

Factual and scientific hearings were conducted jointly by the court and magistrate judge to help determine how these cases should be administered. Extensive scientific testimony and demonstrations were introduced, showing advantages of the products and potential difficulties and concerns relied upon by the plaintiffs; enough evidence was produced to warrant consideration of certification issues. *See, e.g.*, Science Day Part I Hr'g Tr., 14-CV-1142, 14-CV-4090, June 19, 2015 ("Science Day I"); Science Day Part II Hr'g Tr., 14-CV-1142, 14-CV-4090, July 21, 2015 ("Science Day II").

In October 2015, the court stayed all related flushable actions pending in the Eastern District of New York. The issue of an appropriate definition of "flushable" wipes and related matters were respectfully referred to the Federal Trade Commission ("FTC"). *See Belfiore*, 311 F.R.D. at 39, 73-80; *see also* Order Staying Cases, 14-CV-1142, Oct. 13, 2015, ECF No. 183.

At that time, the Commission was considering claims against defendants in this court. The FTC had a filed complaint against Nice-Pak Products, Inc. ("Nice-Pak"). Nice-Pak is the manufacturer of the "flushable" wipes sold by retailers Costco Wholesale Corporation ("Costco") and CVS Health ("CVS"). The Commission was separately conducting individual investigations into the "flushable" products of Kimberly-Clark Corporation ("Kimberly-Clark") and Procter & Gamble Company ("Procter & Gamble").

After the stays were interposed in the instant court proceedings, the FTC entered into a final consent order with Nice-Pak. *See* Nice-Pak Final Consent Order, 14-CV-1142, Nov. 10, 2015, ECF No. 207-1 ("Nice-Pak Final Consent Order"). In addition to binding Nice-Pak, the

final consent order reaches the retailers that market and sell Nice-Pak's "flushable" wipes, including Costco and CVS. *See Kurtz v. Kimberly-Clark Corp.*, 2015 WL 8481833, at *2 (E.D.N.Y. Dec. 10, 2015).

The Nice-Pak final consent order includes the following flexible and somewhat amorphous definition of "flushability:"

> [D]isperses in a sufficiently short amount of time after flushing to avoid clogging, or other operational problems in, household and municipal sewage lines, septic systems, and other standard wastewater equipment[.]

*See* Nice-Pak Final Consent Order at 3. This definition is bland, written in generalities with no precision as to time of breakdown of the wipes once they are flushed or the extent of their break down into discrete pieces or shreddings. But the FTC order does present a reasonable attempt to devise a national standard protective of consumers, manufacturers and retailers.

In June 2016, while the cases were stayed and referred to the FTC, the Administrative Conference of the United States adopted a non-binding recommendation recognizing the value of "aggregation techniques to resolve similar claims in adjudications." *See* Aggregation of Similar Claims in Agency Adjudication, 81 Fed. Reg. 40259 (June 21, 2016); *see also* Michael Sant'Ambrogio & Adam Zimmerman, Inside the Agency Class Action (June 15, 2016) (analyzing the use of aggregate procedures in administrative agencies as well as the challenges and benefits of aggregate agency adjudication); Michael Sant'Ambrogio & Adam Zimmerman, Administrative Conference of the United States, Aggregate Agency Adjudication (June 9, 2016), available at https://www.acus.gov/report/aggregate-agency-adjudication-final-report.

This court then indicated that the instant cases might be "particularly appropriate for aggregate agency resolution;" it encouraged the parties "to explore the opportunity for aggregate adjudication of their claims before the FTC pursuant to the new federal recommendation by the

Administrative Conference of the United States." *Kurtz v. Kimberly-Clark Corp.*, 315 F.R.D. 157, 159 (E.D.N.Y. 2016).

The Commission seems unlikely to take action in response to this court's referral. In a letter responding to an inquiry by one of the plaintiffs in the instant cases, the agency indicated its intent to address "flushability"-related claims only on a case-by-case basis. It specified that: (1) it cannot engage in "aggregate adjudication" of claims, due to its administrative design; (2) it does not intend to prescribe trade regulation rules in relation to issues raised by this court's referral; and (3) the parties and the court can look to the Nice-Pak final consent order for guidance on the Commission's views regarding representations of "flushability." *See* FTC Letter dated July 27, 2016, 14-CV-4090, Aug. 3, 2016, ECF No. 184-2 ("July 27, 2016 FTC Letter") for the full FTC response.

The FTC has now closed its investigation of Kimberly-Clark without defining "flushability" in that case. *See* FTC Closing Letter, 14-CV-1142, June 30, 2016, ECF No. 228-1. Apparently, the only remaining ongoing relevant investigation is the FTC's inquiry into Procter & Gamble's "flushability" claims. *See* Procter & Gamble Letter, 14-CV-4090, Aug. 4, 2016, ECF No. 185; Feb. 3, 2017 Hr'g Tr. at 14:3-4 ("[The FTC] remains engaged in an ongoing inquiry into P&G, Procter & Gamble's Freshmates.").

Given the number of cases challenging manufacturers' and retailers' representations of "flushability" that are currently pending before this court and other courts across the country, resolution of the instant consumer actions through a coordinated national federal administrative agency approach would have been desirable. *See, e.g.*, *Belfiore*, 311 F.R.D. at 79 (noting the "substantial danger of inconsistent rulings among various courts and the FTC" and stating that

"[w]hether wipes should be labeled 'flushable' is a national issue that requires a single national resolution.").

As indicated in the court's October 2015 memorandum and order in the *Belfiore* action, the FTC appeared to be particularly well-suited to lead such an effort. *See id*. at 76-80. It is an agency "specifically tasked with addressing deceptive labeling." *Id*. at 78. It was already considering the "flushability"-related claims of several manufacturers and retailers of allegedly "flushable," moist wipes. Development of a uniform definition of "flushability" through consolidated agency action—rather than through individual consumer class suits—could have led to regulation of the market and national advertising issues as a whole, avoiding inconsistent judgments and protecting consumers, producers and retailers nationwide:

> Certification of a damages *or* an injunctive class might thwart the development of an integrated and transparent national market. With multiple cases before this court and others across the nation (each at a different phase and featuring different substantive state laws), the FTC's engagement in an ongoing inquiry of defendant, and the agency's pending agreement with another manufacturer, there is a substantial risk of inconsistent judgments regarding the meaning of "flushable." A robust management of the "flushable" problem by the FTC, rather than by courts, could avoid unnecessary inconsistencies and controversies, helping manufacturers, retail vendors and consumers alike.

*Id*. at 39 (emphasis in original).

In the absence of action by the FTC, uniform resolution of "flushability" claims could have been achieved through a class-wide settlement, with industry-wide regulation through standards set by the relevant industry association, through multidistrict litigation, or by legislative action at the municipal, state, or federal level. *See Kurtz*, 2016 WL 6820405. These mechanisms have not been invoked by the parties, although an association of the producers of flushable wipes has been considering the problem, and relevant legislation has been proposed in New York State. *See Belfiore*, 311 F.R.D. at 47, 50. In the absence of an administrative, legislative, industry-wide or

settlement approach, the court is compelled to address these consumers' claims on a state-by-state basis.

This memorandum and order serves, in part, as a synopsis of the measures already taken in the six class actions pending before this court. It sets out a roadmap for the next steps to be addressed in each individual case that is still pending. All prior orders and memoranda are deemed included in this memorandum as follows: *Belfiore v. Procter & Gamble Co.*, 94 F. Supp. 3d 440 (E.D.N.Y. 2015) (denying defendant's motion to dismiss); *Belfiore v. Procter & Gamble Co.*, 311 F.R.D. 29 (E.D.N.Y. 2015) (outlining preliminary rulings on class certification, staying case and referring matters to the FTC); *Belfiore v. Procter & Gamble Co.*, 140 F. Supp. 3d 241 (E.D.N.Y. 2015) (denying plaintiff's motion for reconsideration); *Kurtz v. Kimberly-Clark Corp.*, 2015 WL 8481833 (E.D.N.Y. Dec. 10, 2015) (denying motion to lift the stay); *Kurtz v. Kimberly-Clark Corp.*, 315 F.R.D. 157 (E.D.N.Y. 2016) (encouraging the parties to explore aggregate agency adjudication of their claims with the FTC); Order, 14-CV-1142, Oct. 13, 2016, ECF No. 252 (recommending that the parties seek centralization of cases pending all over the nation in one court, through multidistrict litigation or the appointment by the court of a special master or masters to assist in settlement); *Kurtz v. Kimberly-Clark Corp.*, 2016 WL 6820405 (E.D.N.Y. Nov. 18, 2016) (describing methods of consolidation and resolution); Order Dismissing Case with Prejudice, 15-CV-4579, Jan. 20, 2017, ECF No. 95 (dismissing the *Richard* action with prejudice); *Palmer v. CVS-Health & Nice-Pak Prod, Inc.*, 2017 WL 656767 (E.D.N.Y. Feb. 17, 2017) (transferring the *Palmer* action to the District of Maryland); *Armstrong v. Costco Wholesale Corp. & Nice-Pak Prod., Inc.*, 2017 WL 656768 (E.D.N.Y. Feb. 17, 2017) (transferring the *Armstrong* action to the District of Oregon); *Kurtz v. Kimberly-Clark Corp.*, 2017 WL 751231 (E.D.N.Y. Feb. 27, 2017)

(severing and transferring New Jersey-based claims, denying certification of a nationwide class of consumers and staying the *Honigman* action).

As noted above and below, the motions for a New York State class certification are granted, in part, in *Kurtz* and *Belfiore*. *See infra* Part VIII.

## II.    Procedural Background

### A.    Overview of Cases

The nature and status of the six putative class actions originally pending before this court are set out below:

1.  <u>*Kurtz v. Kimberly-Clark Corp. & Costco Wholesale Corp.*, No. 14-CV-1142 (E.D.N.Y. filed Feb. 21, 2014)</u>:  This is a putative class action.  Plaintiff has filed a motion to certify classes of consumers who purchased flushable wipes sold by defendant Costco—known as "Kirkland Signature Moist Flushable Wipes," and manufactured by Nice-Pak—and flushable wipes manufactured by defendant Kimberly-Clark.  Alleged are violations of section 56:8-1 of the New Jersey Consumer Fraud Act, sections 349 and 350 of the New York General Business Law, and the common law.  Injunctive and monetary relief are sought.  This action remains open; the New Jersey aspects have been severed and ordered transferred to the District of New Jersey.  *See Kurtz v. Kimberly-Clark Corp.*, 2017 WL 751231 (E.D.N.Y. Feb. 27, 2017).

2.  <u>*Belfiore v. Procter & Gamble Co.*, No. 14-CV-4090 (E.D.N.Y. filed July 1, 2014)</u>:  This is a putative class action filed by a consumer who purchased "flushable" wipes manufactured by defendant Procter & Gamble.  Claimed are violations of section 349 of the New York General Business Law.  Plaintiff seeks monetary damages and injunctive relief.  This action remains open.

12

3. _Armstrong v. Costco Wholesale Corp. & Nice-Pak Products, Inc._, No. 15-CV-2909 (E.D.N.Y. filed May 19, 2015): This is a putative class action filed by a consumer who purchased "flushable" wipes sold by defendant Costco and manufactured by defendant Nice-Pak. Alleged are violations of Oregon's Unlawful Trade Practices Act and its common law. Both injunctive and monetary relief are sought. Defendants have answered the complaint. No motion for class certification has been made. This case was transferred to the District of Oregon. _See Armstrong v. Costco Wholesale Corp. & Nice-Pak Prod., Inc._, 2017 WL 656768 (E.D.N.Y. Feb. 17, 2017).

4. _Honigman v. Kimberly-Clark Corp._, No. 15-CV-2910 (E.D.N.Y. filed May 19, 2015; complaint filed May 20, 2015): This is a putative class action brought by a consumer who purchased "flushable" wipes manufactured by defendant Kimberly-Clark. Alleged are violations of sections 349 and 350 of the New York General Business Law and the common law. Both injunctive and monetary relief are sought. Defendant has answered the complaint. No motion for class certification has been made. No discovery has taken place. The case is stayed. Certification decisions in _Kurtz_ and _Belfiore_ will control the ultimate disposition of this case. _See Kurtz v. Kimberly-Clark Corp._, 2017 WL 751231 (E.D.N.Y. Feb. 27, 2017).

5. _Palmer & Palmer v. CVS Health & Nice-Pak Products, Inc._, No. 15-CV-2928 (E.D.N.Y. filed May 20, 2015): This is a putative class action brought by consumers who purchased "flushable" wipes sold by defendant CVS and manufactured by defendant Nice-Pak. An amended complaint was filed on July 9, 2015. Alleged are violations of the Maryland Consumer Protection Act, section 13-301, and the common law. Both injunctive and monetary relief are sought. Defendants have answered the amended complaint. No class certification

motion has been made.  This case was transferred to the District of Maryland.  *See Palmer v. CVS-Health & Nice-Pak Prod, Inc.*, 2017 WL 656767 (E.D.N.Y. Feb. 17, 2017).

6.  <u>*Richard & Richard v. Wal-Mart Stores, Inc. & Rockline Indus*., No. 15-CV-4579 (E.D.N.Y. filed Aug. 5, 2015)</u>:  This was a putative class action brought by consumers who purchased "flushable" wipes manufactured by defendant Rockline Industries ("Rockline") and sold by defendant Wal-Mart Stores, Inc. ("Wal-Mart").  Alleged were violations of New Hampshire Regulation of Business Practices for Consumer Protection, section 358-A:2, and the common law.  Both injunctive and monetary relief were sought.  Upon suggestion by the court that it would transfer the case, the parties dismissed the case with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(1)(a)(ii).  Order, 15-CV-4579, Jan. 19, 2017, ECF No. 95.

*See generally Belfiore*, 311 F.R.D. at 42-43.

### B.    Motion to Dismiss for Lack of Standing Denied in *Belfiore* Action

Defendant in the *Belfiore* action moved, pursuant to Federal Rule of Civil Procedure 12(b)(1), to dismiss the claim for injunctive relief for lack of standing; moved to dismiss under Rule 12(b)(6) for failure to state a claim; and moved to strike plaintiff's class action-related allegations under Rule 12(f).  *Belfiore*, 94 F. Supp. 3d at 443-44.

Because plaintiff was unlikely to ever purchase the product again, defendant argued he could not show that the requested injunctive relief would "redress a real and immediate threat of future injury to him."  *Id*. at 444 (quotation marks and citation omitted).

Defendant's motion was denied.  Plaintiff was found to have standing to pursue injunctive relief even though he was unlikely to re-purchase the product because he was trying to protect other consumers:

14

> To hold otherwise would denigrate the New York consumer protection statute, designed as a major support of consumers who claim to have been cheated. The only way a consumer could enjoin deceptive conduct would be if he were made aware of the situation by suffering injury. But once the consumer learned of the deception, he would voluntarily abstain from buying and therefore could no longer seek an injunction.
>
> *An injunction in connection with a class action is designed to afford protection of future consumers from the same fraud. It does this by permitting the plaintiff to sue on their behalf.*

*Id*. at 445 (emphasis added). It was determined that plaintiff had standing and defendant's motion to strike the class allegations was denied. *Id*. at 445-47.

### C.    Motions for Class Certification in the *Belfiore* and *Kurtz* Actions

Prior to the October stay and FTC referral, plaintiff in the *Belfiore* case moved to certify a class action, pursuant to subsections (b)(2) and (b)(3) of Federal Rule of Civil Procedure 23. He defined the proposed class as: "all persons and entities who purchased Charmin Freshmates in the State of New York between May 23, 2011 and May 23, 2014[.]" *Belfiore*, 311 F.R.D. at 51. In February 2015, defendant Procter & Gamble sought denial of Belfiore's class certification motion. *See* Mot. to Deny Class Cert., 14-CV-4090, Feb. 27, 2015, ECF No. 59. In August 2015, the court heard oral argument on Belfiore's motion for class certification. Minute Entry, 14-CV-4090, Aug. 12, 2015, ECF No. 126. By a recent letter to the court, Belfiore defined the proposed class as: "All persons and entities who purchased Charmin Freshmates in the State of New York between May 23, 2011 and the present." Letter, 14-CV-4090, Feb. 6, 2017, ECF No. 242.

Plaintiff in the *Kurtz* action moved for class certification pursuant to Federal Rule of Civil Procedure 23 subsections (b)(2) and (b)(3) in February 2015. *See* Kurtz Mem. in Supp. of Class Cert., 14-CV-1142, Feb. 27, 2015, ECF No. 81 at 1. He sought certification of classes of

national, New York, and New Jersey purchasers of Kimberly-Clark and Costco products. *Id.* at

3. Kimberly-Clark and Costco opposed. *See* Kimberly-Clark Mot. to Deny Class Cert., 14-CV-

1142, Feb. 27, 2015, ECF No. 82; Costco Mot. to Deny Class Cert., 14-CV-1142, Feb. 27, 2015,

ECF No. 87. The court heard oral argument on plaintiff's motion for class certification in

October 2015. *See* Kurtz Class Cert. Oral Arg. Hr'g Tr., 14-CV-1142, Nov. 10, 2015, ECF No.

204. By a recent letter to the court, Kurtz clarified that he is now seeking to certify three classes:

(1) "All persons and entities who purchased Kimberly-Clark Flushable Products in the State of

New York between February 21, 2008 and the present."; (2) "All persons and entities who

purchased Kirkland Signature Flushable Wipes in the State of New York between July 1, 2011

and the present."; and (3) "All persons and entities who purchased Kimberly-Clark Flushable

Products from February 21, 2008 and the present or Kirkland Signature Flushable Wipes from

July 1, 2011 to the present." Letter, 14-CV-1142, Feb. 6, 2017, ECF No. 282. The third class

would be national in scope.

### D.    Preliminary Rulings on Class Certification in *Belfiore* Action

Class certification motions remained pending until now.

Both damages and injunctive relief are sought by plaintiffs. Plaintiff Belfiore claims

statutory damages of fifty dollars per purchase based on a premium price theory. *Id.*; *see* N.Y.

Gen. Bus. Law § 349(h) (permitting recovery of "actual damages or fifty dollars, whichever is

greater"). He seeks to enjoin defendant Procter & Gamble from labeling its wipes product as

"flushable" and "safe for sewer and septic systems." *Belfiore*, 311 F.R.D. at 51 (citation omitted).

In its memorandum and order staying the case and referring issues to the FTC, this court

made preliminary rulings on Belfiore's motion for class certification. *See Belfiore*, 311 F.R.D. at

16

59-73.  These findings remain in force.  It was concluded that the Federal Rule of Civil Procedure 23(a) factors were satisfied:

- The numerosity requirement is satisfied.  *See id.* at 61 ("Here, numerosity is obvious.  The number of individual purchases of Freshmates in New York is over a million.") (citations omitted).

- The commonality requirement is satisfied.  The common injury was identified as "the price premium on every product sold."  *Id.* at 63.  Defendant's argument that the injury depended on the individual purchaser's expectations or experience after purchase was rejected:  "Liability . . . does not depend on whether class members relied upon the representation when they purchased Freshmates, nor does it depend on whether the product met their personal, subjective expectations.  Rather, the 'injury is the [excessive] purchase price.' . . . The purpose of New York General Business Law § 349, is to 'punish companies that sell products using advertising that misleads the reasonable consumer.'"  *Id.* at 62 (citations omitted).  This position is strengthened by the New York Court of Appeals opinion in *Borden v. 400 E. 55th St. Assoc., L.P., et al.*, providing an expansive and flexible definition of a New York State class action.  *See* 24 N.Y.3d 382, 394-95 (2014); Thomas A. Dickerson & Leonard B. Austin, *New York State Class Actions in 2016*, N.Y. Law Journal, Sept. 28, 2016 *available at* http://www.newyorklawjournal.com/id=1202768776871/New-York-State-Class-Actions-in-2016?slreturn=20160917145328.

- The typicality requirement is satisfied.  The central issue in the case is the alleged payment by consumers of a price premium for a product that misrepresented itself as flushable.  "The injury is the payment of an inflated price, not the clog."  *Belfiore*, 311 F.R.D. at 64.  Individual plumbing damages are not relevant to the price premium theory and are not subsumed in the

17

class action. *Id.* ("What happened after [plaintiff's] purchase, as a result of his sewage disposal system or the condition of his pipes, is irrelevant to the class's premium price theory.").

- The adequacy of representation requirement is satisfied. *See id.* at 64-65.  Counsel for plaintiff have handled the case with great skill and full attention.

- The implied requirement of ascertainability is satisfied.  The proposed class comprising "all persons or entities who purchased [defendant's 'flushable' product] Freshmates in New York State between May 23, 2011 and May 23, 2014" sufficiently "identifies a particular group of individuals [who were] harmed in a particular way (defrauded by labels and marketing materials [leading to higher prices]) during a specific period in particular areas.  Only one product is at issue, and it was labeled in a uniform manner."  *Id.* at 66 (quotation marks and citations omitted).  The fact that plaintiff did not retain receipts of purchase is not a bar to certification.  *Id.* at 66-67.  The purchases and their price can be proven by other means.

### 1.    Injunctive Class

This court rejected defendant Procter & Gamble's position that plaintiff Belfiore did not have Article III standing to pursue injunctive relief for a product he will not re-purchase.  *Id.* at 67; *Belfiore*, 94 F. Supp. 3d at 444-45; *supra* Part II.B.  If defendant's theory were to be accepted, it would effectively bar injunctive classes in consumer deception cases, since purchasers who become aware of a harm and stop buying the offensive product would not be able to seek relief for the class.  That result is undesirable as a matter of public and federal policy and practice:

> To hold otherwise would denigrate the New York consumer protection statute, designed as a major support of consumers who claim to have been cheated.  The only way a consumer could enjoin deceptive conduct would be if he were made aware of the situation by suffering injury.  But once the consumer learned of the deception, he would voluntarily abstain from buying and therefore could no longer seek an injunction.

> An injunction in connection with a class action is designed to afford protection of future consumers from the same fraud. It does this by permitting the plaintiff to sue on their behalf.
>
> Given plaintiff's dissatisfaction with Freshmates, it is unlikely he will re-purchase the product again. No information to the contrary has been provided. Based on the law as interpreted, he has standing.

*Belfiore*, 94 F. Supp. 3d at 445.

The court noted that it would likely certify an injunctive class under Federal Rule of Civil

Procedure 23(b)(2):

> Here, certification of an injunctive class is appropriate. Rule 23(b)(2)'s rigorous requirements are satisfied. First, an injunction prohibiting defendant from labeling Freshmates "flushable" and "safe for sewer and septic systems" would provide a single solution, applicable to each class member. Second, the proposed class is cohesive . . . . Third, certification of an injunctive class is necessary because an injunction, unlike monetary damages, will protect the rights of all consumers.

*Belfiore*, 311 F.R.D. at 68.

Defendants now argue that certification of an injunctive class is not available because of

the recent decision of the Court of Appeals for the Second Circuit in *Nicosia v. Amazon, Inc*., 834

F.3d 220 (2d Cir. 2016). *See infra* Part VIII.F.1.c.1. In *Nicosia*, the offending product had been

completely taken off the market. *See Nicosia*, 834 F.3d at 239. Because defendant continues to

sell a version of the "flushable" wipes almost identical in construction and effect to the ones

purchased by plaintiff, injunctive relief is appropriate. *See infra* Part VIII.F.1.c.1

### 2.    Damages Class

In its October 2015 memorandum and order, this court preliminarily determined that the

predominance requirement to certify a damages class was satisfied. *See Belfiore*, 311 F.R.D. at

68-71. It noted that hedonic regression—the premium damages model set forth by plaintiff's

expert—could be used to determine whether the class paid a premium for the product because it

19

was marketed as "flushable." *Id*. at 70.  Once the injury is established—*i.e.*, the payment of a price premium for allegedly mislabeled "flushable" wipes—statutory damages can be calculated on a class-wide basis pursuant to section 349(h) of the New York General Business Law.  *See id.*

The instant case is not barred by *Zyprexa UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 133 (2d Cir. 2010):

> There, the Second Circuit Court of Appeals held that certification of a putative class based on an "excess price theory" constituted an "abuse of discretion" because the damages model was "not susceptible to generalized proof with respect to either but-for or proximate causation."  But *Zyprexa* is distinguishable on two grounds. First, in that case the issue was whether plaintiffs demonstrated *reliance*, an element not required under New York General Business Law § 349.  Second, in *Zyprexa* (as distinct from the instant case) the persons who purportedly relied on the misrepresentations were distinct from those who were allegedly harmed.

*Belfiore*, 311 F.R.D. at 70-71 (citations omitted) (emphasis in original).

*Zyprexa* remains inapplicable.  In that case, involving medically prescribed drugs, the Court of Appeals for the Second Circuit's opinion was premised, at least in part, on the fact that purchase depended on a doctor's decision and prescription, in which price was a nominal or no factor.  *Zyprexa*, 620 F.3d at 126.  In the instant cases the consumer makes the decision herself at the cash register based, at least in large part, on labeling and price.

The court indicated that it would likely deny certification of a damages class under Federal Rule of Civil Procedure 23(b)(3) because the superiority requirement was not satisfied.  *Belfiore*, 311 F.R.D. at 73.  It explained that the FTC was in a better position to protect consumers in New York and nationally given its authority to investigate deceptive practices and the fact that it was already considering "flushable" claims by defendant Procter & Gamble and other manufacturers:

> In the instant case, a class action seeking statutory damages is not a superior method of adjudication.  The FTC is better suited to protect consumers nationally as well as those in New York.  Not only does

20

the FTC's mandate encompass investigating deceptive practices in the labeling of consumer goods, the agency is *already* considering "flushable" claims made by this defendant, and those of at least one other manufacturer.   In the interest of uniform protection of consumers, the FTC should address the instant case and related cases, lest inconsistent judgments and labeling abound.  This risk is serious, as noted by the number of cases that have already reached varying dispositions.   Consumers as well as vendors require a uniform definition of "flushable," and the FTC is best suited to announce it.

*Id*. (citations omitted) (emphasis in original).

The court also opined that an award of statutory damages could be excessive and in violation of New York State policy as embodied in section 901(b) of the New York Civil Practice Law and Rules ("CPLR").  *See id*.  Section 349 of the New York Business Law, pursuant to which plaintiff is suing, permits an action to recover statutory damages.  Specifically, the provision allows a plaintiff to initiate "an action . . . to enjoin such unlawful act or practice, an action to recover his actual damages *or fifty dollars, whichever is greater*, or both such actions."  N.Y. Gen. Bus. Law § 349(h) (emphasis added).  Section 901(b) of the New York CPLR prohibits the maintenance of New York State class actions seeking to recover "a penalty, or minimum measure of recovery created or imposed by statute," unless that statute explicitly authorizes recovery through a class action.  CPLR § 901(b).

Federal Rule of Civil Procedure 23, which sets forth the requirements for maintaining a class action in federal court, contains no such restriction.  *See* Fed. R. Civ. P. 23.  In *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010), the Supreme Court of the United States considered the interaction between Federal Rule of Civil Procedure 23 and New York CPLR section 901(b).  A majority of the Court concluded that section 901(b) and Rule 23 do conflict, and that Rule 23 represents a lawful exercise of Congress's procedural rulemaking power.  *Shady Grove*, 559 U.S. at 399-401; *see also Belfiore*, 311 F.R.D. at 56-59; H. Korn, A. Miller, *et al*., N.Y.

21

Civ. Prac. ¶ 901.29 (David L. Ferstendig ed., 2016) (addressing the Supreme Court's rejection of

recognition of section 901(b) under Federal Rule of Civil Procedure 23).

The dissenting opinion in *Shady Grove* was the right one according to academics in New

York. *See, e.g.*, H. Korn, A. Miller, *et al.*, N.Y. Civ. Prac. ¶ 901.22 (first ed., 1995) ("Subdivision

(b) of CPLR 901 expressly prohibits the maintenance of a class action to recover a penalty or

minimum measure of recovery unless the statute creating or imposing such a remedy specifically

authorizes recovery of the statutory remedy in a class action. The prohibition, which has no federal

counterpart and does not stem from a recommendation of the Judicial Conference, would

presumably protect businesses against catastrophic judgments considering that many of the statutes

authorizing class actions to recover a penalty or minimum recovery also limit the total liability of

the defendant. . . . Statutory damages constitute a 'penalty of minimum measure of recovery' so as

to bar a class action in the absence of specific authorization."); H. Korn, A. Miller, *et al.*, N.Y.

Civ. Prac. ¶ 901.29 (David L. Ferstendig ed., 2016) (stating that, prior to the Supreme Court's

decision in *Shady Grove*, "[p]erhaps on the basis of comity and to discourage forum shopping, the

federal courts have routinely denied class certification and referred to CPLR § 901(b)"); *In re

Zyprexa Prod. Liab. Litig.*, 671 F. Supp. 2d 397, 463-64 (E.D.N.Y. 2009) ("If allowed to proceed

in their entirety, the State's claims could result in serious harm or bankruptcy for this defendant

and the pharmaceutical industry generally. For the legal system to be used for this slash-and-burn-

style of litigation would arguably constitute an abuse of the legal process. Constitutional, statutory,

and common law rights of those injured to seek relief from the courts must be recognized. But

courts cannot be used as an engine of an industry's unnecessary destruction.") (citation omitted).

The New York Court of Appeals has emphasized the desirability of a flexible interpretation

of section 901(b) to permit effective use of a class action in protecting large numbers of people.

*See Borden*, 24 N.Y.3d at 394-95; *see also* H. Korn, A. Miller, *et al.*, N.Y. Civ. Prac. ¶ 901.28 (David L. Ferstendig ed., 2016) (stating that in class actions alleging violations of section 349 of the New York General Business law, section 901 will not restrict recovery "if [statutory] damages are waived and class members are informed and given the right to opt-out of the proposed class action").

 *Shady Grove* was analyzed in *Belfiore*.  It was concluded that the effect of section 901(b) on a proposed federal class action should be considered when deciding on certification, and the case would tend to weigh against use of Rule 23:

> There is some justification for the prediction that Freshmates purchasers may be entitled to $95.5 million in "statutory damages." While *Shady Grove* does not prohibit federal class actions seeking fixed statutory damages, such an award, in this case, is inconsistent with . . . New York's substantive policy animating § 901(b). An award of this projected magnitude would run counter to the policy of Congress in implementing the Class Action Fairness Act: to discourage excessively harsh results eclipsing plaintiff's actual damages.

*Belfiore*, 311 F.R.D. at 73.

 On further reflection, any weight given to the paragraph above would flout the Supreme Court's *Shady Grove* decision, and that case is not relied upon in the instant cases as a basis for denying certification.  While disagreeing with the Supreme Court majority opinion, the district court is bound by it.  A certified damages class under Rule 23 is not controlled by section 901(b)—statutory damages under section 349(h) are available on a class basis in federal court, even though they would be barred by section 901(b) if the same action were to proceed in state court—an undesirable situation in view of *Erie* principles.  *See id.* at 59.

### E.    Stay and FTC Referral

In October 2015, this court stayed all six pending cases pursuant to the primary jurisdiction doctrine and referred the controversy to the FTC.  It ruled:

> The case is stayed, pursuant to the primary jurisdiction doctrine, pending the conclusion of the FTC's inquiry and any subsequent action by the agency.  The stay may be lifted by the court to avoid unnecessary delays or for other reasons.

*Id*. at 78; *see also* Order Staying Cases, 14-CV-1142, Oct. 13, 2015, ECF No. 183 ("The issue of an appropriate definition of 'flushable' and related issues are respectfully referred to the Federal Trade Commission.  The stays may be lifted by the court to avoid unnecessary delays or for any other reason.").

The court explained that the FTC was suited to protect all consumers in the nation.  That agency was already considering several "flushable" claims, including those made by defendants in actions pending before this court.  It was desirable to allow the FTC to address the instant cases and develop a uniform national definition of "flushability"—in order to avoid inconsistent judgments and better protect consumers nationwide.  *See Belfiore*, 311 F.R.D. at 73.

Noted was that "[d]etermining whether the term 'flushable' is deceptive to a reasonable consumer is directly within the agency's discretion."  *Id*. at 78.  Given the fact that the FTC was already investigating the "flushability" claims of several defendants, and that a number of cases had been brought by consumers and municipalities against manufacturers of purportedly "flushable" wipes, the court indicated that "[t]here may be substantial danger of inconsistent rulings among various courts and the FTC."  *Id*. at 79.  Action by the Commission would save resources and assist in reaching "a single national resolution" of "a national issue."  *Id*.

F.     **Motion to Reconsider Denied in *Belfiore* Action**

Plaintiff in the *Belfiore* action moved to reconsider the October 5, 2015 memorandum and order, including the court's decision to stay the case and refer matters to the FTC.  *See* Belfiore Mem. in Supp. of Recons., 14-CV-4090, Oct. 16, 2015, ECF No. 157.  He pointed to the "flushable" definition included in the then draft consent order between the FTC and Nice-Pak, arguing that it was sufficient to "guide courts and legislative bodies to a 'single national resolution.'"  *Id.* at 2; *see also Belfiore*, 140 F. Supp. 3d at 245.

Plaintiff's motion for reconsideration was denied.  The court again determined that referral to the FTC was appropriate; the agency should be given the opportunity to develop a uniform definition of "flushable" in order to reduce the risk of inconsistent directions to the industry:

> Referral to the FTC in the present case is appropriate.  The FTC is specifically granted broad power to regulate advertising and should be afforded the opportunity to determine a uniform definition of "flushable" applicable on a national, and perhaps international, basis.  As noted in the October 5 memorandum and order, allowing the FTC to develop a common definition of "flushable" reduces the substantial risk of inconsistent judgments and facilitates the prospect of an injunctive class settlement, aiding manufacturers, retailers, and the public.

*Belfiore*, 140 F. Supp. 3d at 245-46 (citations omitted).

The court reiterated its preliminary view on the question of class certification, stating that if it were to certify a damages class, it would be bound by *Shady Grove* to allow plaintiff's exorbitant New York statutory damages of fifty dollars a purchase:

> The court reaffirms as presently appropriate what it had declared in the October 5 memorandum and order and at the October 21 hearing on plaintiff's motion for reconsideration:  If the court were to grant money damages class certification *now*, it would be bound by *Shady Grove* to allow plaintiff's statutory damages claim.  New York General Business Law § 349(h) allows injured consumers to bring an action to recover *either* actual damages or fifty dollars per purchase, whichever is *greater*.  The actual damages at issue in the present case (the price premium of the difference between wipes

25

labeled "flushable" compared to other moist wipes not so labeled) are likely to be quite small compared to the fifty dollars per purchase statutory damages provided by § 349(h). If a damages class certification under *Shady Grove* were granted *now*, the class representative would have to seek the higher statutory amount, given his fiduciary obligation to attempt to obtain the best deal possible for class members. The court reserves the right to modify or reject this position when the stay is lifted.

In its memorandum and order the court noted that its present view on a damages class was based "primarily on the ground that certification would violate important New York State policy," because of *Shady Grove*. But, the court considered other factors relevant to an analysis under Rule 23(b)(3) of the Federal Rules of Civil Procedure. They include the difficulty in determining actual damages, the availability of non-judicial alternatives such as refund programs, and the superiority of FTC administrative remedies in this case.

*Id.* at 246-47 (emphasis in original) (citations omitted).

### G.    Final FTC Consent Order with Nice-Pak

On October 30, 2015, the FTC finalized its consent order with Nice-Pak. *See* Nice-Pak

Final Consent Order at 6. Nice-Pak was ordered to "not make any representation, in any manner,

expressly or by implication . . . unless the representation is non-misleading" that its wipes product:

A. is safe for sewer systems;

B. is safe for septic systems;

C. breaks apart shortly after flushing;

D. will not clog household plumbing systems;

E. will not clog household septic systems;

F. is safe for plumbing;

G. is safe to flush;

H. dissolves or disperses when interacting with water; or

I. is flushable[.]

*Id*. at 2.  The FTC specified that

> any tests, analyses, research, studies, or other evidence purporting
> to substantiate any of the above representations must at least:
>
> A. demonstrate that the Covered Product disperses in a sufficiently
> short amount of time after flushing to avoid clogging, or other
> operational problems in, household and municipal sewage lines,
> septic systems, and other standard wastewater equipment; and
>
> B. substantially replicate the physical conditions of the environment
> in which the Covered Product is claimed, directly or indirectly,
> expressly or by implication, to be properly disposed of; or, if no
> specific environment is claimed, then in all environments in which
> the product will likely be disposed of.

*Id*. at 3.

The consent order provided that Nice-Pak send notice to its "trade customers, wholesalers, and retailers" requesting that they "immediately stop using all packaging, advertising, and marketing materials previously provided . . .  by Nice–Pak about these wipes."  *Id*. at 4 and Attachment A.

While not a perfect resolution of consumers' claims in this court, the FTC did provide a solid basis for settlement of all cases with but minor tweaking.  The parties, however, continued to resist court suggestions for settlement, including an offer to appoint settlement masters.

## H.    Motion to Lift Stay Denied in *Kurtz* Action

On November 10, 2015, plaintiff in the *Kurtz* action filed a motion to lift the October 9, 2015 order staying the case and referring issues to the FTC.  *See* Kurtz Mem. in Supp. of Mot. to Lift Ct. Order, 14-CV-1142, Nov. 10, 2015, ECF No. 206.

Kurtz argued that, at a minimum, the stay should be lifted in *Kurtz*, *Armstrong*, and *Palmer* because the FTC had finalized its consent order with Nice-Pak, which included a definition of

"flushability," and had reached the retailers that market and sell Nice-Pak's flushable wipes, including Costco and CVS.  *See Kurtz*, 2015 WL 8481833, at *2.

Plaintiff's motion was denied.  The court ruled that the Nice-Pak final consent order did not sufficiently address the reasons for the referral.  It did not "purport to create a single, uniform, 'flushable' definition applicable to manufacturers and retailers nationwide."  *Id*. at *4.  Although final, the consent order was limited to the "wipes manufactured by Nice-Pak, and [was] binding only on Nice-Pak and the retailers who sold that product."  *Id*.

The court noted that, at the time of plaintiff's motion, the FTC was continuing to investigate additional manufacturers of "flushable" wipes, including Kimberly-Clark and Procter & Gamble—two of the defendants in the actions currently before this court.  *Id*.  It concluded that lifting the stay would be premature:

> The FTC must be given a meaningful opportunity to respond to the court's referral.  Only two months have passed since the court ordered the stay of the present action and referred issues to the FTC. The FTC received an electronic copy of the complete public record in the instant case, as well as related cases, on November 2, 2015. Lifting the stay at this time would be premature and would not further the public interest in a uniform and nationally applicable definition of "flushability."

*Id*. (citations omitted).

## I.      Continued Urging of Settlement Discussions

The parties were reminded that the cases had not been stayed to prevent settlement discussions.  They were encouraged to continue exploring settlement opportunities with the assistance of the magistrate judge:

> Nothing prevents the parties in this and related cases, with or without the assistance of the magistrate judge or the judge, from seeking to arrange a global settlement or a case-by-case settlement. If the parties agree on the definition of "flushability" provided by

28

the FTC in its consent order with Nice-Pak, the parties might reach
a settlement based on that definition.

*Id.* (citations omitted); *see also Belfiore*, 140 F. Supp. 3d at 248 (stating that the stay does not affect settlement discussions, indicating possible settlement terms and referring all pending cases to the magistrate judge for the purpose of settlement).

### J.    Aggregate Agency Adjudication

On June 10, 2016, the Administrative Conference of the United States adopted a recommendation providing guidance to administrative agencies "on the use of aggregation techniques to resolve similar claims in adjudications."  *See* Aggregation of Similar Claims in Agency Adjudication, 81 Fed. Reg. 40259 (June 21, 2016).  It recognized "aggregation as a useful tool to be employed in appropriate circumstances."  *Id.* at 40260.

In an order filed in all six pending actions, this court indicated that the instant cases "may be particularly appropriate for aggregate agency resolution."  *Kurtz*, 315 F.R.D. at 159.

While the cases were stayed, the court issued an order encouraging the parties to "explore the opportunity for aggregate adjudication of their claims before the FTC pursuant to the new federal recommendation by the Administrative Conference of the United States."  *Id.*

The FTC rejected this court's suggestion that it take control as beyond its authority and capacity.  *See infra* Part II.L; July 27, 2016 FTC Letter.

### K.    Conclusion of FTC Investigation of Kimberly-Clark

On July 15, 2016, Kimberly-Clark, a defendant in the *Kurtz* and *Honigman* actions, notified the court that the FTC had closed the investigation into the company's advertising for flushable wipes.  *See* Kimberly-Clark Letter, 14-CV-1142, July 15, 2016, ECF No. 228.  It provided the court with a copy of a June 30, 2016 letter sent by the FTC to attorneys for Kimberly-Clark.  The

letter states that "[u]pon further review of the matter, it appears that no further action is required at this time."  FTC Closing Letter, 14-CV-1142, June 30, 2016, ECF No. 228-1.  It ruled that the investigation into Kimberly-Clark "has been closed," but cautioned that "[t]his action is not to be construed as a determination that no violation has occurred, just as the pendency of an investigation should not be construed as a determination that a violation has occurred."  *Id*.

### L.  *Belfiore* Update Letter and Request for Conference

On August 3, 2016, plaintiff in the *Belfiore* action by letter suggested a status conference to the court.  It requested that the conference be scheduled in order for the court and the parties to "consider the next steps in this litigation."  Belfiore Request for Status Conference, 14-CV-4090, Aug. 3, 2016, ECF No. 184 at 2.

The letter reported that, in response to the court's June 28, 2016 order encouraging the parties to "explore the opportunity for aggregate adjudication of their claims before the FTC pursuant to the new federal recommendation by the Administrative Conference of the United States," plaintiff wrote a letter to the FTC, forwarding a copy of the order and asking whether the FTC intended to "further define 'flushability' beyond what was provided in the consent decree in Nice-Pak," and whether aggregate adjudication of the claims in this and related cases before the FTC was feasible.  *See id*. at 1-2.

On July 27, 2016, the FTC responded to plaintiff's letter, indicating that it was unable to engage in aggregate adjudication of the referred cases.  *See* July 27, 2016 FTC Letter.  It declared that, "[b]y virtue of its administrative design," it does not have the ability to "conduct an 'aggregate adjudication' of the private claims pending before the Court."  *Id*. at 2.  Instead, it noted that it generally proceeds "on a case-by-case basis" when acting in its enforcement capacity.  *Id*. (explaining that the Commission "generally acts in its enforcement capacity *on a case-by-case*

*basis* to address specific representations that are false, misleading, or unsubstantiated") (emphasis added).  The FTC indicated that it "plans to proceed . . . on a case-by-case basis through individual law enforcement actions."  *Id*. (footnote omitted).

While, in addition to its enforcement capacity, the Commission may also "prescribe trade regulation rules" defining "unfair or deceptive acts or practices," the FTC indicated that it currently "has no plans to initiate a trade regulation rulemaking proceeding to address the issues raised in the Court's October 2015 order."  *Id*. at 3 (footnote omitted).

The FTC suggested that the Nice-Pak final consent order might provide guidance on the Commission's views and assist the court and the parties in the analysis of the currently pending cases.  *See id*. at 2 (indicating that the FTC's final consent order with Nice-Pak, which prohibits Nice-Pak from making certain "flushability" representations "without competent and reliable evidence to support such representations," can provide "guidance on the Commission's views regarding the substantiation required under Section 5 of the FTC Act when making a representation that a wipe is 'flushable,' 'septic safe,' or 'safe for sewer and septic systems' – or other similar representations.") (footnote omitted).  The Commission specified that, "[t]o the extent . . . the representations in the pending cases are the same or similar to the representations addressed in the Nice-Pak matter . . . *FTC staff thinks that the Nice-Pak Consent Order can assist the parties and the Court in their analysis*."  *Id*. (emphasis added).

According to plaintiff, the FTC's response indicates that this court's "stay is unlikely to have its intended effect."  Belfiore Request for Status Conference, 14-CV-4090, Aug. 3, 2016, ECF No. 184 at 2.

Defendant Procter & Gamble responded to plaintiff's letter.  It stated that the FTC's investigation into its flushable wipes products is still ongoing, indicating that the language in the

consent order with Nice-Pak may not be the agency's final say on the question of "flushability." *See* Procter & Gamble Letter, 14-CV-4090, Aug. 4, 2016, ECF No. 185 at 1-2.

### M.    Request for Briefing on Lifting of Stay

In response to the *Belfiore* submissions, the court scheduled a combined status conference in all six pending actions.  It ordered "[t]he parties in all cases [to] submit briefs on further administration of the litigation."  *See* Order, 14-CV-4090, Aug. 8, 2016, ECF No. 188.

In a subsequent order, the court declared that "[i]n light of the status conference scheduled for September 26, 2016 at 4:30 p.m., the stay in the instant case (14-CV-4090), as well as all related cases (14-CV-1142, 15-CV-2909, 15-CV-2910, 15-CV-2928, 15-CV-4579) is lifted.  The stay is not lifted for purposes of additional discovery."   Order, 14-CV-4090, Aug. 25, 2016, ECF No. 191.  It directed the parties to "submit briefs with proposed next steps in the litigation" in advance of the scheduled status conference.  *Id*.

### N.    Continued Encouragement to Aggregate and Settle

On October 13, 2016, the court re-imposed a stay.  Scheduling Order, 14-CV-4090, Oct. 13, 2016, ECF No. 209.  The court declared that the cases "crie[d] out for a global settlement: one that can benefit consumers, producers, retailers, and the public paying the costs of allegedly affected municipal sewage systems."  *Id*.  It again offered to appoint a special master to assist in crafting such a settlement, and also suggested that the parties might consider applying to the Panel on Multidistrict Litigation for pretrial consolidation of the consumer and municipal cases that had been filed.  *Id*.

The court then issued a memorandum detailing the different ways a complex, multifaceted mass litigation like the instant one can proceed.  *Kurtz*, 2016 WL 6820405. Available options include an administrative decision by a federal agency, adoption by legislation

or stipulation a definition promulgated by an industry association, multidistrict consolidation, a single national class action (with subclasses as needed), district court transfer and consolidation, court-annexed mediation, and voluntary settlement.  *Id* at \*2-\*4.  The court reiterated its view that "individual case adjudication . . . is not satisfactory."  *Id.* at \*6.

### O.    Instant Motion Practice

On December 7, 2016, at a court conference attended by counsel for all the parties in the related cases, the court indicated that it was seriously considering an order "to dismiss [plaintiffs'] suit[s] for damages and to close the case.  I don't believe you've established enough in your discovery and in the science hearings that we've had."  *See* Dec. 7, 2016 Hr'g Tr. at 8:25-9:4.  On December 12, 2016, the court—citing Federal Rules of Civil Procedure 1, 16(a), and 56(a), and 28 U.S.C. § 1404(a)—invited the parties to move to terminate or transfer the instant cases.  *See* Scheduling Order, 14-CV-1142, Dec. 12, 2016, ECF No. 263.

Procter & Gamble, the defendant in the *Belfiore* action, moved to dismiss Belfiore's claim for injunctive relief, renewed its motion for a denial of class certification, and, in the alternative, moved for summary judgment pursuant to Federal Rule of Civil Procedure 56.  Kimberly-Clark, a defendant in the *Kurtz* and *Honigman* actions, renewed its motion to deny Kurtz's motion for class certification, and upon denial of certification, to deny or hold as moot the plaintiff's claims for injunctive relief.  Costco, a defendant in the *Kurtz* and *Armstrong* actions, CVS, a defendant in *Palmer*, and Nice-Pak, a defendant in *Armstrong* and *Palmer*, asked the court to deny Kurtz's motion for class certification, and to dismiss the claims for injunctive relief sought by plaintiffs.  The court heard extensive oral argument.  *See* Feb. 2, 2017 Hr'g Tr.; Feb. 3, 2017 Hr'g Tr.

In a subsequent letter, Belfiore defined the proposed class he wishes to certify as: "All persons and entities who purchased Charmin Freshmates in the State of New York between May 23, 2011 and the present." Letter, 14-CV-4090, Feb. 6, 2017, ECF No. 242.

Kurtz clarified that he is now seeking to certify only three classes: (1) "All persons and entities who purchased Kimberly-Clark Flushable Products in the State of New York between February 21, 2008 and the present."; (2) "All persons and entities who purchased Kirkland Signature Flushable Wipes in the State of New York between July 1, 2011 and the present."; and (3) "All persons and entities who purchased Kimberly-Clark Flushable Products from February 21, 2008 and the present or Kirkland Signature Flushable Wipes from July 1, 2011 to the present." Letter, 14-CV-1142, Feb. 6, 2017, ECF No. 282. The court denied certification of Kurtz's third proposed class—the nationwide class—because he has not demonstrated that he could adequately represent a national class of purchasers. *See Kurtz*, 2017 WL 751231, at *2.

## III. Deciding Class Certification Prior to Deciding Summary Judgment

Both in their briefs and at the hearings, the parties encouraged the court to decide the class certification motions before turning to summary judgment. *See* Feb. 2, 2017 Hr'g Tr. at 5:12-17. The rules merely provide that a decision on class certification must be made "[a]t an early practicable time." Fed. R. Civ. P. 23(c)(1)(A). Courts are not required to decide class certification before reaching the merits of a case. *See Schweizer v. Trans Union Corp.*, 136 F.3d 233, 239 (2d Cir. 1998) ("*Eisen* makes clear that the determination of whether a class meets the requirements of Rule 23 must be performed separately from the determination of the merits, but it does not require that class certification be addressed first. There is nothing in Rule 23 which precludes the court from examining the merits of plaintiff's claims on a proper Rule 12 motion to dismiss or Rule 56 motion for summary judgment simply because such a motion precedes

resolution of the issue of class certification.") (internal quotation marks omitted); *Hyman v. First Union Corp.*, 982 F. Supp. 8, 11 (D.C. Cir. 1997) (granting summary judgment prior to a decision on class certification because "neither party will suffer significant prejudice, and it is more practicable to do so"); *Cowen v. Bank United of Texas, FSB*, 70 F.3d 937, 941 (7th Cir. 1995) (granting a defendant's motion for summary judgment prior to ruling on class certification moots the certification question); Linda S. Mullenix, *Dropping the Spear: The Case for Enhanced Summary Judgment Prior to Class Certification*, 43 Akron L. Rev. 1197, 1211-12 (2010) ("Courts agree that ruling on a dispositive motion prior to addressing class certification may be appropriate where there is sufficient doubt regarding the likelihood of success on the merits of the plaintiff's claims.  It is likewise appropriate to rule on a summary judgment motion prior to class certification to prevent inefficiency or avoid waste. . . . .") (citing cases).

In the instant cases, following the traditional route—deciding class certification prior to deciding summary judgment—is sensible.  Class discovery was prioritized over merits discovery.  *See* Order, 14-CV-1142, Nov. 18, 2014, ECF No. 49.  Belfiore claims that a ruling on summary judgment in his case would be premature because he has not had a sufficient opportunity to develop his claims through pretrial discovery.  *See* Lester L. Levy Decl., 14-CV-4090, Jan. 18, 2017, ECF No. 233-3; *see also* Fed. R. Civ. P. 56(d) (the court may defer decision on a summary judgment motion if the nonmovant "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition").  The parties have conducted sufficient discovery for the court to rule on class certification, but not enough to decide summary judgment.  The pending motions for class certification are decided below, and Procter & Gamble's motion for summary judgment is held in abeyance.

## IV.    Facts

### A.    Plaintiff Belfiore

Plaintiff Anthony Belfiore has lived in New York all his life.  Before suffering a back

injury, he worked as an ironworker, roofer, and carpenter.  *Belfiore*, 311 F.R.D. at 39.  About

February 2014, he purchased Charmin Freshmates from a local retailer.  Before purchasing the

product, he read the package and bought the wipes because the wipes were flushable.  *Id.* at 41.

He and his wife used the wipes in their home.  They would flush no more than two wipes down

the toilet at a time.  *Id.* at 41-42.

Plaintiff subsequently had household plumbing problems, including clogging and sewer

back-up.  In March 2014, he hired a plumber, and the plumber removed Freshmates and other

materials from his household's sewage pipes and charged Plaintiff $526.83.  *Id.* at 42; Decl. of

Terrence O'Shea, Feb. 27, 2015, ECF No. 65 at ¶ 7.  A subsequent inspection of plaintiff's house

plumbing in December 2014 by defendant's expert witness revealed flaws: root intrusions, pipe

misalignments, and rust.  The inspection also revealed two non-Freshmates materials that Dr.

Darius Sabaliunas—a Procter & Gamble employee responsible for testing their products—

testified were a non-flushable "Clorox" wipe and a non-flushable feminine hygiene product.

*Belfiore*, 311 F.R.D. at 42.  While plaintiff and his wife testified that they did not flush baby

wipes or feminine hygiene products down the toilet, they could not say with certainty that their

adult children—who visited with their own young children—had not flushed baby wipes at the

house.  *Id.*

Plaintiff spoke about his potential role as class representative:

> Q:    . . . [W]hat obligations would those be?
>
> A:    To do the best that I can for myself and all the other people
> involved in the case, go through with it, and to make sure I could
> see if I could do something about the product.

. . .

Q:    But what . . . activity . . . would be required of you, as you understand it?

A:    I would probably have to go to court . . .

Q:    Anything else?

A:    And to look out . . . for their interest.

. . .

Q:    —what do you expect to do? . . . [And] I would include anything you have done and anything you would expect to do in the future.

A:    I have answered depositions. I have been to court already [for the case]. I show an interest that I want to take care of it, and I would look out—that's what I want to do. I want to do all I could, anything I could to take care of this problem.

Anthony Belfiore Dep., 14-CV-4090, Mar. 27, 2015, ECF No. 79-2 ("Belfiore Dep.") at 102:4-

104:13.

### B.    Plaintiff Kurtz

Dr. D. Joseph Kurtz first purchased Kimberly-Clark's Cottonelle flushable wipes in 2004.

D. Joseph Kurtz Dep., 14-CV-1142, Feb. 27, 2015, ECF No. 86-1 ("Kurtz Dep.") at 133:11-15.

From 2004 until February 2013, Kurtz and his family regularly used these flushable wipes

without experiencing any plumbing or flushability issues. *Id.* at 133:16-25; 36:16-37:10. Kurtz

purchased the Cottonelle wipes whenever he went grocery shopping, and also Costco's Kirkland

flushable wipes once every three months. *Id.* at 50:8-20.

Kurtz experienced plumbing problems he attributed to flushable wipes only after moving

to a new home in Brooklyn in February 2013. Within one week of being in the house, he had a

clog that needed to be cleaned out by a plumber. *Id.* at 17:10-20:3. Prior to the plumber's visit

to his new home, flushable wipes were not the only wipe product being used there; Dr. Kurtz's

37

wife flushed non-flushable baby wipes down the toilet.  *Id.* at 61:17-62:2.  The plumber informed

him that there were "wipes" clogging the pipes.  *Id.* at 20:12-21.

About two days after the plumber cleaned out the clog, the plumbers were called back to

the Kurtz residence after there was a second clog.  *Id.* at 22:20-23:24.  Before clearing out the

pipes again, the plumber reiterated something he had told Kurtz after his first visit: "no wipes are

flushable."  *Id.* at 23:16-24.  In the time between the first and second clog, Kurtz and his family

only used wipes that were labeled "flushable."  *Id.*

Kurtz also experienced plumbing clogs at a rental home in New Jersey in the summers of

2012 and 2013.  He noticed the first clog within a week of living there and using flushable wipes.

*Id.* at 66:17-67:7.  The plumber who cleared the clog advised the family to only flush toilet paper

down the toilet.  *Id.* at 67:8-17.  After another clogging incident in 2013, a plumber removed

wipes from a pipe.  *Id.* at 31:11-33:10.  Plaintiff claims that he knows the removed wipes were

"flushable" wipes because those were the only type of wipes they had been flushing at that time.

*Id.* at 33:4-10.  Plaintiff does not know whether the plumbing of the house had ever been

renovated or the house's age.  *Id.* at 129:16-22.  He believes that other people rent this house in

the winter, but does not know who those people are or their hygiene habits.  *Id.* at 34:13-35:3.

Defendants Kimberly-Clark and Costco arranged to inspect the plaintiff's house

plumbing systems in both his Brooklyn and New Jersey homes.  On December 8, 2014, a master

plumber inspected the plumbing at the Kurtz home in Brooklyn.  Boyer Report, 14-CV-1142,

Feb. 27, 2015, ECF No. 86-26 ("Boyer Report") at § 3.02.01.  The inspection revealed that roots

had infiltrated the sewer pipes and the trap was partially blocked.  *Id.*; Kurtz Dep. at 74:25-75:23.

A December 9, 2014 inspection of the New Jersey property revealed root infiltration of pipes and

indicia that a pipe was sagging, which can cause debris accumulation and blockages.  Boyer

Report at § 3.02.02.

Originally, Kurtz purchased flushable wipes to use when going to the bathroom, and he'd

flush the wipes once he was finished.  D. Joseph Kurtz Dep., 14-CV-1142, Feb. 27, 2015, ECF

No. 83-28 ("Kurtz Dep.") at 56:15-58:8; 63:12-64:5.  After one of the clogging incidents, he no

longer believed the wipes were flushable.  *Id.* at 38:3-12.  Nevertheless, he continued purchasing

the wipes for himself and his family, using them—without flushing them—"in the car, to clean

up messes, to clean the children."  *Id.* at 38:13-39:20; 58:20-24.

Kurtz has given a deposition, attended court, and reviewed and responded to filings and

discovery requests in his role as class representative.  *See* Kurtz Mem. in Supp. of Class Cert.,

14-CV-1142, Feb. 27, 2015, ECF No. 81 at 18-19.

### C.    Procter & Gamble's Charmin Freshmates

Defendant Procter & Gamble manufactures bath tissues and bath wipes under the

"Charmin" label. Marlene Otero Decl., Feb. 27, 2015, ECF No. 66 at ¶ 1.  The product at issue in

the instant case is "Freshmates," which are advertised as "flushable wipes."  Scott Richards

Decl., 14-CV-4090, Feb. 27, 2015, ECF No. 67 at ¶ 1.  The packaging appears as follows:





Ct. Ex. 23, June 19, 2015.  In addition to the labels "flushable" and "flushable wipes," the

package states that the wipes are "Septic Safe" and "Safe for sewer and septic systems":



*Id.* (emphasis added in the form of a red box).  The claims are repeated in Spanish and French.

The packaging, which has not changed since 2011, also advises consumers: "for best results, flush only one or two wipes at a time."  *Id.*; Science Day I at 189:15-24; Marlene Otero Dep., 14-CV-4090, Jan. 26, 2015, ECF No. 62-2 ("Otero Dep.") at 46:2-4 (stating that she was unaware of any packaging changes between 2011 and January 2015).

Freshmates are sold in 40, 80, and 120-count packages.  Otero Dep. at 49:7-20.  They cost more than ordinary toilet paper and non-flushable wipes.  Belfiore Class Cert. Oral Arg. Hr'g Tr., 14-CV-4090, Aug. 12, 2015, ECF No. 127 ("Belfiore Class Cert. Hr'g Tr.") at 18:2-19:15.

Freshmates "are pre-moistened wipes . . . intended for personal hygiene use in the bathroom setting."  Science Day I at 184:15-17.  The wipes are formed and bonded though a process of "hydroentanglement," in which fine, powerful jets of water are used to entangle a wood-pulp base.  *Id.* at 185:14-18.  The base, which is moistened with a "soaking liquid," is

structurally supported by a chemical binder. *Id.* at 184:25-186:7. Intended by defendant is that their wipes lose strength and begin to disintegrate when dropped into the toilet and exposed to physical forces and biological factors found in wastewater systems. *Id.* at 187:13-18.

Procter & Gamble has altered the composition of Freshmates in the time that has elapsed since Belfiore filed this lawsuit. Until February 2016, Freshmates were manufactured using a nonwoven substrate composed of wood pulp, rayon fibers, and between 1% and 2.5% "Bicomponent" fibers. Darius Sabaliunas Decl., 14-CV-4090, Dec. 30, 2016, ECF No. 223-2 at ¶ 10. Beginning on February 1, 2016, Procter & Gamble began shipping a new version of Freshmates that did not contain any "Bicomponent" fibers. *Id.* at ¶ 12. The purpose of removing these fibers from the Freshmates substrate is to increase the wipe's dispersibility. *Id.* at ¶¶ 11-12. This new version of Freshmates is the only version currently on the market. *Id.* at ¶ 12. Nothing in the record suggests any substantial difference in flushability among the versions manufactured by Procter & Gamble.

Procter & Gamble offers full reimbursements to consumers who claim that Freshmates caused a clog. Belfiore Class Cert. Hr'g Tr. at 45:13-17. These reimbursements include a full refund of the purchase price, and a "goodwill" reimbursement—up to $250—if the consumer complains that Freshmates caused plumbing damage. Mary Bush Decl., 14-CV-4090, Dec. 30, 2016, ECF No. 224 at ¶¶ 5-7. On the Freshmates packaging, there is a toll-free customer service telephone number, but no information about Procter & Gamble's refund policies. *See* Feb. 3, 2017 Hr'g Tr. at 14:22-24, 15:22-16:3.

### D.     Kimberly-Clark's Flushable Wipes

Kimberly-Clark first began selling flushable wipes in the mid-1990s. Kimberly-Clark Resp. to Interrog., 14-CV-1142, Feb. 27, 2015, ECF No. 86-3 at 14. Since then, the company

has manufactured and sold flushable wipes under many different brand names.  *See* Product

Chart, 14-CV-1142, Feb. 27, 2015, ECF No. 86-2.  Most of Kimberly-Clark's brands include the

word "flushable" in the title of the product; some only contain flushability claims elsewhere on

the packaging.  *See* Kurtz Mem. in Supp. of Class Cert.., 14-CV-1142, Feb. 27, 2015, ECF No.

81 at 4-5;  Kimberly-Clark Mem. in Opp. to Kurtz Mot. For Class Cert., Mar. 27, 2015, ECF No.

103 ("Kimberly-Clark Opp.") at 3.

     Plaintiff Kurtz purchased "Cottonelle" flushable wipes manufactured by Kimberly-Clark.

As presented to the court at its Science Day hearing, the front panel of a "refills" package

describes the product as "flushable cleansing cloths".  There is also a logo on the front panel

stating the wipes are "sewer and septic safe":



Ct. Ex. 14, June 19, 2015; Ct. Ex. 1, Feb. 2, 2017.  A side panel contains the same "sewer and septic safe" logo.  *Id.*  Beneath that logo on the side panel, the packaging states: "COTTONELLE FRESH CARE Flushable Cleansing Cloths break up after flushing."  *Id.*  It then has the same statement in French, and further down states, in French and English: "For best results, flush only one or two cloths at a time."  *Id.*  The side panel, as a whole, is as follows:



*Id.*

The relevant representations on the current packaging are largely the same.  Ct. Ex. 4, Feb. 2, 2017.  The words "flushable cleansing cloths" are much smaller.  *Id.*  The "sewer and septic safe" logo is absent.  Now, in several places on the package, there is a logo depicting a wipe hovering over a toilet bowl accompanied by the words: "SafeFlush Technology":



*Id.*  Elsewhere on the package, it states: "SafeFlush Technology ensures that Cottonelle FreshCare Flushable Cleansing Cloths break up after flushing, and are sewer and septic safe.  For best results, flush only one or two cloths at a time":

SafeFlush Technology*
ensures that Cottonelle®
FreshCare® Flushable
Cleansing Cloths break up
after flushing, and are
sewer and septic safe. For
best results, flush only one
or two cloths at a time.

SafeFlush Technology*
garantit que les
débarbouillettes jetables
dans les toilettes
Cottonelle® FreshCare® se
décomposent une fois la
chasse tirée et sont sans
danger pour les égouts et
les fosses septiques. Pour
de meilleurs résultats, ne
jetez pas plus d'une ou
deux débarbouillettes par
chasse d'eau.

Alcohol-free / Sans alcool

To learn more about
SafeFlush Technology*,
visit Cottonelle.com.

Pour en savoir plus sur
SafeFlush Technology*,
visitez le site
Cottonelle.com.

*Id.*

Though Kimberly-Clark manufactures and sells different brands of flushable wipes, the actual wipes—and the flushable technology they employ—are essentially the same regardless of brand. *See* Product Chart, 14-CV-1142, Feb. 27, 2015, ECF No. 86-2; Powling Email, 14-CV-1142, Feb. 27, 2015, ECF No. 83-11 (the "basesheet" for all Kimberly-Clark brands are the same); Science Day I at 93:10-14 (Kimberly-Clark uses the "same technology" across its various flushable products). Kimberly-Clark has changed the composition of its wipes multiple times over the past few years in an effort to improve their dispersibility. In late 2011, it reduced the molecular weight of the binder to increase the speed of dispersion. David Powling Dep., 14-CV-1142, Feb. 27, 2015, ECF No. 86-5 at 25:17-26:1. It also changed the binder of the wipes in

46

December 2013 to improve the way the product dissolves.  *Id.* at 27:12-18.  Kimberly-Clark

altered the wetting solution in 2013 to improve the product's softness and dispensability, which

may have had a minimal impact on the product's flushability.  *Id.* at 29:6-30:25.  In total, there

were three versions of flushable wipes manufactured and sold by Kimberly-Clark during the

relevant time period.  Product Chart, 14-CV-1142, Feb. 27, 2015, ECF No. 86-2.

Though the technology changed slightly, the engineering principles underlying the wipes

and their flushability remained essentially the same.  Kimberly-Clark wipes are made of wood

pulp fibers which are bound together by a chemical binder.  After the sheets are made, they are

moistened with a wetting solution made of water, a surfactant, and sodium-chloride.  Science

Day I at 91:19-92:12, 94:18-97:1.  The sodium chloride is the key ingredient stabilizing the

binder; it "maintain[s] the wet strength in-pack and provides the point for the trigger later."  *Id.*

at 96:2-6.

> "[A]s the wipe contacts water . . . the salt in the wetting solution is diluted.  By reducing
> the salt concentration, we're now allowing the water to attack the binder.  The binder
> begins to rehydrate and soften, and that starts the process of strength loss, and ultimately
> some release of the fibers. . . . [Once] it contacts water, [the process of strength loss]
> begins very quickly."

*Id.* at 96:15-23.  Nothing in the record suggests any substantial difference in flushability among

different versions manufactured by Kimberly-Clark.

The manufacturer suggested retail prices of its wipes vary widely depending on the

product and the retailer, ranging from $0.99 to $16.99.  Kimberly-Clark Resp. to Interrog., 14-

CV-1142, Feb. 27, 2015, ECF No. 86-3 at 17-18.  Final sales prices that consumers pay depend

on what product is purchased, the sales channel through which it is distributed, the retailer,

where the product is purchased, if any promotion is used, the type of packaging, and the number

of wipes per package.  Keith R. Ugone Decl., 14-CV-1142, Feb. 27, 2015, ECF No. 86-25

("Ugone Decl. I") at ¶¶ 51-52.

According to Kurtz, flushable wipes are sold at a higher price than toilet paper and non-

flushable products manufactured and sold by Kimberly-Clark.  *See* Mark S. Reich Decl., 14-CV-

1142, July 1, 2014, ECF No. 31 at ¶ 2 (according to Amazon.com, as of June 27, 2014,

Cottonelle FreshCare Flushable Cleansing Cloths cost more per wipe than Huggies baby wipes

or Cottonelle toilet paper).

### E.    Costco's Kirkland Signature Moist Flushable Wipes

Under its private label "Kirkland Signature" brand, Costco sells four types of wipes:

flushable wipes, baby wipes, facial wipes, and surface cleaning wipes.  Kim Wailor Decl., 14-

CV-1142, Feb. 27, 2015, ECF No. 90 ("Wailor Decl.") at ¶¶ 5-6.  Costco began selling the

product at issue, "Kirkland Signature Moist Flushable Wipes," in July 2011.  Kim Babusik Decl.,

14-CV-1142, Feb. 27, 2015, ECF No. 91 ("Babusik Decl.") at ¶ 12.  They are sold in cartons

containing 10 packets of 60 wipes each, for a total of 600 wipes per carton.  *Id.*  At all relevant

times, most cartons have been sold for $14.99 at Costco warehouses.  Costco Resp. to Interrog.,

14-CV-1142, Feb. 27, 2015, ECF No. 89-12 at 2.

The front panel of the carton's packaging describes the product as "moist flushable

wipes" in large print.  Ct. Ex. 18, June 19, 2015.  A logo appears in the upper right corner

indicating that the product is "made with ecoflush technology".  *Id.*

The warning against use of multiple wipes before flushing is probably more satisfactory

in precluding clogs than those of competing products which suggest use of up to two wipes

before flushing.  A logo in the lower left section of the panel states: "NEVER FLUSH MORE THAN 1 WIPE AT A TIME."  *Id.*

Unlike competing products, there is a warning about not using the product in inadequate plumbing.  A bullet point states: "Safe for *Well-Maintained* Sewer & Septics*".  *Id.* (emphasis added).  The front panel as a whole appears as follows:



Ct. Ex. 18, June 19, 2015.

49

The back panel contains more detailed representations, including: "Kirkland Signature Moist Flushable wipes are made with EcoFlush technology from 100% plant-based materials, and are free of chemical binders, chlorine and alcohol.  They are safe for well-maintained sewer and septics*."  *Id.*  The asterisk leads to yellow capitalized text, reading: "*NOT RECOMMENDED FOR USE IN MOTOR HOMES OR WITH BASEMENT PUMP SYSTEMS."  *Id.*  Nearby text, in the same font, states: "NEVER FLUSH MORE THAN ONE WIPE AT A TIME", and "BABY, FACIAL AND CLEANING WIPES, PAPER TOWELS, AND FEMININE HYGIENE PRODUCTS ARE NOT FLUSHABLE AND SHOULD BE DISPOSED OF PROPERLY."  The back panel, in relevant part, appears as follows:



*Id.*

The individual packets within the cartons contain slightly different warnings.  On the

package represented to be the "current" one at the court's Science Day hearings (*see* Science

Day I at 148:7-13), the top panel of the individual packet contains a logo in the upper right

corner stating that the wipe "BREAKS APART after flushing":



Ct. Ex. 17, June 19, 2015.

The bottom panel of the packet stated that "They are safe for sewer and septic systems because they begin to break down after flushing":

*Id.* Costco apparently removed the claim that the wipes "break apart after flushing" from the packaging at some point in 2013. Babusik Email, 14-CV-1142, Feb. 27, 2015, ECF No. 83-1 ("We removed the [breaks apart after flushing] logo, because we felt it created an unrealistic expectation on the part of the consumer that it would break apart immediately upon dropping it in the toilet.").

The current individual packet, as presented to the court at the February 2, 2017, is

different.  The top panel is sparse, and contains an explicit warning to "NEVER FLUSH MORE

THAN ONE WIPE AT A TIME":



Ct. Ex. 2, Feb. 2, 2017.  One part of the bottom panel states:

**Kirkland Signature Moist Flushable Wipes** are now made with new EcoFlush™ technology from 100% plant-based materials and are free of chemical binders, chlorine and alcohol†. They are safe for well-maintained sewer and septics*. The wipes are formulated with vitamin E and aloe, and are ultra soft and gentle on skin. The snap-shut Solo® lid helps preserve moisture in the wipes and enables easy, pop-up dispensing — eliminating the need for a tub. Put one in every bathroom to keep the whole family clean and fresh.
†Does not contain ethanol or rubbing alcohol.

The asterisk on the sentence "They are safe for well-maintained sewer and septics*" leads to

another section of the bottom panel, which appears as follows:



*Id.*

Costco's flushable wipes, which are manufactured by Nice-Pak, are made of wood and synthetic fibers. While the wipes used to be bound thermally, the more recent Costco wipes are bound through hydroentangling. Science Day I at 155:20-159:13. Whereas the Kimberly-Clark wipes rely on a chemical reaction for dispersability, Nice-Pak relies on "mechanical dispersibility" to break down the wipe—that is to say, Nice-Pak's wipes disintegrate due to the energy and velocity of being transported through a system of pipes. *Id.* at 159:14-160:6. Nice-Pak has changed the applicator/basesheet of the Kirkland Signature Moist Flushable Wipe during the relevant time period. The first wipe Costco sold was comprised of a nonwoven substrate made by Buckeye Technologies. Around late 2013 to early 2014, Costco switched to a nonwoven substrate manufactured by Sigma Technologies. Jeff Hurley Dep., 14-CV-1142, Mar. 3, 2015, ECF No. 97-7 ("Hurley Dep.") at 37:17-39:23; Babusik Decl. at ¶ 13. The change was made, in part, to improve the dispersibility of the wipe. Hurley Dep. at 61:10-62:10; Wailor Decl. at ¶ 8. Nothing in the record suggests any substantial difference in flushability among possible different versions produced by Nice-Pak.

Costco offers its customers a full refund—no questions asked—if they are not 100% satisfied with a purchased product. Wailor Decl. at ¶ 3. The customer service phone number

provided on the packaging, however, is not Costco's phone number, but the phone number for

Nice-Pak.  *Id.* at ¶ 10; Ct. Ex. 18, June 19, 2015; Babusik Decl. at ¶ 17.  If a customer complains

about a plumbing issue, the information is forwarded to Nice-Pak to resolve the matter.  Wailor

Decl. at ¶ 11.  Nice-Pak sometimes reimburses a complainant for reasonable plumbing costs

upon receipt of documentation from the customer.  Babusik Decl. at ¶¶ 20-21.  The customer is

not informed on the packaging of this refund policy.

When sold at regular, non-discounted prices, flushable wipes are more expensive than

Kirkland Signature Baby Wipes.  Denise N. Martin Decl., 14-CV-1142, Feb. 27, 2015, ECF No.

89-1 ("Martin Decl. I") at ¶¶ 32-33.

## V.    Definitions of "Flushability"

There are many available definitions of the word "flushable."

### A.    According to the FTC

The FTC, in its consent order with Nice-Pak, defined "flushability" as:

> [D]isperses in a sufficiently short amount of time after flushing to
> avoid clogging, or other operational problems in, household and
> municipal sewage lines, septic systems, and other standard
> wastewater equipment[.]

*See* Nice-Pak Final Consent Order at 3.

### B.    According to the Plaintiffs

The plaintiffs have a more narrow definition of flushability.  Kurtz believes that "flushable

would mean that I can take a product, flush it down the toilet, and it would not cause any problem

to any part of *my* flushing system, any pipes."  Kurtz Dep., 14-CV-1142, May 28, 2015, ECF No.

142-1 at 37:14-20 (emphasis added).  Belfiore similarly stated that he only cares about his own

residential system when evaluating flushability; he would buy Freshmates again if in the future "you had confidence that Charmin flushable wipes would flush down *your* toilet and not clog *your* septic system or *your* sewer line or *your* pipes."  Anthony Belfiore Dep., Dec. 18, 2014, 14-CV-4090, ECF No. 63-1 ("Belfiore Dep.") at 122:16-21 (emphasis added).

### C.    According to Plaintiffs' Experts

Belfiore's expert, Robert Villée, is Executive Director of the Plainfield Area Sewerage Authority, a Regional Interceptor.  He has expertise in municipal sewage systems, but not in consumer's plumbing or cesspools.  Science Day II at 6:12-8:6, 72:10-12.  Villée offers a narrow, pragmatic definition of consumer expectations:

> For the consumer, they just want it to *go away when they push the little silver handle on the big white thing* in the bathroom.  As long as it *goes away and doesn't cause them problems* they consider the product to be flushable . . .

*Id*. at 47:17-20 (emphasis added).  When pressed, he offered: a "flushable" wipe must, from the perspective of a consumer or a municipality, "disperse in a short period of time . . . [and] begin to lose strength almost after it's flushed."  *Id.* at 49:18-19, 50:21-23 (emphasis added).

Kurtz's expert, Daniel H. Zitomer, is an environmental engineer who has served as a consultant for wastewater districts.  He proffered a broad definition that extended to municipal sewage and wastewater treatment systems.

> Q:    When asked at your recent deposition what flushable means . . . [y]ou said that *when used appropriately and flushed, it shouldn't cause any impairments of the function or damage to plumbing system, its sewerage system or the treatment system*.
>
> Is that right?
>
> A:    Yes, that's correct.

Science Day I 48:12-20 (emphasis added).

### D.    According to Plaintiffs' Counsel

Kurtz's counsel believes that all the proffered definitions of "flushable" "have a common theme that basically a product must break apart in a reasonable period of time. . . . Reasonable is going to be determined by a reasonable consumer."  Feb. 2, 2017 Hr'g Tr. at 61:17-62:3. Belfiore's counsel adopts the FTC's definition of flushable, as articulated in the Nice-Pak Final Consent Order.  *See* Feb. 3, 2017 Hr'g Tr. at 29:16-19.

### E.    According to Defendants' Experts

Jeffrey Scott Hurley, Vice President for Nonwovens for Nice-Pak Products Inc., a competitor of defendant, defined "flushable," according to a consumer, as being able to pass through one's property—a definition that, according to him, included a golf ball:

> Q:    [W]hat is your definition of flushable?
>
> A:    Say the consumer, because I'm not wastewater, I'm a consumer, that flushable is the product is passing out through my house and it's off my property.
>
> Q:    *So a paper towel would be flushable* then?
>
> A:    *To a consumer, yes.*
>
> Q:    *A golf ball?*
>
> A:    *A wristwatch, golf ball, Matchbox car.*

Science Day I 178:16-23 (emphasis added).

Dr. Darius Sabaliunas, Associate Director of Global Products Stewardship for Procter & Gamble, offered a specific definition with respect to a consumer's understanding of "flushable":

> A:    . . . If you ask a consumer, consumer's understanding would be, well, *it has to clear the toilet.  It has to clear the drainline.  It has to successfully leave their home.*  Probably that is what they care about.  P&G looks beyond that.  And we agree, obviously, with the consumer and *we have tests to show that wipes do just that, you know, they're compatible with home systems.*  But then also we have

> tests that ensure compatibility of flushable products with municipal
> sewer systems, too, as well as treatment plants.
>
> Q:     How do you measure whether a product is flushable?
>
> A:     We use [the Association of the Nonwoven Fabrics Industry]
> guidelines . . . .

Science Day I at 190:8-18 (emphasis added).

Dr. Sabaliunas reiterated reliance on a proposed industry-wide standard in a declaration,

tying the definition of flushable to the capacity of the product to comply with industry standards

and tests:

> The tests described in the INDA [Association of the Nonwoven
> Fabrics Industry] guidelines measure how a product performs in a
> consumer's toilet and household pipe system, its compatibility with
> wastewater conveyance, treatment, reuse, and disposal systems, and
> whether the product is unrecognizable in effluent and digested
> sludge that is generated in the normal course by wastewater
> treatment facilities.  Products that pass the battery of flushability
> tests described in these INDA guidelines may be labeled as
> "flushable."

Darius Sabaliunas Decl., 14-CV-4090, Feb. 27, 2015, ECF No. 68 at ¶ 7; *see also* Procter &

Gamble Mem. in Opp. to Belfiore Mot. for Class Cert., Mar. 27, 2015, ECF No. 81 ("Procter &

Gamble Opp.") at 9 n.5 ("[I]t is undisputed that Freshmates passes all of the tests required for the

product to be labeled as 'flushable' under these [INDA] guidelines.").  He also stated that

"flushable products do not have to fully disintegrate in home drain lines for them to be

compatible with toilet and drain lines and not to clog them."  Science Day I at 208:1-4.

## F.     According to Defendants' Counsel

For the purposes of this litigation, defendants' counsel argue that there is no one

consumer definition of "flushable"—"flushability" is a highly individualized inquiry.  Defendant

Procter & Gamble contends that whether a wipe is "flushable" is a subjective inquiry, unique to

each purchaser's experience:

> [T]he claim that Freshmates is not "flushable" because it clogged
> Mr. Belfiore's pipes is unique to Mr. Belfiore's actual experience;
> plaintiff has not shown (and could not show) through common
> evidence that the product is actually "non-flushable" for everyone.
> Mr. Belfiore's experience is not typical of the majority of
> purchasers, many of whom have been using the product for years,
> and for whom the product has always been fully "flushable."

Procter & Gamble Opp. at 7.  When pushed to provide a definition, counsel for defendant stated:

"what Procter & Gamble knows consumers believe [flushable] to mean is that it will not cause

problems in their home system."  Belfiore Class Cert. Hr'g Tr. at 46:15-18.

Defendant Kimberly-Clark agrees that a wipe's flushability is based on an individualized

inquiry; whether a consumer considers a wipe to be "flushable" may turn not only on the

individual's knowledge of her own plumbing, but even what toilet she chooses to use in

conjunction with the wipe:

> I think many of us have those individualized inquiries in our homes.
> You may know that you're perfectly comfortable flushing your
> toilet upstairs, triple-ply toilet paper, whatever you want to stick in
> there, because it's good, it's new, it's fast.  But you go downstairs
> and you're limited to the single-ply stuff or what have you.

Feb. 2, 2017 Hr'g Tr. at 9:13-18.

Costco agrees that "flushability" must be determined on a case-by-case basis.

"'Flushable' is a claim about what the consumer can *do* with the product.  If someone buys

flushable wipes and then flushes them without suffering any plumbing problems, they got what

they paid for and have suffered no injury. . . there is no *injury* unless something went wrong

when they flushed it."  Costco Reply in Supp. of Mot. to Deny Class Cert., 14-CV-1142, Apr.

30, 2015, ECF No. 129 ("Costco Reply") at 7 (emphasis in original).

G.      **According to Defendants' Labeling Practices**

For the purposes of labeling their products, all defendants followed the guidelines of the Association of the Nonwoven Fabrics Industry ("INDA").  In June 2008, INDA, an organization of United States companies in the "nonwoven/engineered fabrics industry," and EDANA, its European counterpart, formulated the first edition of guidelines that assessed the flushability of nonwoven consumer products.  *See* Guidelines for Assessing the Flushability of Disposable Nonwoven Prod., Third Edition, 14-CV-4090 June 22, 2015, ECF No. 108-1 ("INDA Guidelines") at 3-4.  The third edition of the flushability guidelines, released in June 2013, addresses how nonwoven products effect both the consumer and wastewater treatment systems. For a product to be "operationally defined as flushable," it must:

> Clear toilets and properly maintained drainage pipe systems when the supplier's recommended usage instructions are correctly followed;
>
> Pass[] through wastewater conveyance systems and is compatible with wastewater treatment, reuse and disposal systems without causing system blockage, clogging or other operational problems; and
>
> Is unrecognizable in effluent leaving onsite and municipal wastewater treatment systems and in digested sludge from wastewater treatment plants that are applied to soil.

INDA Guidelines at 19.  A fourth edition of the guidelines is under consideration.  Science Day II at 15:3-5.

Some of the defendants have worked closely with INDA in developing their flushability guidelines.  David Powling, a Technical Leader in Kimberly-Clark's flushable wipes division, was a technical expert for INDA.  Science Day I at 85:4-5.  Dr. Darius Sabaliunas, Procter & Gamble's Associate Director of Global Products Stewardship, testified that Procter & Gamble is

an active member of INDA and had suggested establishing a flushability task force.  *Id.* at 191:10-23.

All three defendants label their products as "flushable" in accordance with the INDA guidelines.  According to defendants, all of their flushable products have always complied with the applicable INDA guidelines for "flushability."  *Id.* at 106:16-107:13; 128:8-17 (Powling from Kimberly-Clark so testifying); 190:8-18 (Sabaliunas from Procter & Gamble so testifying); 180:25-181:6 (Hurley from Nice-Pak so testifying).

## H.    According to Dictionaries

Dictionaries offer differing definitions of "flushable."  *See, e.g.*, *Flushable*, Merriam-Webster, http://www.merriam-webster.com/dictionary/flushable (last visited Apr. 22, 2017) ("suitable for disposal by flushing down a toilet"); *Flushable*, Oxford English Dictionary (3rd ed. 2007), *available at* http://www.oed.com/view/Entry/268411?redirectedFrom=flushable#eid ("designed to be flushed down a toilet after use.  Also more generally: of a size which admits of disposal down a toilet."); *Flushable*, Webster's New World College Dictionary (5th ed. 2014), *available at* http://www.yourdictionary.com/flushable#websters ("designed to be disposed of by flushing down the toilet").

## I.    Lack of Consumer Surveys

No scientifically-designed survey has been offered indicating consumer understanding of the term.  An acceptable survey would be expensive.  Plaintiffs have been non-committal on whether they are willing to pay for such a survey.  Feb. 2, 2017 Hr'g Tr. at 62:10-16 ("[A survey is] something that has been considered.  We're not sure whether or not that's something that's absolutely necessary.").  Limitation of classes to New York buyers rather than national consumers would reduce the cost and probably increase the accuracy of any class survey.

## VI.    Expert Reports

### A.    Plaintiffs' Expert: Colin B. Weir

Plaintiffs Kurtz and Belfiore submitted expert reports from Colin B. Weir, Vice President of Economics and Technology, Inc., "a research and consulting firm specializing in economics, statistics, regulation and public policy."  Colin B. Weir Decl., 14-CV-4090, Feb. 27, 2015, ECF No. 62-3 ("*Belfiore* Weir Expert Report") at 1; Colin B. Weir Rebut. Decl., 14-CV-4090, Apr. 29, 2015, ECF No. 89-3 ("*Belfiore* Weir Rebuttal"); Colin B. Weir Decl., 14-CV-1142, Feb. 27, 2015, ECF No. 84 ("*Kurtz* Weir Expert Report") at 1; Colin B. Weir Rebut. Decl., 14-CV-1142, Mar. 27, 2015, ECF No. 102 ("*Kurtz* Weir Rebuttal").  Mr. Weir has provided expert testimony before federal and state courts, the Federal Communications Commission, and state regulatory commissions. *Belfiore* Weir Expert Report ¶ 1.

Mr. Weir's "hedonic regression" analysis has been accepted by the federal district court for the Southern District of New York to demonstrate a price premium associated with the specific representation "50% thicker" on the defendant's seed packaging. *In re Scotts EZ Seed Litig*., 304 F.R.D. 397, 413-14 (S.D.N.Y. 2015).  His calculation of a price premium, attributable to a challenged 0% olive oil dilution, was also accepted in the Southern District in *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 571-72 (S.D.N.Y. 2014) (calculating price premium based on a difference in value calculation).

Classwide calculation of a price premium attributable to the representation that a vitamin C supplement is "The Better Vitamin C" was recently rejected in the federal district court for the Eastern District of New York because the methodology was unable to isolate what "better" meant in the context of a label that contained many representations that could have accounted for why the vitamin C at issue was "better." *Hughes v. The Ester C Company*, 317 F.R.D. 333, 355-56 (E.D.N.Y. 2016).

In the instant litigation, Mr. Weir proposed three damages models: full compensatory damages, statutory price premium damages, and statutory damages. *See generally Belfiore* Weir Expert Report at ¶¶ 10-53; *Kurtz* Weir Expert Report at ¶¶ 15-61. His price premium model is relevant to establishing injury; his statutory model is relevant to calculating damages.

In order to ascertain a price premium, Mr. Weir proposes using hedonic regression analysis, a tool that purports to measure the value of various product attributes in order to demonstrate the existence of, and to isolate the amount of, a price premium attributable to defendant's use of "flushable" in merchandising. *Belfiore* Weir Expert Report. at ¶ 15; *Kurtz* Weir Expert Report at ¶ 19. The analysis would rely on evidence gleaned from the defendants' own business records, industry resources, and independent market research data obtained from companies like Nielsen and Information Resources, Inc. *Belfiore* Weir Expert Report at ¶¶ 41-49; *Kurtz* Weir Expert Report at ¶¶ 19-60.

In his report and rebuttal, Mr. Weir presented the hedonic regression function in detail and provided a "preliminary" list of product attributes upon which he would rely. *See Belfiore* Weir Expert Report at ¶¶ 19-25, 33-36; *Belfiore* Weir Rebuttal at ¶¶ 25-29; *Kurtz* Weir Expert Report at ¶¶ 21–31, 38-41; *Kurtz* Weir Rebuttal at ¶ 48. He describes the "iterative" process that can be used to determine the "best regression specification before finalizing the results." *Belfiore* Weir Expert Report at ¶ 34; *Kurtz* Weir Expert Report at ¶ 40.

In the alternative, Mr. Weir presents in a footnote two different methods for determining a price premium:

> It would also be possible to evaluate the difference in price attributable to the 'flushable' label . . . using statistical survey techniques such as contingent valuation (a representative survey technique that asks people to directly report their willingness to pay to obtain a specific good or product attribute, or willingness to accept to give up a good

> or product attribute) or *conjoint analysis* (a representative survey technique where survey panelists are confronted with various choices of product attributes, prices, and other alternatives, and asked either to rank their preferences, or to choose the most preferred attribute or combination thereof) the results of which permits an economist to analyze the value of various product attributes.

*Belfiore* Weir Expert Report ¶ 14, n. 7; *Kurtz* Weir Expert Report ¶ 20, n. 14.

To determine the statutory damages under New York law, Weir proposed a simple mathematical calculation based on the New York statutory penalty of $50 a purchase. *Belfiore* Weir Expert Report at ¶ 53; *Kurtz* Weir Expert Report at ¶ 61; *see* New York General Business Law §§ 349, 350.

### B. Procter & Gamble's Expert: Carol A. Scott, Ph.D.

Defendant Procter & Gamble submitted two expert reports from Carol A. Scott, Ph.D., professor emeritus of marketing at the Anderson Graduate School of Management, University of California, Los Angeles.  Carol A. Scott Decl., 14-CV-4090, Feb. 27, 2015, ECF No. 69 ("Scott Decl. I"); Carol A. Scott Decl., 14-CV-4090, March 27, 2015, ECF No. 82 ("Scott Decl. II").

Dr. Scott calls hedonic regression "not an 'ideal' method to determine a price premium." Scott Decl. II ¶¶ 6, 10-14, 20.  Assuming it is suitable, she challenges Mr. Weir's proposal because it does not provide sufficient details about the model or define parameters for the: (1) dependent variable (the price of the product); (2) set of independent or predictor variables (the product attributes); and (3) set of brands against which these variables will be analyzed. *Id*. at ¶ 15.  She also questions differences in the format of several of the available datasets. *Id*. at ¶¶ 16, 26-42.

### C.    Costco's Expert: Denise N. Martin, Ph.D.

Defendant Costco submitted two expert reports from Denise N. Martin, Ph.D., a Senior Vice President at NERA Economic Consulting.  Martin Decl. I; Denise N. Martin Decl., 14-CV-1142, Apr. 16, 2015, ECF No. 118-1 ("Martin Decl. II").

Dr. Martin analyzed consumer transaction data and found that Costco customers who purchased Kirkland Signature flushable wipes varied widely as to when they purchased the wipes, how often they purchased the wipes, how many wipes they purchased, and whether they purchased other flushable and non-flushable wipes.  Martin Decl. I at ¶¶ 14-24.  Dr. Martin also questioned whether a "comparable, non-flushable" product could be identified to compare against Kirkland Wipes to learn if there is a price premium associated with the "flushability" characteristic, noting that different products have many different characteristics.  *Id.* at ¶¶ 25-30. She contends that an analysis of the price differential between Costco's flushable and non-flushable wipes demonstrates that any higher price attributable to flushable wipes could be explained by volume discounting.  *Id.* at ¶¶ 32-35.

According to Dr. Martin, "Mr. Weir's proposed application of hedonic regression to estimate damages in this case" is "critically flawed."  Martin Decl. II at ¶ 5.  In particular, she criticizes his proposed model because, among other reasons: (1) the "flushable" characteristic it seeks to isolate is not sufficiently defined; (2) there are bundled attributes and omitted variables that cannot be accounted for; and (3) it assumes that prices would be fundamentally the same in a hypothetical world where flushable wipes were not labeled "flushable."  *Id.* at ¶¶ 6-8; 32-64.

### D.      Kimberly-Clark's Expert: Keith R. Ugone, Ph.D.

Defendant Kimberly-Clark submitted two expert reports from Keith R. Ugone, Ph.D., an economist and the Managing Principal at Analysis, Group, Inc. Ugone Decl. I; Keith R. Ugone, Decl., 14-CV-1142, Mar. 27, 2015, ECF No. 105 ("Ugone Decl. II").

Dr. Ugone argued that classwide proof of damages is not possible because individualized inquiries are necessary to determine why a consumer purchased a flushable wipes product, how it worked for that consumer in his or her home, and how much the consumer paid for the product.  Ugone Decl. I at ¶¶ 17-55.  He attacked Mr. Weir's proposed hedonic regression methodology because the flushability representations on the challenged products have changed periodically, and the model lacked detail and clarity concerning variables, comparator products, and whether one or multiple regressions would be needed.  Ugone Decl. II at ¶¶ 6-7; 20-31.  He also critiqued Mr. Weir's proposed survey techniques—contingent valuation and conjoint analysis—as (1) only being able to demonstrate a "willingness" of consumers to pay a precise premium, without demonstrating if such a price premium existed; (2) potentially biasing the survey participants about relevant product features; and (3) unable to measure the value of the "flushability" attribute during the putative class time period.  *Id.* at ¶¶ 36-43.

## VII.   New York Law

Plaintiffs Belfiore and Kurtz allege that the defendants violated New York General Business Law § 349.  Plaintiff Kurtz also alleges that the defendants violated New York General Business Law § 350, and asserts common law claims for negligent misrepresentation, breach of express warranty, and unjust enrichment.

A.     **New York General Business Law §§ 349 and 350**

Section 349 of New York's General Business Law declares consumer fraud unlawful:

> Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.

N.Y.G.B.L. § 349(a).

Section 350 of the New York General Business Law makes unlawful "false advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y.G.B.L. § 350.  "The term 'false advertising' means advertising, including labeling." N.Y.G.B.L. § 350-a.

The elements of the plaintiffs' claims under these two sections of the New York General Business Law are the same.  *See In re Scotts*, 304 F.R.D. at 409; *Koch v. Acker, Merrall & Condit Co.*, 967 N.E.2d 675, 675-76 (N.Y. 2012).  To establish a *prima facie* case, "a plaintiff must demonstrate that (1) the defendant's deceptive acts were directed at consumers, (2) the acts [we]re misleading in a material way, and (3) the plaintiff has been injured as a result."  *In re Scotts*, 304 F.R.D. at 409 (citing *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000)).

Materiality is an objective inquiry; a plaintiff must show that the act complained of was likely to "mislead a *reasonable consumer* acting reasonably under the circumstances."  *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009) (emphasis added) (citation omitted).  Courts "view each allegedly misleading statement in light of its context on the product label or advertisement as a whole."  *Delgado v. Ocwen Loan Servicing, LLC*, 2014 WL 4773991, at *8 (E.D.N.Y. Sept. 24, 2014) (citation and quotation marks omitted).  "The entire mosaic" is "viewed rather than each tile separately."  *Time Warner Cable, Inc. v. DIRECTV, Inc*., 2007 WL 1138879, at *4 (S.D.N.Y. Apr. 16, 2007) (citation omitted).  The "issue may be a question of law

or of fact as individual cases require." *Delgado*, 2014 WL 4773991, at *8 (citing *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 745 (N.Y. 1995)).

"Intent to defraud and justifiable reliance by the plaintiff are *not* elements of the statutory claim." *Oscar v. BMW of N. Am., LLC*, 274 F.R.D. 498, 512 (S.D.N.Y. 2011) (emphasis added) (citing *Small v. Lorillard Tobacco Co.*, 720 N.E.2d 892, 897 (N.Y. 1999)); *In re Avon Anti-Aging Skincare Creams & Prods. Mktg. & Sales Practices Litig.*, 2015 WL 5730022, at *7 (S.D.N.Y. Sept. 30, 2015) ("Plaintiffs need not show justifiable reliance").  But "proof that a material deceptive act or practice caused actual, although not necessarily pecuniary, harm is required to impose compensatory damages." *Id.* (citation omitted).

A violation of New York General Business Law § 349 permits an action to "enjoin such unlawful act or practice, an action to recover actual damages or *fifty dollars [per transaction]*, whichever is greater, or both such actions."  N.Y.G.B.L. § 349(h) (emphasis added).  The provision also provides for trebling of actual damages and fees for plaintiff's attorney:

> The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff.

*Id.*

"Section 349(h) is substantially modelled on the Federal Trade Commission Act." *Genesco Entm't, a Div. of Lymutt Indus., Inc. v. Koch*, 593 F. Supp. 743, 752 (S.D.N.Y. 1984). A violation of New York General Business Law § 350 provides for almost identical relief, except that the statutory award is *five hundred dollars* per transaction.  N.Y.G.B.L. § 350-e (emphasis added).

68

The statutory damages for many multiple purchasers is potentially enormous: it is $50 or $500 per purchase plus attorneys' fees.  Yet, as previously noted *supra* at Part II.D.2, the *Shady Grove* opinion of the Supreme Court permits such damages.  Though plaintiffs would not be able to obtain such statutory damages through a class action if this action were litigated in New York state court (*see* CPLR § 901(b)), the Supreme Court of the United States in *Shady Grove* held that such a class action for statutory damages is maintainable in federal court.  559 U.S. at 399-401.  This holding binds district courts.  *See Belfiore*, 311 F.R.D. at 59; *supra*, Part II.D.2.

### B.     Common Law Claims

#### 1.     Negligent Misrepresentation

"It is well settled that a claim for negligent misrepresentation requires the plaintiff to demonstrate (1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information."  *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1109 (N.Y. 2011) (internal quotation marks omitted).  "In general, a simple commercial relationship, such as that between a buyer and seller or franchisor and franchisee, does not constitute the kind of special relationship necessary to support a negligent misrepresentation claim."  *Century Pac., Inc. v. Hilton Hotels Corp.*, 2004 WL 868211, at *8 (S.D.N.Y. Apr. 21, 2004) (citation omitted) (internal quotation marks omitted).  Where a party holds itself out as possessing special expertise, privity may exist.  See *Kimmell v. Schaefer*, 675 N.E.2d 450, 454 (N.Y. 1996) ("[A] fact finder should consider whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose.").  Certification of a class on the negligent misrepresentation claim is not warranted.  *See infra* at

69

VIII.F.2.c.  The claims of defendants were arguably well founded and supported in part by research.

### 2.        Breach of Express Warranty

"To state a claim for breach of express warranty, a plaintiff must allege (1) the existence of a material statement amounting to a warranty, (2) the buyer's reliance on this warranty as a basis for the contract with the immediate seller, (3) breach of the warranty, and (4) injury to the buyer caused by the breach."  *In re Scotts*, 304 F.R.D. at 410 (internal quotation marks omitted).  Certification of a class on the breach of express warranty claim is not warranted, particularly since there is a standing offer of a full refund.  *See infra* at VIII.F.2.c.

### 3.        Unjust Enrichment

"Under New York law, a plaintiff seeking damages for a claim of unjust enrichment must establish three elements: "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution."  *Digizip.com, Inc. v. Verizon Servs. Corp.*, 139 F. Supp. 3d 670, 682 (S.D.N.Y. 2015) (internal quotation marks omitted).  "An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim."  *Corsello v. Verizon New York, Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012).  Certification of a class on the unjust enrichment claim is not warranted.  *See infra* at VIII.F.2.c.

## VIII.    Class Certification in *Kurtz* and *Belfiore*

Belfiore seeks to certify the following class: "All persons and entities who purchased Charmin Freshmates in the State of New York between May 23, 2011 and the present."  Letter, 14-CV-4090, Feb. 6, 2017, ECF No. 242.

Kurtz seeks to certify the following three classes: (1) "All persons and entities who purchased Kimberly-Clark Flushable Products in the State of New York between February 21, 2008 and the present."; (2) "All persons and entities who purchased Kirkland Signature Flushable Wipes in the State of New York between July 1, 2011 and the present."; and (3) "All persons and entities who purchased Kimberly-Clark Flushable Products from February 21, 2008 and the present or Kirkland Signature Flushable Wipes from July 1, 2011 to the present."  Letter, 14-CV-1142, Feb. 6, 2017, ECF No. 282.  The court defines "Kimberly-Clark Flushable Wipes" as flushable moist wipe products sold under Kimberly-Clark's Cottonelle, Scott, Huggies, Pull-Ups, U by Kotex, and Poise brands.  *See id.*; Compl., 14-CV-1142, Feb. 21, 2014, ECF No. 1 at ¶ 2.  This definition excludes flushable products manufactured by Kimberly-Clark that were never sold in the United States.  *See* Kimberly-Clark Mem. in Supp. of Mot. to Deny Class Cert., 14-CV-1142, Feb, 27, 2015, ECF No. 85 at 4 n. 2 (two lines of products listed in plaintiff's complaint—Scottex and Andrex—were never sold in the United States).  The court may later amend the definition further if needed.  Fed. R. Civ. P. 23(c)(1)(C).

Kurtz's third proposed class, the nationwide class, is denied on adequacy of representation grounds.  *See Kurtz*, 2017 WL 751231 (E.D.N.Y. Feb. 27, 2017).

"[T]he class action is one way of equalizing the power of enfeebled individuals and the powerful entities they confront."  Essay, *Notes on Uniformity and Individuality in Mass Litigation*, 64 DePaul L. Rev. 251, 256 (2015).  "The policy at the very core of [Federal Rule of Civil Procedure 23] . . . is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.  A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth

someone's (usually an attorney's) labor." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617

(1997) (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997)).

"Rule 23 class actions are designed to promote efficiency and economy of litigation . . .

without sacrificing procedural fairness." *Ackerman v. Coca-Cola Co. & Energy Brands, Inc.*,

2013 WL 7044866, at *6 (E.D.N.Y. July 18, 2013) (report and recommendation) (citing, among

others, *Amchem*, 521 U.S. at 614). "[B]y pooling . . . resources, plaintiffs . . . [may also] retain[]

more qualified lawyers." Christine P. Bartholomew, *Redefining Prey and Predator*, 80 Brook.

L. Rev. 743, 785 (2015) (citation omitted).

"At times, legislatures and courts have expanded the availability of class actions . . . . In

the last decade, by contrast, we have seen a movement toward contracting the availability of

class actions." *Notes on Uniformity and Individuality in Mass Litigation*, 64 DePaul L. Rev. at

270-71 (2015). The usefulness of the class action mechanism to consumers in some cases is

seldom denied by opponents of consumer class actions; they purport to prevent what they

characterize as "abuse."

A consensus exists that at least some consumer protection claims are particularly well-

suited to class certification. *See Ebin*, 297 F.R.D. at 567; Essay, *The Role of Judges in a

Government of, by, and for the People: Notes for the Fifty-Eighth Cardozo Lecture*, 30 Cardozo

L. Rev. 1, 177 (2008) (class actions are "essential" for "large groups of people who need to

consolidate their power in the courts in order to protect their rights, as well as for the industry,

which needs to stop almost endless resource-sapping suits."). But respected commentators

contend that "[j]udicial treatment" of class actions involving mislabeling of consumer products

"is 'inconsistent' at best." Victor E. Schwartz & Cary Silverman, *The Rise of "Empty Suit"*

*Litigation. Where Should Tort Law Draw the Line?*, 80 Brook. L. Rev. 599, 657 (2015) (discussing class actions involving alleged mislabeling of food as "natural").

There is general agreement that courts are required to conduct a "rigorous analysis" of each prong of Rule 23. *Ackerman*, 2013 WL 7044866, at *6 (citation omitted); *Jacob v. Duane Reade, Inc.*, 602 F. App'x 3, 5 (2d Cir. 2015) (summary order) (citing *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011)). "[E]vidence, by affidavits, documents, or testimony" must be gathered, *Ackerman*, 2013 WL 7044866, at *6 (citation omitted), and "factual disputes relevant to each Rule 23 requirement" must be resolved. *Jacob*, 602 F. App'x at 6 (citations omitted).

While it "may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (citation omitted), this is *not* a "free-ranging merits inquir[y]." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013). "Merits questions may be considered . . . only to the extent . . . they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* The overarching purpose is "not to adjudicate the case . . . [but] to select the method best suited to adjudication of the controversy fairly and efficiently.'" *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2014 WL 7882100, at *29 (E.D.N.Y. Oct. 15, 2014) (citation omitted), *report and recommendation adopted by In re Air Cargo Shipping Servs. Antitrust Litig.*, 2015 WL 5093503, at *1 (E.D.N.Y. July 10, 2015).

Rule 23 should still be construed "*liberal[y]* rather than restrictive[ly.]" *Gortat v. Capala Bros.*, 257 F.R.D. 353, 361 (E.D.N.Y. 2009) (citing *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997)) (emphasis added). The "general preference" of the Court of Appeals for the Second Circuit is "*granting* rather than denying class certification." *Id.* (emphasis added).

73

Nevertheless, "a district court is afforded broad discretion in determining whether an action should be certified." *Haynes v. Planet Automall, Inc.*, 276 F.R.D. 65, 73 (E.D.N.Y. 2011) (citations omitted); *accord Parker v. Time Warner Entm't Co., L.P.*, 331 F.3d 13, 28 (2d Cir. 2003); 7AA Charles A. Wright, Arthur R. Miller et al., *Federal Practice and Procedure* § 1785 (3d ed. 2015). The court may "revisit [a grant of] certification throughout the legal proceedings before the court." *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 520 (6th Cir. 2015) (citation omitted) (emphasis omitted).

The party seeking class certification "bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met." *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010); *Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 465 (2d Cir. 2013) (same). The pleading burden is the same regardless of whether the court considers a motion to certify or a motion to deny certification. *See, e.g.*, *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 92 (S.D.N.Y. 2010).

"Federal Rule of Civil Procedure 23(a) permits a case to be litigated as a class action *only* if: (1) the class is so *numerous* that joinder of all members is impracticable; (2) there are questions of law or fact *common* to the class; (3) the claims or defenses of the representative parties are *typical* of the claims or defenses of the class; and (4) the *representative parties* will fairly and adequately protect the interests of the class." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015) (emphasis added).

## A.    Rule 23(a)(1): Numerosity

Rule 23(a)(1) provides: "One or more members of a class may sue or be sued as representative parties on behalf of all members only if . . . the class is so numerous that joinder of all members is impracticable[.]" Fed. R. Civ. P. 23(a)(1).

"[N]umerosity is presumed at a level of 40 members[.]"  *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) (citing 1 Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 3.05 (2d ed. 1985)); *see e.g., Rodriguez v. It's Just Lunch, Int'l*, 300 F.R.D. 125, 132 (S.D.N.Y. 2014) (finding plaintiff "greatly exceeded [the requirement], since more than ten thousand individuals purchased defendants' services annually during each year of the proposed class period").  Plaintiff must present either evidence of the number or a "reasonable estimate."  *Kalkstein v. Collecto, Inc.*, 304 F.R.D. 114, 119 (E.D.N.Y. 2015) (citations omitted).

Here, numerosity is present for each proposed class.  The number of individual purchases of Freshmates in New York exceeds forty and is likely to be over one million.  *See* Lester L. Levy Decl., 14-CV-4090, Feb. 27, 2014, ECF No. 62-2 at ¶ 2 (outlining number of purchasers); Belfiore Class Cert. Hr'g Tr. at 11:9-12:5 (plaintiff estimating approximately 1.9 million units sold during the class period); 45:24-46:1 (defendant challenging data but conceding "it can approximate…1.9 million"); 16:21-24 (court noting that numerosity is not a hurdle in the *Belfiore* action).  Costco has sold tens of thousands of units of Kirkland Signature Flushable Wipes annually in New York.  Costco Resp. to Interrog., 14-CV-1142, Feb. 27, 2015, ECF No. 89-12 at 2-3.  Data from Costco demonstrates that from June 2011 to December 2014, tens of thousands of units of one brand of Kimberly-Clark flushable products (Cottonelle) were sold by one retailer (Costco) in their New York stores.  *See* Martin Decl. I at ¶ 21, fig. 6 (87,969 households purchased Cottonelle moist flushable wipes from New York Costco stores from June 15, 2011 to December 29, 2014).  All the classes are so numerous that joinder of all members is impracticable.

### B.     Rule 23(a)(2): Commonality

Rule 23(a)(2) requires that plaintiff establish that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).

Not "*all* questions of law or fact raised" need be "common."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2562 (2011) (Ginsburg, J., dissenting) (emphasis added) (citing 1 Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 3.10 (3d ed. 1992)).  "[E]ven a single common question will do."  *Id.* at 2556 (quoting Richard A. Nagareda, *The Preexistence Principle and the Structure of the Class Action*, 103 Colum. L. Rev. 149, 176 n. 110 (2003)); *see, e.g.*, *id.* at 2551 ("Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury'") (citation omitted); *In re Agent Orange Prod. Liab. Litig. MDL No. 381*, 818 F.2d 145, 166-67 (2d Cir. 1987) (commonality requirement satisfied where class members shared common defense); *Belfiore*, 94 F. Supp. 3d at 447 ("One common motivation and one common injury, payment of a premium price, are sufficient.").

The plaintiffs must demonstrate that their claims "depend upon a common contention . . . of such a nature that [it] is capable of classwide resolution—which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Dukes*, 131 S. Ct. at 2551.  The common contention must generate "common *answers* apt to drive the resolution of the litigation."  *Id.* (citing Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)) (emphasis in original).  Commonality is "the glue holding class members' claims together."  *Enriquez v. Cherry Hill Mkt. Corp.*, 993 F. Supp. 2d 229, 236 (E.D.N.Y. 2013) *reconsideration denied*, (June 25, 2014) (citation omitted).

*In re Scotts EZ Seed Litig.*, 304 F.R.D. 397 (S.D.N.Y. 2015), a consumer class action brought under New York General Business Law § 349, is instructive. Plaintiffs presented the following contention: defendant's claim that their grass is "50% thicker" than that produced by "ordinary seed" is "false and/or misleading." *Id.* at 403-05. Because the "*answer* to this question [wa]s common to all class members, and [wa]s apt to drive the resolution of th[e] litigation," plaintiffs fulfilled the commonality requirement. *Id.* (emphasis added) (collecting cases).

Courts have found that, despite differing "individual circumstances of class members," commonality exists where "'injuries derive from a unitary course of conduct by a single system.'" *Ebin*, 297 F.R.D. at 565 (citing *Marisol A.*, 126 F.3d at 377). For example, in *Ebin v. Kangadis Food Inc.*, plaintiffs brought a putative consumer class action alleging violations of numerous state laws, including New York General Business Law § 349, for the mislabeling of pomace as "100% Pure Olive Oil." *Id*. at 564. Defendants attempted to defeat commonality by arguing that different states had varying standards to distinguish between pomace and olive oil and, therefore, the plaintiffs from different states lacked commonality. *Id.* at 565. But the court rejected the argument, relying on defendant's single system of fraudulent advertising as the common thread. *Id.* at 565-66.

"Typically . . . where the consumer protection statute at issue supplies an objective test, such claims are considered 'ideal for class certification' because they allow the court to adopt classwide presumptions of reliance and do not require an investigation into 'class members' individual interaction with the product.'" *Ackerman*, 2013 WL 7044866, at *10 (quoting *Tait v. B SH Home Appliances Corp.*, 2012 WL 6699247, at *12 (C.D. Cal. Dec. 20, 2012)) (internal quotation marks omitted). In *Ackerman*, the defendant argued that variations in consumer

expectations and labels precluded finding that the proposed class met the 23(a) commonality requirement. *Id.* at \*8-9. The court rejected such arguments, holding that "any putative class member in this case would have the same, central claim: that the name 'vitaminwater' was misleading and deceptive." *Id.* at \*10. Because "whether or not the product name was misleading or deceptive to a reasonable consumer is a single question of fact," it was "not necessary for all of the plaintiffs to have had a 'uniform' experience with respect to the product." *Id.*

Defendants argue, relying on *Hughes v. The Ester C Company*, 317 F.R.D. 333 (E.D.N.Y. 2016), that the term "flushable" is too amorphous and idiosyncratic to be the subject of one common definition. In *Hughes*, the court found that Mr. Weir could not "isolate the premium attributable" to the representation "The Better Vitamin C" because "'better' is not an objective term that carries a single definition or refers to a specific product feature." *Id.* at 355. Because "better" on its own lacked meaning, the court looked at the term "in the context in which it appear[ed]." *Id.* The term "appeared alongside various rotating representations," and "'The Better Vitamin C' conceivably encapsulate[d] some, if not all, of these terms, such that any damaged methodology failing to isolate 'The Better Vitamin C' from these other representations result[ed] in an overvaluing of the price premium attributable to the alleged misrepresentation." *Id.* at 355-56.

The concerns of the *Hughes* Court about the term "The Better Vitamin C" do not apply to the alleged misrepresentations in the instant actions. The primary issue in *Hughes* was that the word "better"—more akin to puffery than a promise about a product characteristic—was so amorphous that plaintiff's expert could not disentangle the impact of the word "better" from other non-misleading representations which could have been seen as substantiation for that word.

That is not a problem in the instant cases. The flushability representation is sufficiently distinctive that it can be isolated from other representations made on the label. *See infra* Parts VI.A; VIII.F.2.a.

Here, commonality is satisfied. The proposed classes present common questions seeking common answers:

(1) What do defendants' "flushable" representations mean to a reasonable consumer?

(2) Do defendants' products currently satisfy that meaning?

(3) Did previous iterations of defendants' products satisfy that meaning?

(4) Are defendants' "flushable" representations materially misleading?

(5) Did class members pay an unsupported premium as a result of the "flushable" representation?

(6) Was that premium—to the extent that it can be reasonably ascertained—relatively uniform?

The defendants argue that commonality has not been established in this case because payment of a price premium "depends on the purchaser's individual experience with the product *after* purchase." *See* Procter & Gamble Reply in Supp. of Mot. to Deny Class Cert., 14-CV-4090, Apr. 30, 2015, ECF No. 88 ("Procter & Gamble Reply") at 6 (emphasis added); *see also* Costco Reply at 7 ("[T]here is no *injury* unless something went wrong when they flushed it.") (emphasis in original); Kimberly-Clark Opp. at 13 ("Consumers who purchased flushable wipes that effectively flushed through their toilets and plumbing . . . received the benefit of any purported 'premium' they paid for the flushability of the wipes, and therefore suffered no economic injury.").

But "that is not the right way to think about 'injury' in the false-advertising context." *Rikos*, 799 F.3d at 507 (collecting cases). Liability under New York General Business Law §§ 349-350 does not depend on whether class members relied upon the representation when they

purchased the flushable wipes, nor does it depend on whether the product met their personal, subjective expectations. *See, e.g.*, *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005) ("a private action brought under § 349 does not require proof of actual reliance"). Rather, the "injury is the purchase price." *Ebin v. Kangadis Food Inc.*, 2013 WL 6504547, at *5 (S.D.N.Y. Dec. 11, 2013); *see also Orlander v. Staples, Inc.*, 802 F.3d 289, 302 (2d Cir. 2015) (collecting cases where "the issue of 'price premium' was relevant because it showed that plaintiffs paid more than they would have for the good but for the deceptive practices of the defendant-sellers"). The fact that some "consumers were satisfied with the product is irrelevant." *Rikos*, 799 F.3d at 507. "It is not necessary for all of the plaintiffs to have had a 'uniform' experience with respect to the product." *Ackerman*, 2013 WL 7044866, at *10. The purpose of New York General Business Law § 349 is to "punish companies that sell products using advertising that misleads the reasonable consumer." *Rikos*, 799 F.3d at 507 (addressing non-New York State false advertising laws). These classes present a sufficient number of common questions requiring common answers. *See Ackerman*, 2013 WL 7044866, at *10 (recommending certification of class based on common question: "whether or not the product name [Vitaminwater] was misleading or deceptive to a reasonable consumer"); *Dei Rossi v. Whirlpool Corp.*, 2015 WL 1932484, at *4 (E.D. Cal. Apr. 28, 2015) (finding commonality—in putative class action brought under California consumer protection statutes and common law— based on answers to the following questions: "(1) whether Defendant labeled and advertised the Refrigerators as Energy Star qualified; (2) whether the Refrigerators met the standards of energy efficiency established by the Energy Star program; (3) whether the Energy Star mark and advertising were material to class members' decision to purchase the

Refrigerators; and (4) whether class members were damaged by purchasing Refrigerators that were not Energy Star qualified").

The instant case is distinct from cases like *In re Canon Cameras*, 237 F.R.D. 357 (S.D.N.Y. 2006) and *Pagan v. Abbot Laboratories, Inc.*, 287 F.R.D. 139 (E.D.N.Y. 2012), two cases defendant rely upon. *See* Procter & Gamble Reply at 10; Kimberly-Clark Opp. at 11, 14. These cases relate to consumer claims spawning from a manufacturer's failure to disclose a product defect. *See In re Canon Cameras*, 237 F.R.D. at 358; *Pagan*, 287 F.R.D. at 141. The courts denied certification based, in part, on lack of commonality because plaintiff could not prove the number of products that were actually defective. *See In re Canon Cameras*, 237 F.R.D. at 359-60; *Pagan*, 287 F.R.D. at 148-49   Here, by contrast, the injury is the price premium on every product sold, not the purchase of some defective products sold among many without defect.

Defendants also argue that the plaintiffs have not met their burden to *prove* what a reasonable consumer understands a "flushable" representation to mean or that there is a price premium attributable to the "flushable" representation. As discussed *infra* Part VIII.F.2.a, plaintiffs have demonstrated that answers to those questions can be proven through common evidence. To the extent that defendants demand more than that, their demand is premature. At the class certification stage, plaintiffs need only show that "they will be able to bring forward at trial competent evidence" that could prove their claims "on a class-wide level. . . . All that must be *proven*, at this stage, is that 'there are *in fact* sufficiently [] common questions of law or fact.'" *Sykes v. Mel S. Harris and Assocs. LLC*, 780 F.3d 70, 86 (2d Cir. 2015) (quoting *Dukes*, 131 S. Ct. at 2551) (some emphasis added). "Anticipating proof [of liability] in the manner suggested by plaintiffs is in keeping with demonstrating a common question of fact based on the

district court's obligation to anticipate 'how a trial on the merits would be conducted if a class were certified.'" *Id.* at 86-87 (quoting *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003)).

For purposes of certification, each class shares a single issue of fact, "flushability," and a single of issue of law, entitlement to New York statutory damages due to payment of a premium price.

### C.    Rule 23(a)(3): Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are *typical* of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3) (emphasis added).

Although the analysis of typicality and commonality "tend to merge," each is "distinct." *Morangelli v. Chemed Corp.*, 275 F.R.D. 99, 104 (E.D.N.Y. 2011), and "serve[s a] different function[]." 5 James Wm. Moore et al., Moore's Federal Practice - Civil § 23.23[6] (3d ed. 2015). "The commonality requirement tests the definition of the class itself," while "the typicality requirement focuses on *how* the named plaintiff's claims compare to the claims of the other class members." *Id.* (emphasis added). Typicality, therefore, acts as a "guidepost[] for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff[s'] claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Rodriguez*, 300 F.R.D. at 136 (citing *Dukes*, 131 S. Ct. at 2551 n. 5); *accord Morangelli*, 275 F.R.D. at 104. Typicality ensures that "class representatives have the incentive to prove all the elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions." *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 238 (S.D.N.Y. 2006) (internal quotation marks omitted).

This "requirement is not highly demanding." *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 113 (S.D.N.Y. 2015) (citation omitted).  "[C]omplete symmetry between the class representative's claims and those of the absent class members" is not required, *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 105 (E.D.N.Y. 2012) (citation omitted), "so long as the named plaintiff's claims share the same essential characteristics as that of the proposed class." *Marcus v. AXA Advisors, LLC*, 307 F.R.D. 83, 99-100 (E.D.N.Y. 2015).  Courts interpret this requirement to mean that "'each class member's claim arises from the *same course of events* and each class member makes *similar legal arguments* to prove the defendant's liability.'"  *Ebin*, 297 F.R.D. at 565 (emphasis added) (citing *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993). Alternatively stated, "disputed issues of law or fact" must "occupy essentially the *same degree of centrality* to the named plaintiff's claim as to that of other members of the proposed class."  *In re Scotts*, 304 F.R.D. at 406 (emphasis added) (citing *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 132 (S.D.N.Y. 2014)).  "[M]inor variations in the fact patterns underlying individual claims" are common and not fatal.  *Dial Corp.*, 314 F.R.D. at 114 (citations omitted); *see, e.g., In re Indep. Energy Holdings*, 210 F.R.D. 476, 484 (S.D.N.Y. 2002) ("While the extent of any non-reliance on [plaintiffs'] part will certainly be a fact question to be decided at trial, it is unlikely to significantly shift the focus of the litigation to the detriment of the absent class members.").

"[T]he existence of defenses unique to the named plaintiff may preclude class certification only if the unique defenses 'threaten to become the focus of the litigation.'"  *Butto v. Collecto Inc.*, 290 F.R.D. 372, 384 (E.D.N.Y. 2013) (citing *Gary Plastic Packaging v. Merrill Lynch*, 903 F.2d 176, 180 (2d Cir. 1990)) (finding that the unique defense—that plaintiff failed to follow the necessary statutory steps for recourse under the Fair Debt Collection Practices

Act—did not overshadow the common issue: substantially similar collection letters sent by defendant which dominated the class action proceeding); *see also Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 180 (S.D.N.Y. 2008) ("[E]ven if [defendant] had shown the presence of a meritorious unique defense as to [p]laintiff, the [c]ourt finds that the litigation of this potential defense will not threaten to become the focus of the litigation . . . because it does not go to the heart of [p]laintiff's case and will not require considerable time and effort to rebut.") (citations omitted) (internal quotation marks omitted).

"[D]ifferences in damages arising from a disparity in injuries among the class members" also does not necessarily preclude class certification. *Espinoza v. 953 Assoc. LLC*, 280 F.R.D. 113, 128 (S.D.N.Y. 2011) (certifying class where injuries derived from same course of conduct despite differing circumstances of class members); *see also Spencer v. No Parking Today, Inc.*, 2013 WL 1040052, at *19 (S.D.N.Y. Mar. 15 2013) (finding—with respect to the potential calculation of damages—"no merit to [the defense's] argument . . . that typicality is not established because [the named plaintiff] may have worked more overtime hours than the other class members"); *cf. Bentley v. Verizon Bus. Global, LLC*, 2010 WL 1223575, at *5 (S.D.N.Y. Mar. 31 2010) (denying class certification because plaintiff's damages were atypical where plaintiff did not pay the disputed charges underlying the litigation).

### 1.    Typicality in *Belfiore*

In the *Belfiore* action, typicality is satisfied. The named plaintiff allegedly purchased Procter & Gamble's "flushable" wipes at a price higher than that of non-flushable wipes. *See supra* Part IV. He explicitly declared that he bought the wipes "[b]ecause they were flushable[,]" and proceeded to use them as directed. *See supra* Part IV.A. Plaintiff's "and other class members' claims arise out of the same course of conduct by the defendant and are based on the same legal theories." *Ebin*, 297 F.R.D. at 565.

84

Procter & Gamble argues that plaintiff falls short because he has yet to pay for any damages related to his plumbing. But the fact that the plaintiff has yet to pay for his plumbing costs neither threatens to become the focus of the present litigation, nor to disrupt the central concern in this case—the payment of a premium price. *See supra* Part VIII.B. In any event, the damages related to plumbing are peculiar to plaintiff and do not affect the class action case for a premium price recovery by purchasers or statutory damages.

The defendant also contends that the named plaintiff is atypical because: (1) his plumbing is poorly maintained, and (2) he experienced clogs prior to his use of Freshmates. Procter & Gamble Reply at 3-5. These issues are not part of the class action. They will be separately determined. Defendant misconstrues the central contention in the case: plaintiff paid a premium for a product that was misrepresented as flushable. The injury is the payment of an inflated price, not the clog. What happened after his purchase, as a result of the kind of sewage disposal system or the condition of his pipes, is irrelevant to the class's premium price theory.

### 2.    Typicality in *Kurtz*

In the *Kurtz* action, typicality is satisfied. Kurtz purchased Kimberly-Clark and Costco flushable wipes products at a higher price than that of non-flushable wipes. *See supra* Part IV. While he initially bought the wipes because he thought he could flush them after use, he continued purchasing them—and refrained from flushing them—after he no longer believed the wipes were "flushable." *See supra* Part IV.B. The defendants argue, in essence, that this makes Kurtz subject to a unique "voluntary payment" defense. "The voluntary payment doctrine bars recovery of payments voluntarily made with full knowledge of the facts." *Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 38 (E.D.N.Y. 2008) (internal quotation marks omitted).

It is unclear whether plaintiff's subjective belief that the wipes should not be flushed constitutes "full knowledge of the facts" so that this defense applies. *Newman v. RCN Telecom Services, Inc.*, 238 F.R.D. 57 (S.D.N.Y. 2006), a case cited by Costco, is inapposite. In *Newman*, the plaintiff sought to represent a putative class who paid "an extra $25.00 per charge for premium high speed internet service" but did not receive the promised speeds. *Id.* at 78. The plaintiff was subject to the voluntary payment doctrine because he "perform[ed]. . . internet speed tests" which revealed his internet speeds were slower than promised and then continued to pay the premium without dispute. *Id.* Kurtzby contrast, did not perform any objective test to confirm his subjective belief that the wipes were not flushable. There is also no evidence that Kurtz's purchases were ever made with "full knowledge" that he was paying a premium price for the "flushable" representation, whereas the enhanced internet speeds in *Newman* were a discrete service requiring the payment of a clearly delineated surcharge.

If the court were to construe the voluntary payment defense extremely broadly and apply it to any person who purchased wipes and did not flush them, typicality would still not be defeated. According to defendants, many consumers who purchased wipes did not flush them. *See* Ugone Decl. I at ¶ 29 (citing surveys indicating that a substantial portion of consumers do not flush flushable wipes). Where a defense applicable to a class representative may also be widely applicable to members of the class, the presence of such a defense is not atypical. *See In re Scotts*, 304 F.R.D. at 406 ("[I]t is not entirely clear [the voluntary payment] defense will be atypical. It is likely many class members purchased EZ Seed twice"); *Dupler*, 249 F.R.D. at 39 ("[I]t is not entirely clear that the voluntary payment doctrine will be an atypical defense. In fact, Costco suggests in its motion papers that the voluntary payment doctrine may be an issue for many members of the proposed class").

Kimberly-Clark and Costco also argue that Kurtz is atypical because of the individual circumstances contributing to his clogs, including poorly maintained plumbing, the flushing of non-flushable wipes, and the flushing of both Kimberly-Clark and Costco wipes. *See* Kimberly-Clark Opp. at 17-18; Costco Mem. in Supp. of Mot. to Deny Class Cert., 14-CV-1142, Feb. 27, 2015, ECF No. 88 at 44-46. These arguments fundamentally misunderstand the nature of plaintiff's class claims, which concern the payment of an inflated price, regardless of what happened when the purchaser actually uses the product.

Even assuming there are defenses unique to Kurtz, this fact alone does not disqualify him from serving as a class representative. Any such defenses would not "threaten to become the focus of the litigation such that [the named plaintiff] could not act in the best interest of the absent class members." *In re Cablevision Consumer Litig.*, 2014 WL 1330546, at *9 (E.D.N.Y. Mar. 31, 2014) (internal quotation marks omitted); *see also In re Scotts*, 304 F.R.D. at 406 (same); *Dupler*, 249 F.R.D. at 39 (same). His claims "are based on the same legal theory as the Proposed Class and arise from the same course of conduct or practice." *Dupler*, 249 F.R.D. at 39. Plaintiff's claims will succeed or fail based on proof of a "unitary course of conduct" by the defendants: misrepresenting a material characteristic of its product and charging a higher price for that product because of that characteristic. Kurtz will not be "preoccupied with defenses unique to [him]." *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990). All consumers who paid a premium price for a mislabeled product are economically injured in the same way without regard to the motivations behind the purchases.

If reliance were an element of the claim it would be appropriate to plumb the depths class members' minds to determine why they made their purchases and if the misrepresentations

influenced those decisions.  *See, e.g.*, *Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 87 (2d Cir. 2015) (reliance is typically a "necessary step in the causal chain linking the defendant's alleged misrepresentation to the plaintiffs' injury: if the person who was allegedly deceived by the misrepresentation . . . would have acted in the same way regardless of the misrepresentation, then the misrepresentation cannot be a but-for, much less proximate, cause of the plaintiffs' injury."); *Ackerman v. Price Waterhouse*, 252 A.D.2d 179, 197 (N.Y. App. Div. 1998)  ("Reliance provides the requisite causal connection between the defendant's misrepresentation and the plaintiff's injury."); *see generally Seldon v. Home Loan Services, Inc.*, 647 F. Supp. 2d 451, 470 (E.D. Pa. 2009) (to prove justifiable reliance, a plaintiff must allege that "he justifiably bought the product in the first place . . . *because* of the . . . misrepresentation or deceptive conduct.") (emphasis added) (internal quotation marks omitted).  Reliance, however, is not an element of plaintiff's claims under the New York General Business Law.  *Koch*, 967 N.E.2d at 676 ("To the extent that the Appellate Division order imposed a reliance requirement on General Business Law §§ 349 and 350 claims, it was error.  Justifiable reliance by the plaintiff is not an element of the statutory claim.").

Finally, Kurtz's claim is typical of the class he seeks to represent though he did not buy every flushable product at issue in the Kimberly-Clark class.  Kimberly-Clark sells wipes with the same formulation under several different brands.  Most of the products contain the word "flushable" in their titles.  Kurtz Mem. in Supp. of Class Cert.., 14-CV-1142, Feb. 27, 2015, ECF No. 81 at 4-5; Kimberly-Clark Opp. at 3.  Defendant does not contest that every product at issue—even the ones without the word "flushable" in their titles—contained a representation that they were "flushable" at all relevant times.  Nor does Kimberly-Clark claim that any differences in the labels or packages would "cause prospective consumers to understand the representations

differently." *Werdebaugh v. Blue Diamond Growers*, 2014 WL 2191901, at *14 (N.D. Cal. May 23, 2014), *class decertified on other grounds by* 2014 WL 7148923 (N.D. Cal. Dec. 15, 2014). Named plaintiff's claims need not be identical to each class member's claims to be typical; the fact that all the representations on Kimberly-Clark's products are substantially similar is sufficient. *See id.* at *17; *Chavez v. Blue Sky Natural Beverage Co.*, 268 F.R.D. 365, 378 (N.D. Cal. 2010) (plaintiff's claims are typical of the class where the allegedly false statement was "worded in several variations" but all products "bore substantially the same misrepresentation"); *Passafiume v. NRA Group, LLC*, 274 F.R.D. 424, 429 (E.D.N.Y. 2010) (finding typicality where "all the alleged class members' claims arose out of identical or *substantially similar* voicemails") (emphasis added).

### D.    Rule 23(a)(4): Adequacy of Representation

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).

This requirement is rooted in due process concerns. *See In re LILCO Sec. Litig.*, 111 F.R.D. 663, 672 (E.D.N.Y. 1986) ("The Court's obligation to examine a proposed class representative's adequacy is even more significant in light of the constitutional defect that attaches to the choice of an inadequate class representative.").  "As a threshold matter, a class representative is not" deemed "'adequate' unless it is a member of the class it purports to represent." *In re Vitamin C Antitrust Litig.*, 279 F.R.D. at 100.

Once the threshold showing is made, a three-part test must be met.  First, plaintiff must "demonstrate that class counsel is qualified, experienced . . . [and] generally able to conduct the litigation," *id.* (citation omitted), and that no conflicts exist that "might impair its representation." *Seijas v. Rep. of Argentina*, 606 F.3d 53, 57 (2d Cir. 2010) (citation omitted).

Second, "the named plaintiff must show that there is no conflict of interest between the named

plaintiffs and other members of the plaintiff class." *Id.* (citations omitted).  Third, "a named

plaintiff must exhibit enough integrity and credibility to convince the court that the named

plaintiff will diligently perform its fiduciary duties to the class." *Id.* (citations omitted); *see, e.g.*,

*In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 251-54 (2d Cir. 2011)

(finding plaintiffs, who held Category A, B and C claims, to be inadequate representatives for

class members who held only Category C claims because plaintiffs would likely pursue the more

lucrative Category A and B claims).

### 1.    Adequacy in *Belfiore*

Procter & Gamble challenges the threshold showing, arguing that plaintiff is not an

adequate representative because his claims are not typical.  The court has already addressed this

argument.  *See supra* Part VIII.C.1.  Defendant next argues that plaintiff is not an adequate

representative because he does not remember the price he paid for Freshmates.  Belfiore Class

Cert. Hr'g Tr. at 50:16-19; Procter & Gamble Opp. at 6 n. 3.  Plaintiff testified he paid between

four and five dollars.  Belfiore Dep. at 31:16-17.  A requirement that consumers retain receipts

for or remember the exact amount paid for sundries in order to bring a cause of action would

undermine the ability of consumers to bring small item actions.  *See infra* Part VIII.E.

Purchasers can be easily proven in this computer-driven age.

The other prongs of the adequacy test are also satisfied.  While it is not clear that counsel

(or plaintiff) is planning, or able, to finance the expensive consumer and economic studies

necessary for effective prosecution of a case on a premium price theory, counsel otherwise

appears qualified to represent the class; the court is aware of no conflicts of interest.  For his part,

plaintiff has "demonstrated [his] commitment to pursue these claims on behalf of class members

by . . . sitting for lengthy depositions." *Ebin*, 297 F.R.D. at 566 (finding adequacy where

plaintiffs sat for "lengthy depositions," responded to written discovery requests, and testified that

he was "committed" to the case); Belfiore Dep. at 104:8.  He has appeared in court, *id.* at 104:8-

9, and he understands he will "probably have to go to court" again.  *Id*. at 102:14-15.  He read

the complaint before it was filed.  *Id.* at 21:3-6.  Adequacy is satisfied.

### 2. Adequacy in *Kurtz*

Defendants Costco and Kimberly-Clark attack the threshold showing by arguing that

Kurtz is not an adequate representative because his claims are atypical.  The court already

addressed this argument.  *See supra* Part VIII.C.2.

Defendants do not contest the first prong, that class counsel is qualified, experienced, and

conflict-free.  Counsel's attempt to represent both New York and New Jersey classes through

one class representative may have caused a conflict, but the court has resolved that conflict by

severing and transferring the New Jersey claims.  *See Kurtz*, 2017 WL 751231.  And, while the

court is unsure that plaintiff or counsel is willing to finance the desirable consumer surveys, the

monetary burden of conducting such a survey was reduced by dismissal of the national claims.

*See id.*

Kimberly-Clark challenges the second prong by attempting to demonstrate a potential

conflict between plaintiff and other members of the classes.  Defendant argues that Kurtz is

inadequately representing the class by pursuing certification for smaller-value claims under the

New York General Business Law related to labeling and not pursuing certification for higher-

value claims related to damaged plumbing.  *See* Kimberly-Clark Obj. to Class Cert., 14-CV-

1142, Feb. 24, 2017, ECF No. 287 at 25.  According to defendant, this choice may preclude

absent class members from seeking plumbing damages due to res judicata.

91

"The doctrine of res judicata dictates that 'a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.'" *Stephenson v. Dow Chemical Co.*, 273 F.3d 249, 259 (2d Cir. 2001) (quoting *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 466 n. 6 (1982)). Res judicata may prevent absent class members from bringing related claims "if the earlier decision was (1) a final judgment on the merits, (2) by a court of competent jurisdiction, (3) in a case involving the same parties or their privies, and (4) involving the same cause of action." *Anaconda–Ericsson Inc. v. Hessen (In re Teltronics Servs., Inc.)*, 762 F.2d 185, 190 (2d Cir. 1985). A court will not apply the doctrine to absent class members if doing so would violate due process. *Stephenson*, 273 F.3d at 260.

The primary case Kimberly-Clark relies upon is *Small v. Lorillard Tobacco Co.*, 720 N.E.2d 892 (N.Y. 1999). In *Small*, the plaintiffs artificially limited their claims to losses incurred from purchasing cigarettes after 1980 to ensure that the action would be a "negative value" suit. *Id.* at 896-97. The relatively meager sum that was sought paled in comparison to the "substantial claims for personal injury and emotional distress based on nicotine addiction" that absent class members may have been precluded from filing if a class was certified. *Id.* at 897. Based on these facts, the New York Court of Appeals held that the Appellate Division did not abuse its discretion or commit an error of law when it held that the named representative would not fairly and adequately protect the interests of the absent class members. *Id.*

In the instant case, Kurtz's interests are sufficiently aligned with the interests of absent class members so that he is an adequate representative. No culling of claims was necessary to make this litigation a negative value suit—even the most unusual plumbing expenses required for clearing blockages are not likely to be more than a few thousand dollars. *See* Ugone Decl. I

92

at ¶ 61 (plumbing expenses reported by New Yorkers to Kimberly-Clark ranged from $150 to $2,436).  This sum that is unlikely to spur individual litigation on its own.  *Cf. Bryan v. Amrep Corp.*, 429 F. Supp. 313, 318 (S.D.N.Y. 1977) (arguing potential claims ranging from $3000 to $6000 "are not manifestly a sum substantial enough to make individual litigation feasible.") (internal quotation marks omitted); *Clark v. Bally's Park Place, Inc.*, 298 F.R.D. 188, 202 (D.N.J. 2014) (certifying a class where the "individual claims are for relatively small amounts— on average, likely not exceeding a few thousand dollars each—making it highly unlikely" that any individual class member would litigate his claims individually); *see also Mayo v. UBS Real Estate Sec., Inc.*, 2011 WL 1136438, at *7 (W.D. Mo. Mar. 25, 2011) ("An individual claim that is potentially worth thousands of dollars is likely to be a 'negative value' case when brought against large [companies] with almost unlimited resources to litigate.").  Compared to the statutory damages Kurtz is seeking, any difference in damages will be *de minimis*, especially given that many class members made many purchases.  These are not cases where the "class representatives had left aside the far stronger claims for monetary damages and sought to have the weaker claims certified, for dubious strategic purposes."  *Coleman v. Gen. Motors Acceptance Corp.*, 220 F.R.D. 64, 82 (M.D. Tenn. 2004) (reviewing cases where courts found adequacy of representation problems due to case-splitting).

In any event, damages to plumbing in individual cases is not part of the class action.  Price differential to all, not physical harm to the plumbing of some, is the class action issue.  Moreover, absent class members will not be bound by res judicata absent due process.  *Stephenson*, 273 F.3d at 260.  Pursuant to Federal Rule of Civil Procedure 23(c)(2)(B), notice and the right to opt out will be provided to the class prior to a judgment.  *See* Fed. R. Civ. P.

23(c)(2)(B). Any class member who determines that Kurtz is not adequately representing his or her interest will have the opportunity to opt out and pursue his or her own claim.

Costco, focusing on the third prong, argues that inconsistencies in some of Kurtz's sworn statements and his failure to preserve evidence render him inadequate. Costco Mem. in Supp. of Mot. to Deny Class Cert., 14-CV-1142, Feb. 27, 2015, ECF No. 88 at 47. Most of the issues Costco raises pertain to plaintiff's plumbing and clogs, which are not the basis of the class litigation. Costco notes that plaintiff failed to preserve most of his receipts, even after filing his complaint, but such an oversight does not sufficiently impugn his "integrity and credibility" so that the court is convinced "that the named plaintiff" will not "diligently perform its fiduciary duties to the class." *In re Vitamin C*, 279 F.R.D. at 100.

Plaintiff has shown that he is committed to this case. He sat for a lengthy deposition, attended a court hearing, reviewed the complaint, and responded to discovery requests. *See* Kurtz Mem. in Supp. of Class Cert., 14-CV-1142, Feb. 27, 2015, ECF No. 81 at 18-19. Adequacy is satisfied.

### E.    Implied Requirement of Ascertainability

The Court of Appeals for the "Second Circuit has recognized a fifth pre-condition to class certification: the implied requirement of ascertainability." *In re Scotts*, 304 F.R.D. at 407 (citation omitted); *see Brecher v. Rep. of Argentina*, 806 F.3d 22, 24-25 (2d Cir. 2015) (discussing ascertainability). For a class to be ascertainable in the Second Circuit, the class definition must, first, be based on "objective criteria" and, second, be "administratively feasible" such that class members can be identified without conducting a "mini-hearing on the merits of each case." *Charron v. Pinnacle Group N.Y. L.L.C.*, 269 F.R.D. 221, 229 (S.D.N.Y. 2010)

(citation omitted) (injunctive class ascertainable where defined as tenants in an apartment that was rent-regulated and owned directly or indirectly by the defendant landlord as of the date of the court's opinion); *see also Brecher*, 806 F.3d at 25 (damages class defined only as beneficial owners of a bond series insufficiently definite to identify the class of persons who would be bound). This standard "is not demanding and is designed only to prevent the certification of a class whose membership is truly indeterminable." *Ebin*, 297 F.R.D. at 567 (internal quotation marks omitted). In fact, "[c]lass members need not be ascertained prior to certification, but the exact membership of the class must be ascertainable at some point in the case." *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liability Litig.*, 209 F.R.D. 323, 337 (S.D.N.Y. 2002) (internal quotation marks omitted) (class ascertainable where the proposed class definition was owners of wells containing MTBE located in a class state).

Costco argues the class is not ascertainable because a "mini-trial" would have to be held for each class member to determine if they are part of the class based on the purchasing motivations and experiences of those who bought Kirkland Signature Flushable Wipes. Costco Mem. in Supp. of Mot. to Deny Class Cert., 14-CV-1142, Feb. 27, 2015, ECF No. 88 at 50. Those factual determinations are not necessary to ascertain if someone is a class member. *See supra* Part VIII.B. Ascertainability of class membership can be readily determined by a claims filing procedure provided under court directions.

Procter & Gamble and Kimberly-Clark maintain that the class is not ascertainable because consumers did not retain receipts. Procter & Gamble Opp. at 21-22; Kimberly-Clark Mem. in Supp. of Mot. to Deny Class Cert., 14-CV-1142, Feb, 27, 2015, ECF No. 85 at 32-33. "District judges in th[e Southern] District [of New York]," and elsewhere, "have expressed conflicting views on whether putative classes are ascertainable when consumers are unlikely to

retain receipts or other records of purchase" or whether additional records are required. *In re Scotts*, 304 F.R.D. at 407 (comparing cases); *Mosely v. Vitalize Labs, LLC*, 2015 WL 5022635, at *5 (E.D.N.Y. Aug. 24, 2015) (denying summary judgment in consumer class action where "a reasonable juror could conclude that [plaintiff] purchased [the product in question] . . . despite his lack of physical proof of purchase."); *cf. Carrera v. Bayer Corp.*, 727 F.3d 300, 305-12 (3d Cir. 2013) (adopting heightened ascertainability requirement and holding that affidavits by prospective class members do not satisfy the ascertainability requirement); *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 663-64 (7th Cir. 2015) (comparing cases); *Guido v. L'Oreal, USA, Inc.*, 2014 WL 6603730, at *17 (C.D. Cal. July 24, 2014) (comparing cases). The Second Circuit Court of Appeals has yet to weigh in on whether "heightened" ascertainability is required. *See* Jeremy M. Creelan & Kate T. Spelman, *Ascertaining the Requirements for Ascertainability Under FRCP 23*, New York Law Journal, Oct. 1, 2015, at 4.

The decision to allow "self-identification" in place of proof of purchase has sometimes turned on whether the alleged misrepresentation was on all the products sold by the defendant during the relevant time period. *See Ebin*, 297 F.R.D. at 567 (finding class of olive oil consumers ascertainable through self-identification where allegedly false labeling was uniformly present across the product); *Ault v. J.M. Smucker Co.*, 310 F.R.D. 59, 65-66 (S.D.N.Y. 2015) (collecting and comparing cases from in and outside the Second Circuit where courts based decision to allow self-identification on continuity of representations but finding class that did not keep records not ascertainable); *but see Weiner v. Snapple Beverage Corp.*, 2010 WL 3119452, at *13 (S.D.N.Y. Aug. 5, 2010) (finding class of purchasers of beverage not ascertainable where plaintiffs "offer[ed] no basis to find that putative class members will have retained a receipt,

bottle label, or any other concrete documentation of their purchases of [the product]," especially as distinct from other Snapple products).

In the instant case, the court finds that the proposed classes are ascertainable. The class definitions "identif[y] a particular group of individuals [who were] harmed in a particular way (defrauded by labels and marketing materials) during a specific period in particular areas." *Mullins*, 795 F.3d at 660-61. The products at issue all contained a flushability representation on their packages throughout the class period. *See, e.g., In re Scotts*, 304 F.R.D. at 407 (classes consisting of New York and California purchasers of EZ Seed packages containing 50% thicker claim . . . "sufficiently specific to satisfy the ascertainability requirement" despite likely lack of receipts).

Because it is unlikely that consumers will retain receipts, plaintiff may rely on affidavits for those without a receipt. Plaintiff may also identify some consumers via electronic purchase records, where possible. The court takes judicial notice of the widespread ownership of home computers in this district, as shown in jury selections. Belfiore Class Cert. Hr'g Tr. at 10:5-11:6. It also appears likely that Costco has very detailed records about consumer purchasers because each Costco member is assigned a unique identification number that is linked to their purchases. *See* Martin Decl. I at ¶¶ 8-10. To require receipts "would render class actions against producers almost impossible to bring." *Ebin*, 297 F.R.D. at 567. As one scholar noted:

> [R]igorous insistence on proof-of-purchase is counterproductive. If one's goal is to ensure that compensation flows to injured parties, the most important step we can take is to relax the filter that prevents uninjured parties from obtaining compensation. *Proof-of-purchase requirements may do a good job of keeping damages from the uninjured, but courts' extravagant concern with compensating the uninjured does an equally effective job of keeping damages from the truly injured.*

Myriam Gilles, *Class Dismissed: Contemporary Judicial Hostility to Small-Claims Consumer Class Actions*, 59 DePaul L. Rev. 305, 316 (2010) (emphasis added).

### F.    Rule 23(b) Factors

After satisfying the requirements of Rule 23(a), "plaintiff must show that the claims are among [one of] three types of class actions defined in Rule 23(b)." *Calabrese v. CSC Holdings, Inc.*, 2009 WL 425879, at *5 (E.D.N.Y. Feb. 19, 2009) (internal quotation marks omitted). Here, plaintiffs seek class certification under both 23(b)(2) (injunctive relief) and (b)(3) (money damages). Belfiore Mem. in Supp. of Class Cert., 14-CV-4090, Feb. 27, 2015, ECF No. 58-1 at 2; Kurtz Mem. in Supp. of Class Cert., 14-CV-1142, Feb. 27, 2015, ECF No. 81 at 3.

### 1.    Rule 23(b)(2) Injunctive Relief

Plaintiffs are requesting an injunction to enjoin defendants from selling the products at issue with the "flushable" representation on its packaging. They want the products to "either be relabeled or taken off the market." Feb. 2, 2017 Hr'g Tr. at 68:10-13; *see* Feb. 3, 2017 Hr'g Tr. at 29:22-25 ("I want the misrepresentations taken off the label."). "A Rule 23(b)(2) class is appropriate only when a *single* injunction or declaratory judgment would provide relief to *each member of the class*." *Ault*, 310 F.R.D. at 68 (emphasis added) (quoting *Dukes*, 131 S. Ct. at 2557). "It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." *Dukes*, 131 S. Ct. at 2557 (emphasis in original).

"Individualized monetary claims are inappropriate in a class certified under Rule 23(b)(2); therefore, claims for monetary relief may not be certified under Rule 23(b)(2), at least where . . . the monetary relief is not *incidental* to the injunctive or declaratory relief." *Ault*, 310 F.R.D. at 68 (emphasis added) (quoting *Dukes*, 131 S. Ct. at 2557); *see also Nationwide Life Ins. Co. v. Haddock*, 460 F. App'x 26, 29 (2d Cir. 2012) (summary order) ("[U]nless merely

'incidental' to the requested declaratory or injunctive relief, claims for individualized monetary

damages preclude class certification under Rule 23(b)(2)").  "[M]onetary relief is considered

incidental when it 'flows directly from liability to the class as a whole on the claims forming the

basis of the injunctive or declaratory relief' and does not entail complex individualized

determinations."  *Ackerman*, 2013 WL 7044866, at *16 (quoting *Dukes*, 131 S. Ct. at 2560)

(recommending certification of 23(b)(2) class based on premium price injury but recommending

denial of 23(b)(3) price premium class).

Some courts impose "two additional hurdles that plaintiffs must clear in order to certify a

(b)(2) class." *Laumann v. Nat'l Hockey League*, 105 F. Supp. 3d 384, 395 (S.D.N.Y. 2015).

They are the "cohesive" and "necessary" requirements.

> *First, plaintiffs must demonstrate that the class is "cohesive."*  This
> requirement is similar, conceptually, to the commonality
> requirement under Rule 23(a).  *Second, plaintiffs must demonstrate*
> *that class certification is, in the first instance, necessary.*  Because
> the relief available under Rule 23(b)(2) is injunctive and
> declaratory—rather than monetary—certification is not always
> required to secure the rights in question.

*Id.* (emphasis added).

These additional case law interpretive requirements to Rule 23 are unjustified in light of

the detailed legislative attention to Rule 23, which does not contain them.  In any event, the

requirements are met here.

### a.  Cohesiveness

The proposed classes are sufficiently cohesive because the defendants, through their

labeling practices, "acted or refused to act on grounds that apply generally to the class, so that

final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a

whole" *see* Fed. R. Civ. P. 23(b)(2).  Any "individualized issues as to liability or remedy" do not

"destroy" the presumption that injunctive relief is appropriate.  *See Larsen v. JBC Legal Grp., P.C.*, 235 F.R.D. 191, 197 (E.D.N.Y. 2006); *see also Ackerman*, 2013 WL 7044866, at *17 ("If, as plaintiffs allege, the name 'vitaminwater' is misleading to a reasonable consumer, then equitable relief in the form of an injunction would be an appropriate remedy.  I therefore respectfully recommend that the New York and California classes be certified as 23(b)(2) injunctive classes").  The classes are also cohesive by the same rationale justifying a finding of predominance.  *See infra* Part VIII.F.2.a.

### b.  Necessity

A leading Court of Appeals decision by the Second Circuit decision on its "necessity" requirement is *Galvan v. Levine*, 490 F.2d 1255 (2d Cir. 1973).  Rather than establishing that a plaintiff must prove that class certification is necessary to grant the relief he seeks, the *Galvan* decision merely held that it was "permissible" for a court to deny certification if the "class action designation is largely a formality" because it is clear that the relief will "run to the benefit not only of the named plaintiff but of all others similarly situated."  *Id.* at 1261-62.  Courts examine four factors to evaluate when certification is not necessary:

> *First,* notwithstanding the presumption that government officials will abide by a court's decision as to similarly situated individuals, an affirmative statement from the government defendant that it will apply any relief across the board militates against the need for class certification.  *Second*, withdrawal of the challenged action or non-enforcement of the challenged statute militates against the need for class certification.  *Third*, the type of relief sought can affect whether class certification is necessary.  Courts have found that where the relief sought is merely a declaration that a statute or policy is unconstitutional, denial of class certification is more appropriate than where plaintiffs seek complex, affirmative relief.  *Fourth*, courts also consider whether the claims raised by plaintiffs are likely to become moot, making class certification necessary to prevent the action from becoming moot.

*Casale v. Kelly*, 257 F.R.D. 396, 406-07 (S.D.N.Y. 2009) (emphasis added) (citing *Blecher v. Department of Housing Pres. & Dev.*, 1994 WL 144376, at *4-5 (S.D.N.Y. Apr. 19, 1994)).

These four factors are not exhaustive; practical considerations about how certification (or its lack) will impact the administration of the case matter too. *See Daniels v. City of New York*, 199 F.R.D. 513, 514-15 (S.D.N.Y. 2001) (holding that a stipulation that "defendants. . . will apply the [c]ourt's declaratory and injunctive rulings . . . to all persons similarly situated to the named plaintiffs" "does not obviate the need for class certification" because certification could allow for greater discovery, privileged communications between class counsel and absent class members, and more complex affirmative relief).

The court has wide discretion in considering the four factors in *Casale*. These added on requirements by courts are a gloss on the language of Rule 23, which contains precise details on requirements. *Cf.* Fed. R. Civ. P. 65(d) (contents of an injunction order). Certifying a class action in this case would not be a "mere formality." The factors do not weigh in favor of finding that certification is not necessary. The affirmative relief the plaintiffs are seeking—primarily with respect to labeling—is relatively easy to fashion and appropriate. Certification of the classes is necessary.

### c. Defendants Arguments Against Certification Pursuant to Rule 23(b)(2)

The defendants have made several arguments against class certification that are specific to certification under Rule 23(b)(2). They argue that that the named plaintiffs lack standing under Article III to pursue injunctive relief, that Kurtz lacks standing to pursue injunctive relief for products he did not purchase, that any relief plaintiffs could obtain is moot, and that plaintiffs have not made the requisite showing that they are entitled to injunctive relief.

### (1)    Article III Standing

Defendants argue that the named plaintiffs lack standing to pursue injunctive relief for a product they will not re-purchase.  For the reasons stated in the court's memorandum and order on the motion to dismiss, the court finds that plaintiff has Article III standing.  As the court wrote:

> To hold [that plaintiff lacks Article III standing] would denigrate the New York consumer protection statute, designed as a major support of consumers who claim to have been cheated.  The only way a consumer could enjoin deceptive conduct would be if he were made aware of the situation by suffering injury. But once the consumer learned of the deception, he would voluntarily abstain from buying and therefore could no longer seek an injunction.

*Belfiore*, 94 F. Supp. 3d at 445; *cf. Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 533 (N.D. Cal. 2012) ("[W]ere the [c]ourt to accept the suggestion that plaintiffs' mere recognition of the alleged deception operates to defeat standing for an injunction, then injunctive relief would never be available in false advertising cases, a wholly unrealistic result.").

Public policy, as well as precedent, supports this ruling in *Ries*.  *See Belfiore*, 94 F. Supp. 3d at 445 (collecting cases and denying motion to dismiss, pursuant to Fed. R. Civ. P. 12(b)(1), for lack of subject matter jurisdiction); *Dei Rossi v. Whirlpool Corp.*, 2015 WL 1932484, at *3 (E.D. Cal. Apr. 28, 2015) (finding that consumers who purchase product at a premium based on advertised specifications suffer an economic injury when that product fails to meet the advertised specifications, and therefore possess Article III standing); *but see Elkind v. Revlon Consumer Prod. Corp.*, 2015 WL 2344134, at *3 (E.D.N.Y. May 14, 2015) (collecting cases and granting motion to dismiss claims for injunctive relief because plaintiff-consumer, unlikely to repurchase product, cannot allege future harm); *Machlan v. Procter & Gamble Co.*, 77 F. Supp. 3d 954, 960

(N.D. Cal. 2015) (granting motion to dismiss claims for injunctive relief because plaintiff lacks Article III standing to pursue claims based on flushable wipes he will not purchase again).

Defendants also challenge plaintiffs' standing to seek injunctive relief based on the decision of the Court of Appeals for the Second Circuit in the case of *Nicosia v. Amazon*, 834 F.3d 220 (2d Cir. 2016). *Nicosia* concerned plaintiff's purchase of a weight loss product (called "1 Day Diet") containing sibutramine, a controlled substance that had been removed from the market, on the website of defendant Amazon.com, Inc. Plaintiff claimed violations of the Consumer Product Safety Act ("CPSA").

Amazon stopped selling the 1 Day Diet product. As of the filing of the plaintiff's compliant, it continued to sell other weight loss products identified by the FDA as containing undisclosed amounts of sibutramine.

The plaintiff moved for a preliminary injunction requesting that: (1) remedial notices be sent to past purchasers of products containing sibutramine; and (2) measures be put in place to prevent Amazon from unwittingly selling other products containing sibutramine. The district court concluded that the plaintiff lacked standing to seek an injunction because he "failed to plead facts that would permit the plausible inference that [he is] in danger of being wronged again." *Nicosia*, 834 F.3d at 238.

The Court of Appeals for the Second Circuit affirmed. It found that "[p]laintiffs lack standing to pursue injunctive relief where they are unable to establish a 'real or immediate threat' of injury." *Id*. at 239 (citation omitted). It explained:

> Although past injuries may provide a basis for standing to seek money damages, they do not confer standing to seek injunctive relief unless the plaintiff can demonstrate that she is likely to be harmed again in the future in a similar way. While "enhanced risk" of future injury may constitute injury-in-fact in certain circumstances, such

> injuries are only cognizable where the plaintiff alleges actual future
> exposure to that increased risk.

*Id.* (citations omitted).  The court concluded that the plaintiff had not established a likelihood of

future or continuing harm, because he did not show that he was likely to be subjected to further

sales of Amazon products containing sibutramine:

> Nicosia did not establish a likelihood of future or continuing harm.
> Even assuming his past purchases of *1 Day Diet* resulted in injury
> and that he may continue to suffer consequences as a result, he has
> not shown that he is likely to be subjected to further sales by
> Amazon of products containing sibutramine. Amazon has ceased
> selling *1 Day Diet* on its website, and Nicosia has failed to allege
> that he intends to use Amazon in the future to buy *any* products, let
> alone food or drug products generally or weight loss products in
> particular.

*Id.* (emphasis in original).

Nicosia is distinguishable from the instant litigation.  It is not applicable to cases where a

defendant continues to manufacture or sell the challenged product as misleadingly labeled.

While all the defendants have slightly altered the composition of their products since the actions

were filed (*see supra* Parts IV.C-E), the plaintiffs contend, with substantial justification, that

"essentially the technology and the product is the same" and "[t]hey still do not break down in a

reasonable period of time."  Feb. 2, 2017 Hr'g at 71:13-16; Feb. 3, 2017 Hr'g at 33:10-12 ("This

product is still being sold, still being labeled as flushable, it's still premium priced, when it

shouldn't be.").  Consumers are still at risk of purchasing a mislabeled product.  Injunctive relief

is appropriate.

### (2)    Class Standing

Kurtz has "class standing" to pursue injunctive relief for all the Kimberly-Clark flushable

products, including ones he did not purchase, for the same reasons his claim is typical.  *See supra*

Part VIII.C.2.  "[I]n a putative class action, a plaintiff has class standing if he plausibly alleges:

(1) that he personally has suffered some actual injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants." *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012) (alterations, internal quotation marks, and citations omitted).  Though distinct from the adequacy of representation inquiry (*id.* at 158 n. 9), the class standing test overlaps that and the typicality inquiry because the "standard is satisfied" when the representative's "litigation incentives are sufficiently aligned with those of the absent class members."  *Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chicago v. Bank of N.Y. Mellon*, 775 F.3d 154, 161 (2d Cir. 2014); *see In re ICN/Viratek Sec. Litig.*, 1996 WL 164732, at *10 (S.D.N.Y. Apr. 9, 1996) ("The typicality and 'fair and adequate' representation requirements are primarily designed to ensure that the named plaintiffs have an incentive to represent zealously the other members of the class.").

In three recent cases, the Court of Appeals for the Second Circuit has defined the boundaries of Rule 23 standing doctrine.  In *NECA*, the court allowed a named plaintiff to sue loan originators for making material misrepresentations in the offering documents of certificates he did not purchase because all of the relevant offering documents contained "similar if not identical statements" that were alleged to be misrepresentations and the originators "issued, underwrote, and sponsored every" certificate from each of the trusts at issue.  *NECA*, 693 F.3d at 162.  It did not matter that the misrepresentations may have appeared in different places in the different offering documents because "the location of the representations has no effect on a given purchaser's assertion that the representation was misleading."  *Id.* at 162-63.  Where the

certificates were backed by other loan originators, the alleged injures had "the potential to be

very different—and could turn on very different proof." *Id.* at 163.

In *DiMuro v. Clinique Labs, LLC*, 572 Fed. App'x 27 (2d Cir. 2014) (summary order),

the court held that plaintiffs who purchased three of the seven products that comprised the

"Repairwear" cosmetics product line did not have class standing to assert claims on behalf of

purchasers of all seven products.  The claims arose from allegedly false and misleading

marketing of the products.  The court noted that in contrast to *NECA*, where the "claims brought

by a purchaser of debt from one offering would raise a set of concerns nearly identical to that of

a purchaser from another offering," the claims in *DiMuro* involved seven "different products"

that have "different ingredients" and made "different advertising claims." *Id.* at 29 (internal

quotation marks and citations omitted).  The named plaintiffs' claims would not raise the "same

set of concerns" as claims concerning the other products because "[e]ntirely unique evidence will

. . . be required to prove that the 35-some advertising statements for each of the seven different

Repairwear products are false and misleading." *Id.*

More recently, in *Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chicago

v. Bank of N.Y. Mellon*, 775 F.3d 154 (2d Cir. 2014), the court differentiated the case from *NECA*

by noting that in *NECA*, the "absent class members' claims were similar to those of the named

plaintiff in all essential respects. . . . [T]he named plaintiff had the right incentives . . . because

the proof contemplated for all of the claims would be sufficient similar." *Id.* at 161.  In contrast,

the named plaintiff's claims in *Ret. Bd.* turned on Countrywide's actions in relation to different

loans being held by different trusts—"whether Countrywide breached its obligations under the

governing agreements . . . require[d] examining its conduct with respect to each trust." *Id.* at

162.  There was "no way in which answering these questions for the trusts in which Plaintiffs

invested [would] answer the same questions for the numerous trusts in which they did not

invest." *Id.* Though the court thought it might be possible for the plaintiff to litigate claims in

trusts they did not invest in, "[t]he core question is whether a plaintiff who has a personal stake

in proving her own claims against the defendant has a sufficiently personal and concrete stake in

proving other, related claims against the defendant." *Id.* at 163.

The claims in the instant case are much more similar to the claims in *NECA* than the

claims in *DiMuro* or *Ret. Bd.* Like the representation at issue in *NECA*, a materially similar

"flushable" representation was made by Kimberly-Clark on the labels of all their flushable

products. The same proof, not "entirely unique evidence," will be needed to show that the

representation was false or misleading because the products had essentially the same advertising

claims and the same ingredients. *Cf. Dimuro*, 572 Fed. App'x at 29. The plaintiff is properly

incentivized by the "same set of concerns" to prove that defendant's conduct which caused him

injury also caused injury to the other class members. He has standing to pursue relief for

purchasers of all the Kimberly-Clark products at issue.

### (3)    Mootness of Injunctive Relief

Defendants also argue injunctive relief may be "prudentially moot" because the FTC has

already provided the plaintiffs with all the relief they could be accorded through an injunction.

Their arguments are premised on the FTC's decisions to enter into a consent order with Nice-Pak

and to close its investigation of Kimberly-Clark. Procter & Gamble claims that the FTC's

interpretation of "flushable" in the Nice-Pak Final Consent Order moots Belfiore's request for

injunctive relief. Kimberly-Clark and Costco assert that the FTC's actions amount to a tacit

approval from the FTC for the current Kimberly-Clark and Costco products, and this tacit

approval obviates any need for an injunction impacting the current versions of their products.

Without conceding that their products ever violated the law, defendants proclaim that the FTC's actions make clear that the products now on the market as packaged definitely do not contravene law. Another way to interpret Costco's argument is that its agreement with the FTC to substantiate its marketing claims means that injunctive relief is moot because it has "voluntarily ceased" any past illicit conduct.

"[I]f events so overtake a lawsuit that the anticipated benefits of a remedial decree no longer justify the trouble of deciding the case on the merits, equity may demand not decision but dismissal. When it does, we will hold the case 'prudentially moot.'" *Winzler v. Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208, 1210 (10th Cir. 2012). "Prudential mootness doctrine often makes its appearance in cases where a plaintiff starts off with a vital complaint but then a coordinate branch of government steps in to promise the relief she seeks." *Id.*

In *Winzler*, the court dismissed the plaintiff's lawsuit as prudentially moot where the "precise[] relief" she was seeking—notice to all owners of certain car models about a defect and a fund to repair the defects—was accomplished by Toyota notifying the National Highway Transportation Safety Administration of the defect and "set[ting] into motion the great grinding gears of a statutorily mandated and administratively overseen national recall process." *Id.* at 1211. The court decided that there was "not enough value left for the courts to add" when considering the costs of continuing the litigation because the court could "offer[] not even a sliver of additional relief for Ms. Winzler and members of the class she seeks to represent." *Id.* The court noted that "[t]hings might be different . . . [i]f the party seeking relief can show that 'there exists some cognizable danger of recurrent violation,' some cognizable danger that the coordinate branch will fail and she will be left without a complete remedy." *Id.* at 1211-12 (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)).

108

"[F]actual changes made by a defendant after litigation has commenced cannot render a case moot unless it is absolutely clear the defendant cannot resume the allegedly offending conduct." *Clear Channel Outdoor, Inc. v. City of New York*, 594 F.3d 94, 110 (2d Cir. 2010) (citation omitted). "The heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000) (internal quotation marks omitted). "The voluntary cessation of allegedly illegal activity may render a case moot if the defendant can demonstrate that: (1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Clear Channel Outdoor*, 594 F.3d at 110 (internal quotation marks omitted).

The defendants' arguments that injunctive relief is moot fail because they have not proven that the FTC's actions (or inactions) grant plaintiffs the complete relief they are seeking in the courts. Procter & Gamble's contention that the FTC's definition of flushable renders moot any claim by Belfiore for injunctive relief is rejected. The mere promulgation of an informal definition of "flushable" does not provide the plaintiff with adequate relief. The FTC's investigation of Procter & Gamble is ongoing—it is too soon to say whether Freshmates even meet that vague definition. *See supra* Part I.B. Belfiore's plea for injunctive relief is not moot.

Kimberly-Clark's argument is also rejected. The letter the Commission sent to Kimberly-Clark notifying it of the closure of its investigation expressly stated that the closure "is not to be construed as a determination that no violation has occurred" and that the Commission "reserves the right to take such further action as the public interest may require." *See* FTC Closing Letter, 14-CV-1142, June 30, 2016, ECF No. 228-1. A decision not to order Kimberly-

Clark to change its labeling does not indicate that the FTC approves of the labeling or that plaintiffs' pursuit of more detailed relief is imprudent. *See generally Ault v. J.M. Smucker Co.*, 2014 WL 1998235, at *3 (S.D.N.Y. May 15, 2014) ("Where the FDA is unable to address a potentially deceptive practice, state claims are one of the few means of safeguarding consumers and therefore should not be preempted by the FDA's inaction."); *U.S. E.P.A. v. City of Green Forest, Ark.*, 921 F.2d 1394, 1405 (8th Cir. 1990) ("[A]gency inaction is precisely the circumstance in which private action is appropriate.").

Costco, whose wipes are subject to the Nice-Pak Final Consent Order, has the strongest argument that Kurtz's claim for injunctive relief is moot. The FTC investigated Nice-Pak's products and labeling and entered into a consent order where Nice-Pak promised to only make flushability claims it could substantiate with "competent and reliable evidence." *See* Nice-Pak Final Consent Order at 2. The mere existence of this third-party agreement does not render moot the request for injunctive relief. A promise made to an administrative agency to do something— or to refrain from doing something—does not assure that no violation has occurred or will occur or that the effects of any past violation have been completely and irrevocably eradicated. *See Gropper v. Fine Arts Housing, Inc.*, 12 F. Supp. 3d 664, 670 (S.D.N.Y. 2014) (a restaurant's promises to retrofit its premises pursuant to a voluntary consent agreement did not moot plaintiff's claims because the agreement "consists largely of promises that [the restaurant] will fulfill *in the future*") (emphasis in original); *see generally Kostok v. Thomas*, 105 F.3d 65, 66 (2d Cir. 1997) (a promise by a defendant to grant the relief sought by the plaintiff does not moot a lawsuit because "[i]f some impediment arises or some prolonged delay ensues" in granting the relief, the plaintiff "would be at square one"). There is too much money at stake for plaintiffs to assume defendants will do "the right thing" in a relabeling that might reduce sales and profits.

110

Another factor negating the contention that Kurtz has been provided with the "complete relief" he seeks is that the FTC's consent order did not provide the relief he is actually seeking: a change in the label or removal of the product from the market. *Cf. United States v. Local 295 of Int'l Bhd. of Teamsters*, 1991 WL 35497, at \*2 (E.D.N.Y. Mar. 8, 1991) (finding that "relief obtained in the Consent Judgment renders moot the injunctive relief sought in the present complaint" because the "broad language [of the Consent Judgment] includes the relief sought here"). Moreover, nothing in or subsequent to the consent order indicates that the FTC ever made a determination that Nice-Pak's products comply with the law. Even if the FTC had made such a determination, it is not clear that such a determination would necessarily moot plaintiff's claim for injunctive relief. *See Douglas v. Indep. Living Ctr. of S. California, Inc.*, 565 U.S. 606, 613-14 (2012) (lawsuit seeking preliminary injunction of state law that allegedly violated Medicaid regulations not mooted by decision of the Centers for Medicare & Medicaid approving the state law because the "agency decision does not change the underlying substantive question, namely whether California's statutes are consistent with a specific federal statutory provision," and plaintiffs "continue to believe that the [state law] violate[s] the federal provision, the agency's view to the contrary notwithstanding.")

Costco's argument is akin to the argument made by the defendant in *State of La., ex rel. Guste v. Fedders Corp.*, 543 F. Supp. 1022 (M.D. La. 1982). In that case, the Louisiana Attorney General brought suit against manufacturers under a state law protecting consumers from deceptive trade practices. Louisiana law, like the New York law in the instant cases, allowed defendants to argue as a defense that their practices comply with the rules and regulations of the FTC. *See id.* at 1025; N.Y. Gen. Bus. Law § 349(d). One of the manufacturers, Fedders, had reached a consent decree with the FTC and argued that "their

111

activities are in compliance with the consent decree and thus with the Federal Trade Commission

Act ("FTCA"), and therefore the State cannot seek additional relief." *Fedders*, 543 F. Supp. at

1025. The court held that this argument "is totally devoid of merit," declaring:

> Far from representing a certification of Fedders' innocence from
> wrongdoing, the consent decree was a compromise of an action
> begun with an FTC complaint charging Fedders with violations of
> the FTCA. In order to avoid litigation of the dispute to its
> conclusion, Fedders agreed to provide the extensive consumer
> remedies which it insistently points to. Obviously, the consent
> decree does not indicate that Fedders did not violate the [consumer
> protection law] with regard to the heat pumps covered by the decree,
> and as to the various other products involved in the State's
> complaint the consent decree makes absolutely no reference.
> Fedders' undertaking of the remedial action called for under the
> consent decree has no bearing on its culpability for other actions,
> past or future.

*Id.* The same is true of Nice-Pak's consent order with the FTC. Nice-Pak (and by extension,

Costco) agreed to the order without any definitive findings about the legality of the packaging.

Costco's "undertaking of the remedial action called for under the consent decree has no bearing

on its culpability for other actions, past or future." *Id.* Plaintiff's bid for injunctive relief has not

been mooted.

### (4)    Entitlement to Injunctive Relief

Kimberly-Clark argue that Kurtz has not properly shown that he is entitled to injunctive

relief because he has not satisfied the familiar four-factor test demonstrating: "(1) that [he] has

suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are

inadequate to compensate for that injury; (3) that, considering the balance of hardships between

the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest

would not be disserved by a permanent injunction." *eBay v. MercExchange, L.L.C.*, 547 U.S.

388, 391 (2006).

Plaintiffs do not need to meet this four-factor test at this stage of the litigation. *See In re Vitamin C Antitrust Litig.*, 279 F.R.D. at 111 ("[D]efendants have lifted the standard for granting a permanent injunction and grafted it onto Rule 23's standard for class certification. This is clearly improper"). Whether entry of a permanent injunction is appropriate is a decision that should be made on a full evidentiary record. It is inappropriate to consider all the details of a possible injunction prior to discovery in the instant cases. At the point of class certification, Rule 23(b)(2) merely requires the court to determine whether injunctive relief may be appropriate if plaintiff succeeds on the merits because "the party opposing the class has acted or refused to act on grounds that apply generally to the class." Fed. R. Civ. P. 23(b)(2). Generally, where a deceptive practice misleads a reasonable consumer, an injunction targeting the misleading conduct is an appropriate remedy. *Ackerman*, 2013 WL 7044866, at *17; *Ries*, 287 F.R.D. at 541; *Jermyn v. Best Buy Stores, L.P.*, 256 F.R.D. 418, 434 (S.D.N.Y. 2009). The New York General Business Law explicitly encourages injunctive relief: "Any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice. . . ." N.Y. Gen. Bus. Law § 349(b). Plaintiffs have made the necessary showing at this stage of the litigation that injunctive relief may be appropriate if they succeed on the merits.

### d.  Certification of 23(b)(2) Classes is Granted

Certification of injunctive classes is merited. Rule 23(b)(2)'s rigorous requirements are satisfied. As a threshold matter, an injunction prohibiting defendants from labeling their products as "flushable" and "safe for sewer and septic systems" would provide a single solution, applicable to each class member. Second, the proposed class is cohesive, as demonstrated *supra*, Part VIII.F.1.a. Third, certification of an injunctive class is necessary, as demonstrated *supra*,

113

Part VIII.F.1.b.  The defendants' arguments against certification of these classes are not

persuasive.  *See supra* Part VIII.F.1.c.

Possible plumbing costs are relatively nominal and do not thwart certification.  The

monetary relief sought by some class members—in the form of fairly nominal plumbing costs—

is not affected by the injunctive relief sought, are relatively small in number and can be

separately tried for individual plumbing physical damage claims.

### 2.    Rule 23(b)(3) Damages

In addition to meeting the threshold requirements of Rule 23(a), "a plaintiff [seeking

damages pursuant to Fed. R. Civ. P. 23(b)(3)] must establish (1) *predominance*—that the

questions of law or fact common to class members predominate over any questions affecting

only individual members; and (2) *superiority*—that a class action is superior to other available

methods for fairly and efficiently adjudicating the controversy." *Johnson*, 780 F.3d at 137

(emphasis added) (citing Fed. R. Civ. P. 23(b)(3)) (additional citation omitted).

### a.  Rule 23(b)(3): Predominance

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently

cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623.  "Economies of

time, effort, and expense in fully resolving each plaintiff's claim will only be served, and the

predominance requirement satisfied, if the plaintiffs can show that *some* of the . . . questions can

be answered with respect to the members of the class as a whole through generalized proof and

that those common issues are more substantial than individual ones." *Myers*, 624 F.3d at 549

(emphasis added) (citation omitted).  Although "predominance" is a "far more demanding

inquiry into the common issues which serve as the basis for class certification" than

commonality, it "does *not* require a plaintiff seeking class certification to prove that each

element of her claim is susceptible to classwide proof." *Sykes*, 780 F.3d at 81(emphasis in original) (citations omitted) (alterations omitted).

Defendants challenge predominance on several grounds. First, defendants claim that plaintiffs cannot prove the elements of a section 349 claim on a *classwide* basis because determination of whether consumers were injured by the "flushable" label requires an *individualized* inquiry into each purchaser's experience. Some consumers, defendants contend, have "consistently flushed without problem" and therefore could not "have been deceived" by the "flushable" label. Procter & Gamble Mem. in Supp. of Mot. to Deny Class Cert., 14-CV-4090, Feb. 27, 2015, ECF No. 60 at 29; *see also* Kimberly-Clark Mem. in Supp. of Mot. to Deny Class Cert., 14-CV-1142, Feb, 27, 2015, ECF No. 85 at 16 ("[T]he evidence shows that most consumers who have purchased flushable moist wipes received exactly that—a moist wipe that was capable of being flushed through their toilets and plumbing systems. . . even if those consumers. . . paid a purported 'premium' because they were flushable, they received the full value of that 'premium,' and suffered no economic injury."); Costco Mem. in Supp. of Mot. to Deny Class Cert., 14-CV-1142, Feb. 27, 2015, ECF No. 88 at 30 ("The evidence here strongly suggests that the overwhelming majority of purchasers of Kirkland Signature Flushable Wipes used the wipes for whatever purpose they intended without experiencing any complications, and were fully satisfied that they got exactly what they paid for.").

In so arguing, defendants analogize the instant cases to a number of distinguishable cases. In *Vaccariello v. XM Satellite Radio, Inc.*, 295 F.R.D. 62 (S.D.N.Y. 2013), the court found that individual issues predominated in a putative class of purchasers of satellite radio service who alleged deception in the automatic renewal of their subscription. *Id.* at 68. Divining

which consumers suffered no injury (because they actually wanted their services renewed) meant that individualized inquiries would trump common ones. *Id.*

*Vaccariello* is inapposite. Unlike that case, where some consumers received the service they wanted, in the instant case either all consumers purchased "flushable" wipes that were, in fact, "non-flushable,"—and of lesser value—or none did.

Other cases cited by defendants are distinguishable on the same grounds. *See In re Canon Cameras*, 237 F.R.D. at 360 ("[P]roof of malfunction is a prerequisite to any of plaintiffs' claims, and yet they do not meaningfully contest that the class they seek to certify likely consists in overwhelming measure of owners of cameras that did not malfunction at all."); *Pagan*, 287 F.R.D. at 149 ("[T]he Plaintiffs need to demonstrate that the recalled Similac that the class members purchased actually contained beetle parts. Yet, as the evidence discussed above indicates, less than 1% of all recalled Similac were even contaminated with beetle parts."); *see also Janes v. Triborough Bridge & Tunnel Auth.*, 889 F. Supp. 2d 462, 466-68 (S.D.N.Y. 2012) (re-defining the class because certain potential class members, such as those who are deceased, did not have standing to pursue prospective injunctive relief); *Green v. Green Mountain Coffee Roasters, Inc.*, 279 F.R.D. 275, 284-85 (D.N.J. 2011) ("[T]he complaint does not allege that all individuals in New Jersey who purchased the Keurig Brewing Systems have experienced the defect. Plaintiff actually acknowledges that there are members in the putative class who have not yet [experienced the defect].").

The instant cases are similar to *Ebin*, 297 F.R.D., where plaintiff sought to certify a damages class of purchasers of a product labeled "100% olive oil," which was actually pomace. Individualized inquiries were unnecessary. The product was not what it said it was. All class members, even those who "actively wanted to buy pomace instead of 100% pure olive oil"

116

suffered an injury: they "paid too much for it." *Id.* at 568-69; *see also In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 857 (6th Cir. 2013) ("Because *all* Duet owners were injured at the point of sale upon paying a premium price for the Duets as designed, even those owners who have not experienced a mold problem are properly included within the certified class.") (emphasis in original), *cert. denied sub nom. Whirlpool Corp. v. Glazer*, 134 S. Ct. 1277 (2014); *In re Avon*, 2015 WL 5730022 at *4 (comparing cases where misrepresentation was essentially uniform, leading to a finding of predominance, with those where it materially varied).

Here, if the products at issue are found to not be "flushable," then all consumers were injured by being overcharged. This question predominates. The question of whether the products do not disintegrate "for some individuals goes solely to the merits; it has no relevance to the class certification issue." *Rikos*, 799 F.3d at 519 (finding that where probiotic supplement worked for some individuals goes to merits of plaintiff's claim and not to commonality); *cf. Anonymous v. CVS Corp.*, 728 N.Y.S.2d 333, 340 (N.Y. Sup. Ct. 2001) (finding dismissal of the § 349 putative class unwarranted even where some customers appeared not to suffer injury and continued to conduct business with defendant).

Procter & Gamble contends that determining whether the "flushable" label was "material" to an individual consumer's decision to purchase the flushable wipes will require individualized proof. Procter & Gamble Mem. at 29.

Defendant improperly analogizes to *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008), a fraud-based RICO case involving allegations of misrepresentation of "light" cigarettes as healthier alternatives to "full-flavor" cigarettes. There, the Court of Appeals for the Second Circuit found that common issues did not predominate because proving reliance, an

117

element of a RICO claim, would require individualized inquiries.  *Id.* at 223.  *McLaughlin* is not controlling here.  Unlike RICO claims, "individualized proof of reliance is not necessary" for § 349 claims.  *Guido v. L'Oreal, USA, Inc.*, 2013 WL 3353857, at *12 (C.D. Cal. July 1, 2013); *see also Ackerman*, 2013 WL 7044866, at *2 (collecting cases holding that § 349 does not require reliance); *but cf. Haynes*, 276 F.R.D. at 80 (*dicta* positing that § 349 claims may require individualized proof of reliance).

The question of whether the "flushable" label was *material* to a reasonable consumer's decision to purchase "is an objective inquiry that focuses on that packaging."  *Guido*, 2013 WL 3353857, at *12 (holding that the New York General Business Law requires applying objectively reasonable average consumer standard based on common proof); *In re Scotts*, 304 F.R.D. at 409 (holding that "the materiality of an alleged misrepresentation [under New York General Business Law] is judged according to an objective standard") (citation omitted).  This classwide inquiry issue predominates over individual issues.

To adopt *McLaughlin* here would conflate "reliance" and "causation," which the New York Court of Appeals has "cautioned against."  *Rodriguez*, 300 F.R.D. at 147 (citation omitted) (causation under § 349 requires "nothing more . . .than . . . plaintiff suffer a loss because of defendants' deceptive act").

Costco points to *Weiner v. Snapple Bev. Corp.* as "directly on point."  Costco Mem. in Supp. of Mot. to Deny Class Cert., 14-CV-1142, Feb. 27, 2015, ECF No. 88 at 31.  In *Weiner*, the court held—in the context of analyzing a motion to certify *unjust enrichment* claims—that "[i]ndividualized inquiries would be required to determine, for instance, whether class members were fully informed about the inclusion of HCFS in Snapple beverages, whether they believed HFCS to be natural, and whether they continued to purchase Snapple despite their beliefs

118

concerning HFCS." 2010 WL 3119452, at *11. Common inquiries concerning Kurtz's unjust enrichment claim do not predominate over individual inquiries. *See infra* Part.VIII.F.2.c.

Finally, Costco argues that individual proof is needed to connect the "purchase of the wipe and injury related to the 'flushable' representation." Costco Mem. in Supp. of Mot. to Deny Class Cert., 14-CV-1142, Feb. 27, 2015, ECF No. 88 at 30-32. To make this argument, Costco relies on *Oscar v. BMW of N. Am., LLC*, 2012 WL 2359964 (S.D.N.Y. June 19, 2012). In *Oscar*, the court held that determining how a reasonable consumer's decision to purchase a car at the listed price would have been affected by disclosures about issues with the tires was a "personal"—not common—inquiry. *Id.* at *5. "[T]here are simply too many other variables in play to permit [the] conclusion [that further disclosures would have been germane] as to the entire class of consumers." *Id.* The plaintiff in *Oscar* made no attempt to isolate the price premium attributable to the vehicle's tires; he merely noted that there was a $2,600 price difference between the car he bought and a different model of the same car and ignored that his car "came equipped with significant standard equipment lacking" in the other model. *Id.* at *4. As explained *infra*, plaintiffs have put forth an acceptable methodology to isolate the price premium attributable to "flushable" and can rely on the full penalties of New York's General Business Law §§ 349 and 350. Reliance on *Oscar* is misplaced.

The defendants challenge Mr. Weir's premium damages model as insufficient to establish classwide injury or causation. Procter & Gamble Opp. at 4; Kimberly-Clark Mem. in Supp. of Mot. to Deny Class Cert., 14-CV-1142, Feb, 27, 2015, ECF No. 85 at 21-25, 27-31; Costco Mem. in Supp. of Mot. to Deny Class Cert., 14-CV-1142, Feb. 27, 2015, ECF No. 88 at 30-32; 35-41. The model is sufficient for certification. *See* the extended discussion of hedonic regression, *supra* at Part VI.A.

It is common sense that "flushability" is a valuable characteristic that producers include on their labels with the expectation that it will allow them to extract a higher price for the product. Internal company documents make it clear that flushability is the *raison d'être* for this market niche. As one Kimberly-Clark presentation aptly put it, "The label says it all – The reason the category exists is because the product is moist & flushable." *Kurtz* Weir Expert Report at ¶ 10. Testimony from company executives confirms that they believe flushability is an important attribute for consumers. *See id.* at ¶¶ 11-14; *Belfiore* Weir Expert Report at ¶ 9.

All three companies have expended significant resources to improve its wipe's "dispersibility"— the chief characteristic by which the FTC purports to measure flushability. *See* Nice-Pak Final Consent Order at 3 (evaluating a wipe's flushability on whether it "*disperses* in a sufficiently short amount of time after flushing. . .") (emphasis added). It is impossible to accept the argument that these companies would make this investment to gain or improve flushability without expecting a reasonable financial return.

Plaintiffs need not prove exactly what their damages will be. *See McLaughlin*, 522 F.3d at 229 ("[T]he district court is quite correct that damages need not usually be demonstrated with precision.") (internal quotation marks and alteration omitted). "*Comcast* held that a model for determining classwide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class's asserted theory of injury; but the Court did not hold that proponents of class certification must rely upon a classwide damages model to demonstrate predominance." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015) (citing *Comcast*, 133 S. Ct. at 1433). In *Roach*, the Court of Appeals for the Second Circuit held that a district court's decision to not certify a class "[b]ecause the district court concluded damages were not capable of measurement on a classwide basis—and *only* because the district court concluded

damages were not capable of measurement on a classwide basis . . . was not required by *Comcast* [and] was contrary to the law of this Circuit." *Id.* at 409 (emphasis in original). "[I]ndividualized damages determinations alone cannot preclude certification under Rule 23(b)(3)." *Id.*

In the instant cases, once the injury is established, precise statutory damages can be calculated on a classwide basis. New York General Business Law § 349(h) provides for statutory damages of $50 to each class member for each time defendant violated the statute by a sale. New York law does not require that the injury must be proven with a specified degree of certitude; a plaintiff is only required to show "that plaintiffs paid more than they would have for the good [because of] the deceptive practices of the defendants-sellers." *Orlander*, 802 F.3d at 302. "A plaintiff must allege that, on account of a materially misleading practice, she purchased a product and did not receive the full value of her purchase." *Id.* The single question of whether plaintiffs paid more than they would have for the good because of the deceptive practices of the defendants-sellers in labeling their products as "flushable" predominates over any individualized damages inquiries.

Mr. Weir's report—which proposes using "hedonic regression" to calculate how much, if any, of the price of the wipes products are attributable to the "flushable" representation—is adequate for class certification. *See, e.g., In re Scotts*, 304 F.R.D. at 413 (model sufficient at the class certification stage where Mr. Weir identified the "statistical methodology" he would use and described that "methodology in detail"); *cf. Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 99 (S.D.N.Y 2015) (only "minimal scrutiny" of the damages model is required for class certification (citing *Comcast Corp.*, 133 S. Ct. 1426)). This matter is fully discussed *supra* at Part VI.A.

In the alternative, two survey techniques are suggested on behalf of plaintiffs to measure how consumers value product attributes: contingent valuation and conjoint analysis. *See Belfiore* Weir Expert Report ¶ 14, n. 7; *Kurtz* Weir Expert Report ¶ 20, n. 14. "Properly developed survey evidence is admissible subject to arguments regarding its weight and probative value." *Schwab v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 992, 1245 (E.D.N.Y. 2006). Both of these techniques are adequate for proving classwide causation at the certification stage, and have previously been approved in consumer class actions as reliable methodologies available for calculating the price premium attributable to a product characteristic. *See Miller v. Fuhu Inc.*, 2015 WL 7776794, at * 21 (C.D. Cal. Dec. 1, 2015) (citing cases where contingent valuation was used to calculate a price premium); *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 1026 (C.D. Cal. 2015) (citing cases where conjoint analysis was used to calculate a price premium).

Dr. Ugone provides cogent criticisms of plaintiffs' proposed proof of damages. *See* Ugone Decl. II at ¶¶ 36-43. But plaintiffs appear able to demonstrate that they paid for something they did not get—"flushability" as they reasonably defined the term and the value of what they were denied. Under New York General Business Law §§ 349 and 350, this is enough. The objection that poor survey design may bias the results is premature. "[E]rrors in a survey's methodology . . . generally bear upon the probative weight to be afforded to the survey, rather than its admissibility." *U.S. v. American Exp. Co.*, 2014 WL 2879811, at *10 (E.D.N.Y. June 24, 2014). The criticism that future surveys are unable to ascertain past product values is not persuasive. "[U]sing current research results to draw inferences about past consumer behavior is a regular practice in litigation. . . . [The expert's] proposed use of future survey data does not make [the] methodology unsound or unable to satisfy *Comcast*." *In re Conagra*, 90 F. Supp. 3d at 1028.

The instant cases' battle of experts on price differential is largely beside the point.  Once an injury is established, statutory damages can be precisely calculated for each class member.  New York General Business Law § 349(h) provides for statutory damages of $50 to each class member for each time defendant violated the statute.  *Cf. Guido*, 2014 WL 6603730, at *18 (affirming that class members are entitled to $50 statutory damages under § 349(h) even though the amount "grossly outweigh[ed]" the actual purchase price).

As already shown, this case is not barred by *Zyprexa UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 133 (2d Cir. 2010).  *See supra* Part II.D.2.  There, the Second Circuit Court of Appeals held that certification of a putative class based on an "excess price theory" constituted an "abuse of discretion" because the damages model was "not susceptible to generalized proof with respect to either but-for or proximate causation."  *Id.  Zyprexa* is distinguishable on two grounds.  First, in that case the issue was whether plaintiffs demonstrated *reliance*, an element not required under New York General Business Law § 349.  *See supra* Part VIII.C.  Second, in *Zyprexa* (as distinct from the instant case), the persons who purportedly relied on the misrepresentations (the doctors) were distinct from those who were allegedly harmed (the payors of a premium).  *Zyprexa*, 620 F.3d at 133.

Defendants also argue that, for those class members who experienced plumbing problems, individualized issues as to the causes of those problems will predominate.  Procter & Gamble Mem. at 32; Kimberly-Clark Mem. in Supp. of Mot. to Deny Class Cert., 14-CV-1142, Feb, 27, 2015, ECF No. 85 at 25-27; Costco Mem. in Supp. of Mot. to Deny Class Cert., 14-CV-1142, Feb. 27, 2015, ECF No. 88 at 32-35.  Individualized issues of physical plumbing damages will be tried on an individual basis, not as part of the class action.  Any potential recoveries from plumbing damages caused by defendants' wipes are likely to be *de minimis* as compared to the

123

class recovery.  *See supra* Part VIII.D.  These individual physical damages are not covered by the class certifications.

### b.  Rule 23(b)(3): Superiority

Rule 23(b)(3) permits class certification only where a class action is "superior to other available methods" of adjudication.  Fed. R. Civ. P. 23(b)(3); *Ramirez v. Dollar Phone Corp.*, 668 F. Supp. 2d 448, 468 (E.D.N.Y. 2009).  To qualify, a class action must be arguably the most "fair [] and efficient[]" method of resolving the dispute.  Fed. R. Civ. P. 23(b)(3).  "The class action device is particularly well-suited in situations where 'plaintiffs are allegedly aggrieved by a single policy of defendant[] . . . since many nearly identical litigations can be adjudicated in unison.'" *Poplawski v. Metroplex on the Atl., LLC*, 2012 WL 1107711, at *11 (E.D.N.Y. Apr. 2, 2012) (citing *In re Nassau County Strip Search Cases*, 461 F.3d 219, 228 (2d Cir. 2006)).  Courts will consider four non-exclusive factors:

> (1) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (2) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (4) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)–(D).

"[T]he [c]ourt has discretion to consider other relevant factors . . .[which may include]: consideration of the alternative methods of adjudication available for the claims, a comparison of the fairness to all whose interests are implicated between any alternative methods and a class action, and a comparison of the efficiency of each method in adjudicating the claims."

*Morangelli*, 275 F.R.D. at 116 (quoting 1 Joseph M. McLaughlin, McLaughlin on Class Actions § 5:63 (6th ed. 2010)).

Courts in this circuit have considered the availability of non-judicial alternatives, such as a refund program for consumers, as an alternative method of adjudication. *See, e.g., Patton v. Topps Meat Co., LLC*, 2010 WL 9432381, at *10 (W.D.N.Y. May 27, 2010) (report and recommendation) (collecting cases and recommending a finding that ongoing refund program is a superior method of adjudication); *cf. In re Scotts*, 304 F.R.D. at 415-16 (finding class action superior to "No Quibble Guarantee" refund program).

The first factor weighs in favor of certification. "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Amchem*, 521 U.S. at 617. "In a consumer class action of this type involving the purchase of a relatively inexpensive . . . product, injured consumers are extremely unlikely to pursue their claims on an individual basis." *Johnson v. Gen. Mills, Inc.*, 275 F.R.D. 282, 289 (C.D. Cal. 2011).

The second factor also weighs in favor of certification. While the court is aware that there are many pending suits around the country concerning these flushable products, it is not aware of any other class actions brought on behalf of New York purchasers. The court has suggested on numerous occasions that the parties consolidate these actions with other similar actions making their way through the courts. The parties have shown no interest in doing so.

The third factor also weighs in favor of certification. The class representatives are residents of New York, the putative class members are New York purchasers of the products, and this court sits in New York. Defendants have not brought to the court's attention any other forum that may be more appropriate for a class of New York purchasers. *See Rodriguez*, 300

F.R.D. at 142 ("The fact that a significant number of class members are located in this jurisdiction makes this forum somewhat more appropriate than others for the litigation of the parties' controversy. Significantly, [defendant] does not argue that any other forum would be more appropriate.").

The fourth factor also weighs in favor of certification. Defendants' manageability concerns are premised on the predominance of individualized issues and class membership being unascertainable. Those issues have already been sufficiently addressed above. *See supra* Parts VIII.B-E.

Defendants argue that their refund programs are a superior method of adjudication. They believe these programs are superior because refunds provide faster compensation with lower transaction costs than a class action. "Where available refunds afford class members a comparable or even better remedy than they could hope to achieve in court, a class action would merely divert a substantial percentage of the refunds' aggregate value to the class lawyers. . . . [T]he court [should] ensure that a putative class action is grounded in the realistic prospect of a remedy that class members could not otherwise obtain." *In re Aqua Dots Products Liability Litig.*, 270 F.R.D. 377, 383 (N.D. Ill. 2010); *but see* 654 F.3d 748, 752 (7th Cir. 2011) (affirming district court's denial of class certification, but rejecting the rationale relied upon by the district court because "Rule 23(b)(3) was drafted with the legal understanding of 'adjudication' in mind: the subsection poses the question whether a single suit would handle the dispute better than multiple suits. A recall campaign is not a form of 'adjudication' under the committee note.") (internal citation omitted). The remedy available for plaintiffs in a class action—statutory damages of $50 or $500 per purchase—is a more effective remedy for most class members than a simple refund of their purchase price. *See Leonard v. Abbott Laboratories, Inc.*, 2012 WL

764199, at *27 (E.D.N.Y. Mar. 5, 2012) (if "Plaintiffs were able to prove injury, but their damages were less than the statutory minimum [amount of damages], they would still be entitled to the minimum amount of statutory damages.").  Though defendants argue that their refund programs will also sometimes reimburse those complaining of plumbing problems, the uncertain prospect of some class members recovering money for plumbing damages—which is likely to be a *de minimis* sum—does not make the refund program superior to a class action.  Additionally, it is not well advertised that the companies are willing to reimburse consumers for plumbing expenses incurred allegedly due to use of their products; any potential recovery of plumbing damages that could inure to class members through a refund program is therefore somewhat illusory, as compared to a class action remedy.  *See In re Scotts*, 304 F.R.D. at 416 ("If consumers do not realize the No Quibble Guarantee exists, it cannot be a superior alternative to a class action.").

Defendants also argue that a class action is not a superior method of adjudication because the FTC is actively engaged in addressing the issues raised in the lawsuit.  Where administrative agencies have yet to take definitive remedial measures, some courts rely on that fact to deem class actions superior.  *See, e.g., Bryan*, 429 F. Supp. at 318-19.  In *Bryan*, class members alleged that defendants violated the Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1703, when they induced the plaintiffs to purchase worthless land through fraud and misrepresentations.  An FTC complaint was lodged but the status of the FTC proceedings was unclear.  It was not known whether the FTC had the power to seek refunds for members of the proposed class, and in any event, the agency had not taken affirmative steps towards procuring any refunds.  The court deemed a class action superior because "[t]he possibility that the FTC *may at some future time* secure refunds for the class is not an adequate reason to deny class

determination in this case, which seeks present and independent relief." *Id.* at 318-19 (emphasis added).

The rationale of *Bryan* applies here. The instant actions were stayed to give the FTC the opportunity to definitively adjudicate the claims made by plaintiffs. It is now clear that the FTC does not intend to act on the court's recommendation. *See* July 27, 2016 FTC Letter. The Commission has not given any indication that it intends to pursue refunds even though it "had reason to believe that [Nice-Pak, the manufacturer of Costco's wipes] has violated the Federal Trade Commission Act." *See* Nice-Pak Final Consent Order at 1. For largely the same reasons plaintiffs' requests for injunctive relief are not prudentially moot, resolution by the FTC is not now a superior method of adjudication. *See supra* Part VIII.F.c.3. The mere "possibility" of an FTC proceeding does not outweigh the "economies of time, effort, and expense" afforded by a class action. *Bryan*, 429 F. Supp. at 318.

Like other consumer class actions where common issues predominate, class actions in the instant cases are superior to other available methods for fairly and efficiently adjudicating the controversy. *See, e.g.*, *In re Scotts*, 304 F.R.D. at 416; *Ebin*, 297 F.R.D. at 568; *In re Whirlpool*, 722 F.3d at 861.

### c.  Common Law Claims

The preceding 23(b)(3) analysis focused on plaintiffs' statutory claims. Kurtz also alleges common law claims of negligent misrepresentation, breach of warranty, and unjust enrichment. Kurtz's negligent misrepresentation and breach of warranty claims require proof that he relied on the "flushable" representation on the defendants' packages, and that that reliance caused his injury. *See supra* Part VII.B.1; VII.B.2. For these non-statutory claims,

common questions of law or fact do not predominate over individual questions because individualized proof is necessary to demonstrate each purchaser's reliance on defendants' alleged misrepresentations.  *See McLaughlin*, 522 F.3d at 223.

Kurtz's own purchasing history demonstrates that individualized inquiry into the element of reliance is necessary under the common law.  After a clogging incident, Kurtz continued to purchase flushable wipes despite believing the wipes were not flushable.  *See supra* Part IV.B. Arguably, he did not reasonably rely on the flushability representation (though it may have affected the price he paid) after he no longer believed the wipes were flushable.  Certification of a class on these two common law claims is inappropriate.

Plaintiff's unjust enrichment claim is duplicative of his claims under the New York General Business Law.  *Corsello*, 967 N.E.2d at 1185 ("To the extent that these claims succeed, the unjust enrichment claim is duplicative; if plaintiff['s] other claims are defective, an unjust enrichment claim cannot remedy the defects.").  Duplicative unjust enrichment claims must be dismissed.  *Id.*  Kurtz's unjust enrichment claim is therefore dismissed.

## IX.    Appointment of Class Counsel

Wolf Popper, Belfiore's counsel, is appointed class counsel for the class brought by Belfiore.  Counsel is competent and able to represent the class.  *See supra* Part VIII.D.1.

Robbins Geller, Kurtz's counsel, is appointed class counsel for the two classes brought by Kurtz.  Counsel is competent and able to represent the class.  *See supra* Part VIII.D.2.

## X.    Conclusion

These New York centered class actions are not complex or difficult to administer. Defendants sold products purported to be "flushable."  Whether a reasonable consumer regards

this representation as materially misleading is a common question that will drive the resolution of the litigation. If the representation is misleading, whether a plaintiff would have paid less for the product absent the "flushable" representation is a common question that will control.

Plaintiffs have shown that proposed methodologies can probably be used to learn common answers to common questions. Plaintiff Kurtz may not be a perfect representative of the class, but the law does not require him to be; he is more than adequate. If need be, the court can modify this order to modify the class, replace Kurtz as a class representative, and replace counsel. *See Gen. Telephone Co. of Southwest. v. Falcon*, 457 U.S. 147, 160 (1982) ("Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation.").

In the *Belfiore* action (14-CV-4090), a class is certified as: "All persons and entities who purchased Charmin Freshmates in the State of New York between May 23, 2011 and March 1, 2017." Present plaintiff and counsel shall appear for the class. Fed. R. Civ. P. 23(g).

In the *Kurtz* action (14-CV-1142), the following two classes are certified: (1) "All persons and entities who purchased Kimberly-Clark Flushable Products in the State of New York between February 21, 2008 and March 1, 2017"; and (2) "All persons and entities who purchased Kirkland Signature Flushable Wipes in the State of New York between July 1, 2011 and March 1, 2017." Certification of a national class action is denied. Present plaintiff and counsel shall appear for both classes. Should certification of both classes be affirmed on appeal, the court will consider requiring separate plaintiffs and separate counsel for each of the classes. For purposes of an interlocutory appeal, there is no conflict between the two classes represented by Kurtz and his counsel. Fed. R. Civ. P. 23(g).

An appeal under Rule 23(f) is recommended before the parties and court engage in further expensive, time consuming discovery and address other matters such as notice, new class representatives, and new counsel. *See, e.g.*, Rule 23(c)(d)(e)(g)(h).

This memorandum and order does not become effective until April 10, 2017.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Date:   March 27, 2017
          Brooklyn, New York